Filed 7/16/25

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,

Plaintiff and Respondent,

v.

RAYMOND LEE OYLER,

Defendant and Appellant.

S173784

Riverside County Superior Court

RIF133032

---

**ORDER MODIFYING OPINION AND**

**DENYING PETITION FOR REHEARING**

THE COURT:

The majority opinion in this matter, filed on May 5, 2025, and appearing at 17 Cal.5th 756, is modified as follows:

1. The third sentence in the second full paragraph on page 771 is modified to read:

> An arson investigator determined the fire was caused by arson but he was unable to locate an incendiary device. He noted that the origin point of the fire was "buried under … a couple inches of dirt from — the passerby that had stopped to suppress the fire[.]"

2. The third sentence in the first full paragraph on page 772 is modified to read:

An arson investigator determined the fire's general point of origin and eliminated all natural and accidental causes for the fire, but was unable to locate any incendiary device.  He opined that this may have been due to the disturbed condition of the point of origin.

3. The third full paragraph on page 773 is modified to read:

An arson investigator determined the Orchard Fire was caused by arson, but he was unable to locate an incendiary device.  He opined that this was due to extensive disturbance of the point of origin by firefighting crews and equipment.

4. The first sentence of the second full paragraph on page 779 is modified to read:

In 2000, defendant applied to become a volunteer firefighter.

5. The last full paragraph on page 782 is modified to read:

The owner of an auto shop in Banning where defendant worked part-time prior to the June 3 layover device fire— at which investigators found a blue paper towel— testified that his shop used blue paper towels.

6. The first full paragraph on page 851 is modified to read:

Defendant contends that the cumulative effect of the guilt and penalty phase errors asserted in his merits briefing requires us to reverse his convictions and death sentence. As to those claims, we have assumed error, but found no prejudice, regarding the trial court's instruction regarding the arson-murder special circumstance and related challenge to the sufficiency of the evidence supporting the finding on that special circumstance, and the admission of evidence in the penalty phase regarding Uncharged Act V. We conclude that the cumulative effect of these assumed errors does not warrant reversal. (See *Scully*, *supra*, 11 Cal.5th at p. 613.)

This modification does not affect the judgment. Defendant's petition for rehearing is denied.

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

RAYMOND LEE OYLER,
Defendant and Appellant.

S173784

Riverside County Superior Court
RIF133032

May 5, 2025

Chief Justice Guerrero authored the opinion of the Court, in which Justices Corrigan, Kruger, Groban, and Jenkins concurred.

Justice Evans filed a concurring and dissenting opinion, in which Justice Liu concurred.

PEOPLE v. OYLER

S173784


Opinion of the Court by Guerrero, C. J.


A jury convicted defendant Raymond Lee Oyler of five counts of first degree murder (Pen. Code, § 187, subd. (a); counts 1–5)[1] after five firefighters died while fighting a wildland fire that defendant started. The jury also convicted defendant of 20 counts of arson (§ 451, subd. (c); counts 6–8 and 12–28) and 17 counts of possession of an incendiary device (§ 453, subd. (a); counts 29–45), and made true findings on arson-murder (§ 190.2, subd. (a)(17)(H)) and multiple-murder (§ 190.2, subd. (a)(3)) special-circumstance allegations. In the penalty phase, the jury returned a verdict of death. The trial court denied defendant's motion to reduce the death verdict (§ 190.4, subd. (e)) and sentenced him to death on the murder convictions and to 28 years on the remaining convictions. Defendant's appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment.

---

[1] Undesignated statutory references are to the Penal Code.

## I. FACTUAL AND PROCEDURAL BACKGROUND[2]

### A. Guilt Phase

Between May 16 and October 26, 2006,[3] more than two dozen wildland fires were reported in the Banning Pass area of Southern California. The series culminated with a fire known as the Esperanza Fire, which killed five firefighters assigned to Engine 57 of the United States Department of Agriculture Forest Service (Forest Service).

#### 1. *Prosecution case-in-chief*

##### a. *The fires*

###### i. *May 16 "remote device" fires (counts 6–8 and 29–31)[4]*

On May 16, three vegetation fires were set in Banning within about 16 minutes and two to three miles of each other. The first fire started around 2:05 p.m. at Sunset Avenue and Wilson Street, and burned an area approximately 10 feet by 20 feet. The second fire started around 2:11 p.m. at Sunset Avenue and Mesa Street (about one mile up Sunset Avenue from

---

[2] Because defendant challenges the sufficiency of the evidence supporting nearly every conviction and special-circumstance finding, "we review in detail the evidence in support of the prosecution's case" (*People v. Dalton* (2019) 7 Cal.5th 166, 177) and "view the evidence in the light most favorable to the judgment below" (*People v. Hill* (2000) 23 Cal.4th 853, 855).

[3] Unless otherwise indicated, all relevant events occurred in 2006.

[4] For each fire started with an incendiary device, an arson count was paired with a corresponding incendiary-device count. Thus, for example, count 6 and count 29 are the arson and incendiary device-counts, respectively, that correspond to the first fire on May 16.

the first fire), and burned an area about 10 or 20 feet by 10 or 20 feet. The third fire started around 2:21 p.m. at Gilman Road and Pump House Road (about one mile up Sunset Avenue from the second fire), and burned an area of about one-half to one acre. All three fires started within about 10 feet of the roadside.

An arson investigator who investigated all three fires determined they were caused by arson. At the point of origin of each fire, the investigator found a time-delayed incendiary device consisting of a Marlboro Light cigarette with wooden matchsticks attached lengthwise by a rubber band. The devices at the Sunset/Wilson and Sunset/Mesa fires had 31 matches attached and the device at the Gilman/Pump House fire had 30 matches attached. The matches pointed in both directions, such that some heads were at opposite ends of the cigarette.

Prosecution witnesses referred to this type of incendiary device as a "remote device" because it can be constructed ahead of time and later be lit and deployed by, for example, being thrown or shot by a slingshot from a car. An arson investigator testified that a remote device offers the advantage of reducing the arsonist's chances of being detected because the arsonist need not leave his or her car. The disadvantage, however, is that the arsonist is unable to select an ideal fuel bed, thus reducing the likelihood of a significant fire.

This type of remote device also functions as a time-delayed incendiary device. As the investigator explained, the lit cigarette burns like a fuse to the point at which it touches and ignites a match head, between about four and eight minutes after the cigarette is lit. This delay affords the arsonist additional time to leave the scene undetected after deploying the device. Investigators surmised that the matches pointed both

directions so that some match heads would abut the cigarette filter and destroy the device or any DNA the arsonist had deposited on it while puffing on the cigarette to light it.

### ii. *May 28, 29, and 31 loose matchstick fires (counts 9–11)*[5]

On May 28, firefighters responded to a grass fire at Brookside Avenue and Jonathan Avenue in Cherry Valley. The fire ultimately burned about one acre. At the fire's point of origin, an arson investigator found three loose wooden matches.

On May 29, firefighters spotted a grass fire at Hathaway Street and Nicolet Street in Banning. The fire covered a small area, estimated at trial to be no more than around 200 square feet. At the fire's point of origin, an arson investigator found two to three wooden matches.

On May 31, firefighters responded to a grass fire at San Timoteo and Redlands Boulevard near CaliMesa. The fire burned about one acre. At or near the fire's point of origin, an arson investigator found four wooden matches or match heads.

### iii. *June and July "layover device" fires (counts 12–22 and 32–41) and uncharged June 11 and June 18 fires*

On June 3, firefighters responded to a grass fire burning near Sixth Street and Xenia Avenue in Banning. The fire had already burned about two acres, was spreading quickly due to significant winds, and was threatening nearby residences. The fire burned an additional acre before the 15 to 20 responding firefighters were able to extinguish it. At the fire's point of origin, an arson investigator found a time-delayed incendiary

---

[5] The jury was unable to reach a verdict on these counts.

device consisting of a Marlboro Light cigarette with three wooden matches laid across it. The investigator also found a blue paper towel, like those used in auto shops, twisted up near the device.

Investigators working the numerous arson cases had never encountered such a device, so they referred to it descriptively as a "layover device." An investigator explained that a layover device functions as a time-delayed incendiary device because the cigarette burns like a fuse until it touches and ignites the matches laid across it. The farther down the cigarette the matches are placed, the longer the delay. A layover device must be constructed onsite, which has the advantage of allowing the arsonist to place the device in an optimal fuel bed, thereby increasing both the likelihood of a significant fire but also of the arsonist being detected.

On June 7, firefighters responded to a vegetation fire at Jack Rabbit Trail and Highway 60 on the outskirts of Beaumont. By the time the firefighters arrived, a passerby had already extinguished the 50-foot by 20-foot fire with a fire extinguisher. An arson investigator found at the point of origin a layover device constructed from a Marlboro Red cigarette and six wooden matches. One of the match heads was laid across the cigarette's filter.

On June 9, firefighters responded to a grass fire at Millard Canyon in Banning. Firefighters determined the fire had started about five feet from the road and spread about 200 feet up a gradual slope. At the fire's point of origin, an arson investigator found a layover device constructed from a Marlboro Red cigarette and six wooden matches.

On June 10, firefighters responded to a 20-foot by 20-foot vegetation fire at Ramon Road and Chino Road in Banning. An arson investigator found at the fire's point of origin a layover device constructed from a Marlboro Red cigarette and seven wooden matches.

On June 11, firefighters responded to two vegetation fires in the Banning area. At 12:01 p.m., firefighters were dispatched to a 20-foot by 30-foot roadside fire at Highland Springs and Circle C in Banning. An arson investigator found at the fire's point of origin a layover device constructed from a cigarette of undetermined brand and six wooden matches.

Then at 7:30 p.m., firefighters were dispatched to a 50-foot by 50-foot fire at Highway 243 and Mt. Edna Road.[6] Bystanders had unsuccessfully attempted to extinguish the fire, but firefighters quickly finished the job. An arson investigator determined the fire was caused by arson but he was unable to locate an incendiary device because bystanders had disturbed the point of origin.

On June 14, three arson fires were set, each using a layover device constructed from a Marlboro Red cigarette and five wooden matches. June 14 was a "high dispatch day" on which weather and fuel conditions increased the risk for fires. All three fires were started on or near slopes, which accelerate the rate of burn.

---

[6] Defendant was not charged in connection with this fire, but evidence regarding the fire was admitted under Evidence Code section 1101, subdivision (b), and the trial court instructed the jury regarding the limited uses it could make of the evidence.

The first June 14 fire occurred in the morning at Ramon Road and Chino Road in Banning — the same location as the June 10 layover device fire.

The second fire occurred midday at Broadway and Esperanza Avenue in Cabazon. When firefighters arrived, the wind-driven fire was about three to four acres in size and spreading rapidly. It took 15 fire engines, two air tankers, a bulldozer, and a helicopter to suppress the fire, which eventually burned a total of about 10 acres.

The third June 14 fire occurred in the evening along Old Banning Idyllwild Road in San Gorgonio. When firefighters arrived, the fire was burning uphill at a moderate rate of speed. It took seven fire engines, one bulldozer, and one helicopter to extinguish this fire, which burned a total of about three acres.

On June 16, firefighters responded to a half-acre fire slowly burning up a steep hillside at Highway 243 and San Gorgonio. This fire burned about one acre before it was extinguished. An arson investigator determined the fire was caused by arson and found a single wooden match at the point of origin. He did not find a cigarette or layover device but surmised that wind conditions and suppression activity had disturbed the point of origin.

On June 18, firefighters responded to a fire at 6th Avenue and Xenia Avenue in Beaumont, within about 50 yards of the site of the first layover device fire on June 3.[7] By the time

---

[7] As with the uncharged June 11 fire at Highway 243 and Mt. Edna Road, defendant was not charged in connection with this fire, but evidence regarding the fire was admitted under Evidence Code section 1101, subdivision (b), and the trial court

7

firefighters arrived, residents had largely extinguished the fire by kicking or shoveling dirt onto it. An arson investigator determined the fire's general point of origin and eliminated all natural and accidental causes for the fire, but was unable to locate any incendiary device due to the disturbed condition of the point of origin.

On June 28, firefighters responded to a fire at Winesap Avenue and Orchard Avenue in Cherry Valley. The fire burned about two acres before firefighters extinguished it. An arson investigator found at the fire's point of origin a layover device constructed from a Marlboro Red or Marlboro Light cigarette and five wooden matches.

On July 2, firefighters responded to a vegetation fire on a very steep slope at Highway 243 and Mt. Edna Road (the same general location as the uncharged June 11 fire). Firefighters extinguished the fire after it burned about a 10-foot by 25-foot area. An arson investigator found at the fire's point of origin a layover device constructed from a cigarette of undetermined brand and five wooden matches.

iv. *July 9 remote device fire (counts 23 and 42)*

On July 9, firefighters responded to a fire at Meadowlark Street and Durward Street in Banning. The small fire was mostly extinguished when firefighters arrived. An arson investigator found at the fire's point of origin a remote device constructed from an undetermined type of Marlboro cigarette and six wooden matches attached with duct tape (as opposed to a rubber band like the previous remote devices). One of the

---

instructed the jury regarding the limited uses it could make of the evidence.

matches was oriented the opposite direction as the others, with its head at the cigarette's filter.

v. *September 16 fires (counts 24–25, and 43)*

On the afternoon of September 16, firefighters responded to two fires about one mile apart that were reported within about five minutes of each other. The weather conditions that day — which included temperatures of 90 degrees Fahrenheit, 12 percent relative humidity, and hot and dry "Santa Ana" winds of 15 to 20 miles per hour — led authorities to issue a "Red Flag Warning."

The first fire burned about an 8-foot by 8-foot area at Cherry Valley Boulevard and Roberts Road in CaliMesa. An arson investigator determined the fire was caused by a remote device constructed from a cigarette of undetermined brand and six paper matches wrapped around it and attached with an undetermined rubbery substance.

The second fire, which would become known as the "Orchard Fire," was located at Taylor Street and Orchard Street in Cherry Valley. The fire began in a drainage wash but escaped and quickly burned out of control. After 16 hours, about 1,000 firefighters with support from six air tankers eventually extinguished the fire. The Orchard Fire burned over 1,500 acres, destroyed historic structures and vehicles, and damaged other structures.

An arson investigator determined the Orchard Fire was caused by arson, but he was unable to locate an incendiary device because of extensive disturbance of the point of origin by firefighting crews and equipment.

vi. *September 17 fire (counts 26 and 44)*

On the morning of September 17, firefighters responded to a fire on Gilman Street in Banning. When firefighters arrived, the fire was between one and two acres in size and was burning in a drainage wash. The fire escaped the wash and spread uphill at a critical rate, threatening nearby residences and spawning evacuations. Six air tankers, 50 fire engines, and about 350 firefighters were dispatched to the fire, which eventually burned over 1,600 acres and destroyed a barn and two outbuildings. An arson investigator found at the fire's point of origin a remote device constructed from an undetermined type of Marlboro cigarette and six paper matches attached with an undetermined type of adhesive. The cigarette's filter had been cleanly cut off, which the investigator opined could have been done to "remove the end of the filter where any DNA might be." One of the matches was oriented with its head against the filter remnant.

vii. *October 22 "Mias Canyon Fire" (count 27)*

On October 22, firefighters responded to a vegetation fire at Mias Canyon and Bluff Street, just outside Banning. When firefighters arrived, the fire was about five acres in size and burning rapidly at the base of a hill. Additional resources were deployed, including 30 additional engines, bulldozers, 16 hand crews, two helicopters, and two air tankers. Firefighters extinguished the fire after it had burned about 40 acres; without the air tankers, investigators estimated that it would have burned around 1,000 acres. An arson investigator determined the fire was caused by arson but was unable to locate an incendiary device.

viii. *October 26 "Esperanza Fire" (counts 1–5, 28, and 45)*

On October 25, authorities issued a red flag warning for the Banning Pass area, which was experiencing Santa Ana wind conditions.

Around 1:10 a.m. on October 26, firefighters were dispatched to a wildland fire at Esperanza Road and Almond Street in Cabazon (about one mile from the origin of the June 14 layover device fire at Esperanza Road and Broadway). This fire would become known as the Esperanza Fire. A responding Department of Forestry and Fire Protection (CalFire) battalion chief ordered substantial resources, which included five Forest Service fire engines — including Engine 57 — but no air tankers because they were not permitted to operate in the dark.

When crews arrived at the scene, the fire was about five acres in size and located at the bottom of a very steep slope. When the fire hit the slope, it began burning at a critical rate of speed — about four times faster than on flat land — and quickly spread to 50 acres, threatening nearby structures. CalFire ordered a nearby community be evacuated.

Engine 57 was deployed upslope, between the advancing fire and nearby communities in its path. The engine staged on a plateau near an octagon-shaped house that firefighters referred to as the "octagon house." The approaching fire entered a drainage wash that acted like a chimney and increased the fire's spread and intensity. Around 7:00 a.m., the fire rapidly advanced on Engine 57, burned through the crew's location, and continued on. The crewmembers did not have time to deploy their emergency protective gear. Three of the firefighters — Daniel Hoover-Najera, Jess McLean, and Jason McKay — died

at the scene. The other two crew members — Captain Mark Loutzenhiser and Pablo Cerda — were badly burned and were evacuated by helicopter. Loutzenhiser died at the hospital about three hours later; Cerda died at the hospital five days later.

It took firefighters about five days to contain the Esperanza Fire. In addition to the five firefighters' deaths, the Esperanza Fire eventually burned more than 40,000 acres, destroyed 39 homes, and caused $100 million in financial losses.

An arson investigator found at the Esperanza Fire's point of origin a remote device constructed from an undetermined type of Marlboro cigarette, six wooden matches, and a rubber band. One of the matches was oriented the opposite direction from the rest.

### b. *Expert testimony*

The prosecution presented expert testimony regarding fire and firefighter behavior: fires burn faster on slopes than on flat land; drainage washes exacerbate this effect; spot fires create safety risks for firefighters because spot fires can spread rapidly ahead of the main fire, trapping firefighters between two fires; and air tankers and helicopters are critical to fighting wildland fires. CalFire's firefighting priorities are, in descending order, life safety, property preservation, and resource preservation.

The prosecution also presented expert testimony to support the theory that a single arsonist started all the charged fires. CalFire Battalion Chief James Engel testified as an expert regarding arson investigation and incendiary devices. His training in arson investigation included examining commonalities between incendiary devices to determine whether they were built by the same person. Engel concluded

that all the fires charged in this case were started by the same person and that the variation in incendiary devices reflected the arsonist's experimentation and evolution.

Beginning with the three May 16 fires, Engel opined that the "clumsy" remote devices appeared to be the work of a relatively inexperienced arsonist because the number of matches (30 or 31) was "overkill" and made the devices harder to light. The devices stood out to Engel for several reasons. First, it is unusual for an arsonist to use wooden matches to start a wildland fire; it is more common to use paper matches, which are more readily available. Second, regardless of the type of matches used, it "is not common" or "typical" for wildland arsonists to use "a cigarette/match device" or other "time-delayed device"; they "typically use[] just an open-flame device" to "[l]ight[] the fire and leave[]." Engel testified he had never seen an incendiary device that combined a cigarette with wooden matches. Another arson investigator similarly testified that while incendiary devices are commonly constructed from cigarettes and paper matches, he had never seen — in his 350 investigations — one that used wooden matches.

Turning to the May 28, 29, and 31 fires, Engle found the fact that these fires were all started with loose wooden matches — unusual in and of itself — to be consistent with an arsonist experimenting with ignition methods. Engel explained that these fires allowed the arsonist to select an ideal fuel bed, increasing the likelihood of a significant fire.

Engel found the use of layover devices at 10 fires in June and July consistent with an arsonist "experimenting with . . . a configuration for the incendiary device." This was particularly true of the first layover device fire on June 3 because it included

13

a blue paper towel that Engel believed was intended to act as an accelerant. Engel explained that the layover devices gave the arsonist "the best of both worlds" by combining the time-delayed benefit of the initial remote devices with the ideal placement benefit of loose matchsticks. Although he acknowledged the layover devices increased the arsonist's chances of being detected while placing the device, Engel observed that the layover device fires tended to be in locations that "didn't have a lot of exposure." Engel opined that the similarities among the layover devices, including meticulous placement of five to seven matches on a cigarette, indicated they were all constructed by the same person. Engel also found it significant that the layover devices and the May 16 remote devices all involved the uncommon combination of cigarettes and wooden matches, some of which were placed on the cigarette filter in an apparent attempt to destroy evidence.

Engel acknowledged that the series of layover device fires was interrupted by the June 16 loose matchstick fire, but he noted that the uncommon use of a wooden matchstick was consistent with the larger series of fires. Engel theorized that the deviation resulted from the lack of a good place for the arsonist to stop his or her vehicle to access a suitable origin point.

Engel offered several explanations for the arsonist's return from layover devices to remote devices. The arsonist may have become aware of the ongoing investigation or that he or she had been seen placing the layover devices. Returning to remote devices allowed the arsonist to reduce the chances of detection and to minimize the physical evidence that investigators might find.

Regardless of the arsonist's motive for returning to the remote devices, Engel found it significant that these devices also used approximately the same number of matches as the layover devices, indicating that the arsonist had learned from that experience that he or she did not need to use as many matches as with the first three remote device fires. Like the earlier remote devices, the more recent ones also had matches oriented so that one match head abutted the cigarette filter. And even though two of the remote devices used paper matches rather than wood matches, Engel noted that they used the same number of matches as the wooden match remote devices. Another arson investigator testified that while incendiary devices constructed with cigarettes and paper matches are "typically" constructed by "taking [a] matchbook and just sliding the cigarette into the matchbook itself and closing the cover," the paper match remote devices here were constructed similarly to the wooden match remote devices in that the paper matches were wrapped around the cigarette.

Engel also found it significant that the arsonist experimented with incendiary devices in phases — three remote devices, three loose wooden matches, 10 layover devices, four remote devices — rather than alternating devices from fire to fire.

Engel testified that his observations about the consistencies across the various incendiary devices likewise applied to the remote device recovered from the Esperanza Fire.

c. *Evidence implicating defendant as the single arsonist*

i. *Surveillance footage*

Investigators identified defendant as a suspect after seeing his vehicle on surveillance footage near one of the charged fires. In response to the series of arson fires, CalFire investigators placed hidden surveillance cameras on utility poles around the Banning Pass area. Shortly after the October 22 Mias Canyon Fire, investigators reviewed footage from a camera they had placed in that area. Footage from around the time that fire was reported showed a Ford Taurus driving toward the direction of the fire and returning about 10 minutes later. Investigators traced the Taurus's license plate to defendant. The prosecution introduced evidence showing that defendant bought a used blue-grey Taurus in early 2006 and spraypainted it flat black a few months later.

ii. *Eyewitnesses*

On June 11, as John L. was stopped at a turnout on Highway 243, he saw a flat black Taurus drive by. The driver raised his arm to cover his face as he passed, revealing a red, yellow, and blue and/or black tattoo on his arm. When John resumed driving in the direction from which the Taurus had just come, he saw a fire next to the road about 400 feet from the turnout. This fire occurred at the time and location of one of the uncharged fires. (See fn. 6, *ante*.) At trial, John identified defendant as the driver of the Taurus. The prosecution also introduced a photograph of defendant showing a tattoo of red and yellow flames on his left forearm.

On June 14, Ronald M. was working outdoors at a property on Old Banning Idyllwild Road when he saw a "severely

oxidized" brown Taurus drive by. About 30 minutes later, he saw the Taurus return, shortly after which he saw smoke coming from a fire in the direction the car had just come. This fire occurred at the time and location of one of the June 14 layover device fires. At trial, Ronald testified that a photograph of defendant's Taurus looked similar to the car he saw on June 14.

On June 28, D.N. was feeding her horses on her property near Winesap and Orchard Avenues in Cherry Valley when she saw an older model sedan with "very oxidized" dark black or blue flat paint enter her property. The car did not slow down until the driver noticed D.N., at which point the driver abruptly stopped the vehicle, waved at D.N., and then backed up and left. About 15 to 20 minutes later, D.N. smelled smoke and discovered a fire just down the road. This fire occurred at the time and location of the June 28 layover device fire. At trial, D.N. testified that a photograph of defendant's Taurus "look[ed] like it could be" the car she saw on June 28.

### iii. *DNA*

Investigators submitted the cigarettes recovered from the June 9 and 10 layover devices to the Department of Justice (DOJ) for DNA testing. An analyst obtained a complete DNA profile from the June 9 cigarette that matched defendant. The analyst obtained a partial DNA profile from the June 10 cigarette that, to the extent of the partial profile, also matched defendant.

### iv. *Tire treads*

After the June 28 incident at D.N.'s property, investigators created molds of tire impressions left by the car that had entered the property. Four months later, on

October 28, investigators created molds from the tire treads on defendant's Taurus. A DOJ criminalist compared four characteristics of the molds: tread design, tire dimensions, wear, and individualizing marks. The analyst determined that the treads had similar designs and dimensions.

The analyst also compared defendant's Taurus tire treads with photographs of tire treads left at other fire scenes. She determined that the tread design left at the scene of one of the June 14 fires was similar to defendant's tire tread.

v. *Match analysis*

Another DOJ criminalist testified about analyses she performed on matches recovered from many of the crime scenes. For the wooden match sticks, she examined their morphological appearances (length, stick shape, and head size and shape), stick diameters, match head colors, and elemental or chemical composition. Based on these analyses, she identified many common features among the recovered matches.

The loose matchstick recovered from the June 16 fire and the matches recovered from layover devices at the June 3, June 14, and July 2 fires "were similar in the morphological features as well as elemental composition." The matches recovered from the remote devices at two of the May 16 fires and the July 9 fire "were similar in length range," stick shape, diameter, and elemental composition. The matches recovered from the June 9 and 10 layover devices were morphologically and elementally similar to each other and to matches from a box of Diamond brand strike-on-box matches that investigators discovered at the home of defendant's fiancée's mother. The matches recovered from the uncharged June 11 fire and the

June 28 layover device were similar in length, stick shape, diameter, and elemental composition.

### vi. *Motive and opportunity, generally*

Prosecution witnesses testified to defendant's motive and opportunity in setting the series of arson fires.

In 2000, defendant applied to become a volunteer firefighter and began the training process. He was assigned training regarding emergency safety gear for wildland fires but discontinued the training after a few months. Later, in July 2006 — in the midst of the charged fires — defendant approached CalFire personnel about how to become a volunteer firefighter.

Defendant owned two retail police scanners that receive communications between firefighting agencies. Investigators found one scanner in defendant's bedroom at his parents' house and another one connected to external speakers in his apartment that was on "pretty much 24/7."

During the year-and-a-half period leading up to the Esperanza Fire, defendant lived with his fiancée, Crystal B., and their infant daughter in an apartment on Xenia Avenue in Beaumont. Their apartment was near the site of the June 3 layover device fire and the uncharged June 18 fire. During this period, defendant admitted to Crystal that he was an arsonist. Crystal had found in their hallway closet a plastic baggie containing five to seven newspaper articles about local fires. When she confronted defendant about the articles, he admitted he started the subject fires by wrapping something around matches and a cigarette. Defendant told Crystal he had not told anyone else about the fires and that he had acted alone.

Defendant also admitted to Crystal that he started some fires with a cigarette and matches to frame and gain leverage over his cousins. Defendant was engaged in a custody dispute with the cousins over his two-year-old daughter from a previous relationship. The first May 16 fire was less than one mile from the cousins' home and occurred around the time of a custody hearing.

After defendant admitted to Crystal in July 2006 that he started another fire in Moreno Valley (unrelated to this case),[8] Crystal issued an ultimatum that defendant stop setting fires or she would leave him. Shortly after the ultimatum, there was a pause in the arson series from July 9 to September 16.

On September 16 — the day the arson series resumed with the Orchard Fire — defendant and Crystal were visiting her mother a few blocks from that fire's point of origin. Defendant was doing yardwork at the mother's home and left for about 30 minutes. Shortly after he returned, "all of a sudden there was a fire." Defendant's second-cousin, Jill F., who was also friends with Crystal, testified that Crystal was so suspicious of defendant that she broke into the trunk of his car to look for evidence that he started the Orchard Fire. When Crystal confronted defendant about starting the fire, he admitted he did it.

---

[8] Crystal testified this admission occurred in January or February 2006 after she and defendant saw news coverage about a fire in Moreno Valley. However, a public information officer for CalFire testified that the only fire in Moreno Valley that received media attention between November 2005 and October 2006 occurred on July 5, 2006.

Jill testified she also witnessed defendant engage in suspicious behavior. A day or two after the Orchard Fire started, Jill was driving with defendant in her car while he watched the fire in the distance through his binoculars. And on the evening of October 22 — the day of the Mias Canyon fire — while Jill was at defendant's apartment, he asked whether she had heard anything over the scanner about fires because he had been trying to start one. Later that night, Jill observed defendant and Crystal arguing about the fact defendant had not come home the night before because he had fallen asleep in his car in the parking lot at Banning High School while "casing the area" for a location to start a fire.

All the fires in Banning Pass between May and October were set within 15 miles of defendant's apartment, and were often close to his apartment, his workplace, or Crystal's mother's home. Seventeen of the charged fires occurred through early June while defendant worked only part-time as an auto mechanic. The remaining charged fires were set after defendant began a full-time mechanic's position, but all occurred outside of his working hours.

vii. *Motive and opportunity as to the Esperanza Fire*

On October 21, about five days before the Esperanza Fire, animal control seized a dog belonging to defendant's sister, Joanna. Defendant was very angry about this and had a conversation with Joanna the next day. Defendant suggested setting a fire to create a diversion so they could free the dog from the shelter. Defendant made similar statements to Jill on October 22 and 24. Because defendant's Taurus had a flat tire, he asked Jill for a ride so he could "set the mountain on fire,"

but she declined. Joanna's dog was redeemed from the shelter on October 25.

Around 11:00 p.m. on October 25, defendant drove Crystal home from work in a Chevy Malibu he had purchased from his employer about a week earlier.

Around 11:30 p.m., Joanna and her friend Colete N. were at defendant's parents' house, where Joanna lived. Colete testified that she loaned her Saturn vehicle to Joanna so she could go to defendant's apartment to talk to him. Wearing slippers, Joanna drove off in the Saturn with Colete's cell phone still inside. Cell phone records indicated Colete's phone was active between 12:00 a.m. and 12:36 a.m. on October 26, and again after 1:49 a.m. The Esperanza Fire was started around the middle of the inactive period.

Sometime before 1:00 a.m. that early morning, Crystal left her apartment in the Malibu to go shopping at Walmart. She arrived at 1:10 a.m. and left at 2:27 a.m. After stopping for fast food, she arrived home around 2:50 a.m. Only defendant and their daughter were there. Defendant and Crystal got into an argument, and defendant left the residence, taking the keys to the Malibu, around or sometime after 3:30 a.m. Crystal would later lie to Jill, claiming to have been home with defendant the entire night of October 25 and morning of October 26.

Around 2:30 a.m. on October 26, defendant was seen watching the Esperanza Fire from a Shell gas station in Cabazon about one-half to three-quarters of a mile from the fire's point of origin. A fuel truck delivery driver testified that he saw a man — whom he identified at trial as defendant — standing on a fuel pump island, with no vehicles around, watching the fire. The delivery driver commented to defendant

that the fire was burning in an unusual manner, but defendant responded that "it looked normal to him for the conditions," which gave the driver the impression that defendant had "some type of knowledge or training of what he was looking at." Defendant's "primary focus" while at the gas station "was on the fire." At trial, the driver identified himself and defendant in security camera footage from the gas station.

Meanwhile, between 1:55 a.m. and 3:00 a.m. that early morning, Colete called her own cell phone from defendant's parents' house several times trying to get her car back. Joanna eventually returned the car around 4:00 a.m. Colete, who smoked cigarettes but never in her car, found cigarettes and ashes in the car's ashtray. Joanna had never smoked in Colete's car on the previous occasions she had borrowed it.

On October 27, Riverside County Sheriff's Detective Scott Michaels interviewed defendant. Defendant denied any involvement in the fires and initially told Michaels he was home all night on October 25. Defendant later corrected himself, saying he "forgot [he] went to the casino" around 1:00 a.m. in the Malibu. Defendant said he parked and entered from his usual lucky location on the fifth floor, gambled and lost $30 in about five minutes, and then left, noticing the Esperanza Fire as he exited the casino. On the way home, defendant stopped for cigarettes at the Shell station in Cabazon. Defendant said he smokes cigarettes, but "not too much," and that his favorite cigarettes are "Kools" brand menthols. Employing a ruse, Michaels falsely told defendant that investigators had found tire

treads matching his Taurus at the scene of the Esperanza Fire, but defendant insisted that was a mistake.[9]

To verify defendant's alibi, a detective reviewed security camera footage from the fifth floor of the casino and its parking structure from 9:00 p.m. on October 25 to 4:00 a.m. on October 26. The detective saw neither defendant nor his Malibu.

viii. *Additional evidence implicating defendant*

Crystal testified that defendant is a smoker and that he "smoked Marlboro Reds and Kools occasionally." Sheriff's detectives searched defendant's apartment and found a large ashtray outside the front door containing 149 cigarette butts of varying brands, nearly half of which were Marlboro Reds. Nine of the recovered butts were examined for DNA, and eight matched defendant's profile; the only sample that did not match him was from a Kool. In defendant's toolbox at work, detectives found three cigarette filters that had been clipped off. Defendant's manager testified that defendant normally smoked Marlboro Red cigarettes, but whenever the manager saw defendant borrow a different brand of cigarette, he "clipped the filter off" with wire cutters.

The manager of the auto shop where defendant worked at the time of the June 3 layover device fire — at which investigators found a blue paper towel — testified that his shop used blue paper towels.

---

[9] Michaels testified that at the time of the interview investigators were aware that defendant also drove a Malibu but were unaware that defendant may have been driving Colete's borrowed Saturn on the night of the Esperanza Fire.

Investigators searched defendant's Taurus and found Marlboro cigarette butts in the ashtray; empty Marlboro cigarette packs in the car; one wooden matchstick and two paper matches; a wig, a knit cap, latex gloves, and women's clothing; a grocery list with burn marks on it; and a slingshot on which the rubber tubing had apparent burn marks. The car was filled with dirt, dust, weeds, and twigs.

At defendant's apartment, investigators found binoculars and a duffel bag containing rubber bands. Investigators also searched defendant's parents' home. There, investigators found in a toolshed a bag of defendant's belongings near a box of wooden matches. In the parents' living room, investigators found a bag belonging to defendant that contained duplicated copies of two chapters of the book *The Anarchist Cookbook* pertaining to explosive devices and booby traps. At Crystal's mother's home, investigators found Diamond strike-on-box matches, some of which were wrapped in cellophane.

### d. *An inhabited structure burned in the Esperanza Fire*

A Twin Pines resident testified that she evacuated her home on the morning of October 26 because of the approaching Esperanza Fire. When she returned after the fire, her home "was completely gone."

### 2. *Defense case-in-chief*

To rebut the fuel truck delivery driver's testimony that he saw defendant watching the Esperanza Fire at the Shell station in Cabazon, the defense called the station's cashier, who testified he was the individual in security camera footage talking with the delivery driver (although the cashier had no independent memory of it). The cashier acknowledged on cross-

examination that the person he identified as himself in one of the photos could not, in fact, have been him.

Defendant's sister Joanna testified at length for the defense. She testified that she, defendant, and Jill used methamphetamine daily in October 2006. On October 24, after the three smoked methamphetamine together, they drove to the animal shelter, where defendant cut the lock on the fence before hurrying back to the car and leaving without the dog.

On October 25, according to Joanna, she borrowed Colete's Saturn around 11:30 p.m. or 12:00 a.m. but did not go to defendant's apartment until around 3:00 a.m. In the meantime, she crisscrossed Banning borrowing money from friends and buying drugs. She claimed to have made all the phone calls from Colete's cell phone to defendant's apartment during the relevant period.

On cross-examination, Joanna admitted that although she had spoken to detectives four times after the fires and testified at defendant's preliminary hearing, her trial testimony was the first time she mentioned looking for drugs in the early morning hours of October 26. In her prior interviews, Joanna stated she had driven directly to defendant's apartment after borrowing the Saturn. She also acknowledged that although she testified that she spoke by phone with her daughter when her daughter called defendant's apartment at 3:00 a.m., she had previously told detectives this call took place at 2:00 a.m. Phone records showed such a call occurred at 2:03 a.m. Providing defendant an alibi, Joanna also told detectives that he called their parents' house between 12:00 and 1:00 a.m., but no such call is reflected in phone records, and by the time Joanna made this claim she

had become aware that the Esperanza Fire had started around 1:00 a.m.

Joanna denied the prosecutor's suggestion that she went to defendant's apartment to babysit defendant's daughter (thus explaining why she left home wearing slippers) and that defendant left in the Saturn after Joanna arrived. She maintained that Crystal — who was not home at the time — did not allow Joanna to babysit. Joanna also testified that she smoked the cigarettes that were left in Colete's car and that Colete was upset with her about it.

Joanna admitted at trial that she had a prior felony conviction for aggravated assault and had forged a neighbor's checks numerous times; that she lies when she is afraid of something and was "afraid here that something bad [was] going to happen to [her] brother"; and that defendant said he wanted to start a fire to create a diversion to free her dog from the shelter.

Gary Eidsmoe, a then-retired CalFire arson investigator who had been involved in the Esperanza Fire investigation, testified that in the more than 100 wildland fires he investigated, about one-third involved an incendiary device. Of those, however, only six "including this one" involved incendiary devices "that were constructed using wood kitchen matches and a cigarette *in some fashion*." (Italics added.) He acknowledged that "none of those six were a device such as the Esperanza device" and that the others involved "[d]ifferent configuration[s]."

The defense recalled many of the DOJ criminalists who had testified in the prosecution's case-in-chief. They confirmed that they found no DNA on the cigarettes from the incendiary

27

devices that started the May 16 fires; the rubber bands used in the May 16 incendiary devices did not match the rubber bands recovered from defendant's apartment; the brand of cigarettes used in many of the incendiary devices could not be definitively determined; and tire tread impressions from the Esperanza Fire scene did not match defendant's Taurus or Malibu (the Saturn was not tested).

A forensic scientist hired by the defense testified that a partial DNA profile obtained from the rubber band in the device used in the second May 16 fire did not match defendant.

Additionally, a defense investigator testified about her research regarding the availability of wooden matches in the Banning Pass area. Out of 47 stores she visited in the area, only 14 — a "relatively small number of places" — sold wooden matches. The investigator also testified that she had timed the drive from defendant's apartment to the point of origin of the Esperanza Fire, but acknowledged she conducted her experiment at 8:25 a.m. instead of 1:00 a.m., when traffic conditions would have been different, and that her conclusions did not match her recorded travel speeds.

Regarding the prosecution's theory that Joanna babysat while defendant started the Esperanza Fire, Crystal testified that she does not allow Joanna to babysit because of her drug use (though she acknowledged she lets defendant watch their child despite his drug use). She also testified that she, and not defendant, owned certain items glamorizing violence and "burning things" that investigators found in the apartment. Regarding the Orchard Fire, Crystal denied having told Jill that defendant left for about a half-hour before the fire, or that she

suspected defendant had started the fire and broke into the trunk of the Taurus to look for evidence.

Crystal's mother testified that defendant never left her house before the Orchard Fire, but she acknowledged she and Crystal were busy inside while defendant was working outside.

David Smith, a "fire and explosion consultant and investigator" who had investigated "several hundred" wildland fires, testified as an expert for the defense. He explained that, in his experience, serial arsonists used a single signature incendiary device and did not deviate from it. A counterexample was "possible," but not "reasonable." Based on the different types of incendiary devices used in the series of fires at issue, Smith believed that "[t]wo and possibly three" arsonists were responsible for the series of fires. First, based on the similarities between the remote devices found at the May 16 fires and the Esperanza Fire, Smith opined "conclusively" that the same single arsonist was responsible for these fires — but none of the others in the series. Although he had never seen the "exact" type of remote device used in these fires, he had seen similar match/cigarette/rubber band devices in training and literature, and in about two or three past investigations. However, none of those investigations involved wildland fires, and Smith admitted more generally that he had never seen a time-delayed incendiary device used in connection with a wildland fire.

Second, based on his characterization of the layover devices as "very, very unique" — he had "never seen this either in training or literature or in the field" — Smith opined they were all "the work of one person." Because defendant's DNA had been found on two of the layover devices, Smith concluded that defendant "would also be responsible for all ten of . . . the

layover devices." But Smith found that the layover devices and the remote devices were "not similar" to each other and, thus, he found it "reasonable" to conclude that "different arsonists" were responsible for the fires started with the different types of devices.

Third, Smith found it "reasonable that [there] certainly may be a third individual" responsible for the fires started by the paper match remote devices and the remote device constructed with duct tape.

Based on these differences, Smith posited that "copycat[s]" may have accounted for fires started with different incendiary devices. But he acknowledged that although news coverage of the fires may have referenced incendiary devices, the coverage did not describe the devices in detail or mention that they used cigarettes and matches.

Smith further acknowledged that the series of fires "happened within a relatively short time frame," in "a relatively small geographic area," with "a pretty small population base." He agreed "that paper matches are much more common than wooden matches," and acknowledged he had not considered the defense investigator's report regarding the scarcity of wooden matches in the area.

During cross-examination, the prosecutor questioned Smith about a device investigators discovered in defendant's kitchen pantry. The device consisted of a plastic cylinder with two switches on top — a two-way toggle switch and a four-way toggle switch —connected by wire leads. Smith considered the device to be a "contraption" rather than a "device" because "a device" can "do[] something" whereas this contraption can "do[] nothing." Smith acknowledged seeing some type of "toggle

switch" device in *The Anarchist Cookbook*, but not one with a secondary "directional switch" like defendant's device, which Smith deemed suitable for use with remote-controlled vehicles. Smith conceded, however, that the device could start a fire if connected to a power source.

### 3. *Prosecution's rebuttal evidence*

In rebuttal, the prosecution recalled a DOJ DNA analyst who explained that rubber bands are "probably one of the last things" he would test for DNA because they are "passed around" and can become confounded by innocent prior users' DNA or by the suspect's use of gloves while assembling the device. He chose to test cigarettes instead because they are more likely to have more concentrated DNA from the suspect's saliva.

A Riverside Sheriff's deputy assigned to the department's Hazardous Device Team testified that, based on his training and experience, the toggle switch device recovered from defendant's pantry was "an improvised initiating system or incendiary device" that could start a structure fire. He concluded from the presence of two toggle switches that one was a "safety," which supported his conclusion that the device was an incendiary device because "there's no need to have . . . a safety switch" on a device used for "normal things, like powering a car."

In rebuttal to defense expert Smith's signature-device theory, the prosecution called retired CalFire Arson Investigator Douglas Allen, who had been the primary investigator or supervisor in over 100 serial arson investigations and had spoken to dozens of serial arsonists. Based on his training and experience, Allen opined that serial arsonists do not adhere to a single signature incendiary device, but rather, "use a multiplicity of different devices" for a variety of reasons

such as overcoming failures, avoiding detection, or confusing investigators.

Looking at the evidence "in totality," Allen testified it was his "opinion that an individual made all of the incendiary devices from the beginning of May 16th through the Esperanza Fire." Allen noted many "similarities or commonalities" among the incendiary devices. First, most involved wooden matches, which "in and of itself is out of the norm. The norm is a paper matchbook." Second, many of the devices included "placement of a single match facing the opposite direction" toward the filter, making the incendiary device "sort of a self-destructing device." Third, once the arsonist began consistently constructing layover devices with five to seven matches, Allen found it significant that the later remote devices were also constructed with a similar number of matches because it reflected an evolution from the much larger remote devices used at the May 16 fires.[10]

Allen also testified about many significant factors beyond the similarities among the incendiary devices. First, the fact that similar types of devices were used in strings of fires indicated a single arsonist because Allen would have expected to see "totally different device[s] show up" in the same time frame if multiple arsonists were active. Second, multiple fires were set on a single day. Third, Allen noted an evolution toward more sophisticated vegetation fuel beds, progressing from grassfires to heavier fuels, and "from flat ground grass to slope

---

[10]    Allen believed the May 16 devices were "overkill" because "[f]our [to] six matches work just as well" as 30 or 31 and do not carry the logistical or safety hazards involved with lighting a cigarette surrounded by "30-some matches . . . at your mouth," which Allen deemed "very dangerous."

fires" that "burn[] faster uphill." Fourth, Allen considered the roadside location of the points of origin, the visibility and exposure of the locations, and the sparse population of the areas. Finally, Allen found the geographic pattern of the fires significant. He explained that the fire locations fell within "a shotgun pattern" that, at first, appeared to have "no rhyme or reason to it," but upon "close[r] analysis" reflected "clusters of fire activity" showing that the arsonist had "come at least twice to a particular area to set a fire." For example, the June 14 layover device fire and the Esperanza Fire both occurred in the area of Broadway and Esperanza.

Allen acknowledged there were slight deviations in the pattern of incendiary devices, like the loose matchstick fire on June 16 in the midst of a series of layover device fires. But Allen reasoned the arsonist may have impulsively started "a fire of opportunity."

Allen explained that, because arsonists tend to progress toward increasingly destructive fires, it is more common for wildland arsonists to progress to setting structure fires than vice versa.

Lastly, in response to the gas station cashier's conflicting testimony, the fuel truck delivery driver testified in rebuttal that he "know[s] the difference between" defendant and the gas station cashier and "wouldn't confuse them." The driver acknowledged, however, that when he picked defendant's photograph out of a lineup, he had recently seen defendant's photograph on the news or had seen him in person while having

his vehicle serviced at the shop where defendant worked.[11] Nevertheless, he maintained his in-court identification of defendant was based on his personal observation of defendant during the Esperanza Fire.

### 4. *Jury verdicts and findings*

The jury found defendant guilty on all five murder counts, 20 out of 23 arson counts,[12] and all 17 counts of possession of an incendiary device. The jury also made true findings on arson-murder and multiple-murder special-circumstance allegations.

## B. Penalty Phase

### 1. *Prosecution evidence in aggravation*

#### a. *Circumstances of the Esperanza Fire*

The prosecution called several Forest Service firefighting personnel to testify about the circumstances under which they found their colleagues during the Esperanza Fire. Battalion Chief Christopher Fogle, a close friend of Captain Loutzenhiser, watched from a nearby position as the fire burned over Engine 57's location. Fogle and his crew traveled to the burnover scene, where they discovered the injured and dead crewmembers.

---

[11] The detective who administered the lineup confirmed in the defense surrebuttal case that the driver mentioned this during the lineup, but the driver "didn't describe it as a problem" and positively identified defendant with certainty in the lineup. The driver also told the detective about his conversation with defendant about the fire's behavior.

[12] The jury was unable to reach verdicts on counts 9 through 11 — the loose matchstick fires on May 28, 29, and 31 — and the trial court declared a mistrial on those counts.

Captains Richard Gearhart and Freddie Espinosa also responded to Engine 57's location. They first encountered the badly burned body of Pablo Cerda, and believed he was dead. When the crew radioed that Engine 57's crew had been found dead, Cerda moved his arm and Gearhart radioed for medical assistance. Captain Anna Dinkel later assisted with Cerda's evacuation and saw that his eyes were closed, he was not speaking, and he appeared to be in pain.

Gearhart found Loutzenhiser next. His body was badly burned and he was rolling back and forth, repeating, "Air, air, air." Fogle rushed to Loutzenhiser's location to comfort him. Loutzenhiser tried to speak but Fogel could not understand him.

The fire crews found Daniel Hoover-Najera's dead body next. His body was on fire, so firefighters extinguished the flames.

A fire crew tried to approach Engine 57 but was unable to because it was heavily engulfed in flames and its oxygen tanks were exploding. When crewmembers moved around the engine, they found the body of Jess McLean on fire. Firefighters extinguished the flames with their canteens.

Firefighters found Jason McKay's body last. His body was so badly burned that Fogle "probably walked past him a half a dozen times and didn't notice that it was a body." McKay's body was still on fire, so firefighters extinguished the flames with their canteens.

Helicopters responded to airlift Loutzenhiser and Cerda. At great risk to themselves, the pilots landed in 57-miles-per-hour winds, well beyond CalFire's 40-miles-per-hour "maximum safe zone."

A leader of CalFire's safety accident review team, Bradley Harris, testified about his six-month investigation of the Esperanza Fire burnover. Harris determined that McLean and McKay had moved a short distance trying to escape the fire and assumed a prone position to protect their airways. Hoover-Najera's footprints and scattered gear indicated he was running around on fire for "well over 30 seconds." Harris determined that the Esperanza Fire burned over the site at about 30 miles per hour, which is "beyond extreme." The shape of the octagon house accelerated the rate of the fire.

CalFire determined that the Esperanza Fire burned 39 homes, caused $100 million in financial losses, and inflicted non-life-threatening burns to a civilian's hands and face.

b. *Uncharged fires on October 26*

The prosecution introduced evidence to show that defendant started two additional fires on October 26 and that he was aware before the second of those fires that firefighters had died in the Esperanza Fire. We discuss this evidence in more detail in part II.C.1., *post*.

c. *Victim impact testimony*

The prosecution presented victim impact testimony from each victim's survivors: Loutzenhiser's wife, brother, and daughter; McKay's mother, sister, and fiancée; McLean's mother, brother, and sister; Najera-Hoover's mother, aunt, sister, and girlfriend; and Cerda's father. Each witness testified generally about the kind of person the victim was, how the witness learned of the victim's death, and what the witness missed about the victim.

36

d. *Forensic pathologist*

The forensic pathologist who conducted or reviewed the victims' autopsies testified about the medical circumstances of their deaths and introduced photographs taken during the autopsies. We discuss this evidence in more detail in part II.C.2.c., *post*.

2. *Defense mitigation evidence*

a. *Fire expert*

The defense called the CalFire investigator who conducted an after-action review of the Esperanza Fire burnover to "determine what happened . . . and provide lessons learned." The octagon house was identified as "nondefendable" on a map that firefighters use as a guide to assess the defensibility of structures under average fire conditions, but the map had its limitations (e.g., conditions might have changed since it was prepared in 2002), and this information was not communicated to Engine 57's crew. The investigator further testified that under prevailing conditions, "about every house out there could have been a red dot," i.e., a nondefendable structure, and that even with such a rapidly moving fire, it was appropriate to deploy resources and personnel to protect structures that were deemed defensible. The investigator testified that with "any wildland fire, we can't predict exactly what's going to happen," and that the Esperanza Fire involved "extreme conditions." With the benefit of hindsight, the investigator did not know that firefighters should have been positioned at the octagon house. Yet he could not rule out the possibility that he might have "at least utilized it as a lookout initially."

On cross-examination, the investigator testified that regardless of whether a house was a "red dot" on a map,

firefighters still had to undertake a personal assessment of whether there were people in the vicinity potentially in need of evacuation or rescue. He also testified that there were two green dots, indicating defensible structures, close to the octagon house's red dot on the map. Looking back, the investigator thought that Captain Loutzenhiser's actions were reasonable. "Anybody would have died at that location," he testified; the circumstances involved with the area ignition were "very rare." The investigator agreed with the prosecutor's characterization of fire as being "unpredictable" "by its very nature." He also agreed with the prosecutor that among the hundreds of fires that had been fought that previous summer, "every single one of the fires could have become this big."

b. *Defendant's fiancée, mother, and sister*

Crystal maintained defendant was innocent. She testified she had personal knowledge of his whereabouts during the Orchard Fire and the Esperanza Fire and that he did not start either. On cross-examination, Crystal acknowledged that she had lied to Jill about defendant's whereabouts the night of the fire; she and defendant joked that they were going to sue the county for "a bunch of money" if the jury acquitted him; and she had recently admitted previously accusing defendant of starting the Orchard Fire.

Defendant's mother testified that defendant was the eldest of her four children; she raised him with a religious upbringing and tried to instill good values; defendant's father had recently died; she visited defendant while he was in custody and would continue to do so; and defendant did kind things for her and was a good father to his children. She also identified photos of defendant with his family members.

Defendant's adult daughter testified that she moved to Minnesota when she was eight years old but stayed in contact with defendant and visited him every summer, and that he was a good father to her and a good grandfather to her daughter.

c. *Mitigation expert testimony*

A licensed private investigator with a background in law enforcement testified as a mitigation expert about defendant's "potential for adaptability as an inmate should he receive a sentence of life without parole versus the death penalty." She testified that defendant had not been subject to any discipline during the two and a half years he had been in custody and "that he would adjust to institutional life very well."

3. *Prosecution rebuttal evidence*

CalFire Captain Fogel testified that the Engine 57 crew did nothing wrong in responding to the Esperanza Fire and that there were defensible aspects to the octagon house.

4. *Jury verdict and sentence*

After deliberating for about one day, the jury returned a verdict of death. The trial court denied defendant's motion to reduce the death verdict and sentenced him to death on the murder convictions and to 28 years on the remaining convictions.

## II. DISCUSSION

### A. Pretrial Issues

1. *Attorney representation issues*

Defendant raises two challenges regarding his representation at trial. First, he contends the trial court violated his constitutional right to be present at a critical proceeding by discussing outside his presence a request by the

prosecution that the trial court inquire into defendant's retained counsel's qualifications to try a capital case. Second, defendant contends the trial court erred by appointing associate defense counsel to assist his retained lead counsel without first determining whether either of them met the requirements for appointed lead counsel in a capital case. We conclude that neither challenge has any merit.

a. *Background*

Defendant appeared for his November 2, 2006 arraignment with retained counsel, Mark McDonald.

In June 2007, McDonald requested that the court declare defendant indigent so the court could appoint and pay for expert and investigative services. McDonald did not, himself, seek appointment and remained as defendant's retained counsel at all relevant times. The trial court declared defendant indigent on June 26, 2007.

A few months later, McDonald requested that the trial court's "Pay Judge Panel" appoint associate *Keenan*[13] counsel to assist McDonald. This request remained unresolved for several months.

In October 2007 — about one year into the case and over one year before trial would begin — the prosecution filed a "Request for Inquiry and Waiver Regarding Attorney's

---

[13] *Keenan v. Superior Court* (1982) 31 Cal.3d 424. "*Keenan* is shorthand" for the trial court's discretionary, statutory authority to grant *appointed* counsel's request to appoint additional counsel in a capital case. (*People v. Morelos* (2022) 13 Cal.5th 722, 737, citing § 987, subd. (d) ["In a capital case, the court may appoint an additional attorney as a cocounsel upon a written request of the first attorney appointed"].)

Qualifications as Capital Litigator." The request clarified that "the People [were] not asking the court to decide whether Mr. McDonald is or is not qualified to try this particular case." Rather, to forestall a potential reversal based on the ineffective assistance of counsel, the prosecution "merely request[ed] that the court inquire as to whether the defendant is fully informed about Mr. McDonald's legal experience and the relevant qualifications for appointed counsel on capital cases." While the submission expressed "the People's belief that attorney . . . McDonald [did] not have extensive experience in the area of capital litigation," as evidenced by the lack of discovery requests and motion practice typically encountered in a capital case, the prosecution repeatedly explained it was "not . . . attempt[ing] to interfere with the attorney/client privilege or to deprive the defendant of his right to counsel of his own choosing." The hearing would simply ensure that "the record . . . be clear that the defendant is making an informed and intelligent decision in the selection of his attorney."

On December 11, 2007, McDonald received a letter from the Pay Judge Panel advising that it could not provide funds for *Keenan* counsel until the trial court approved a request for associate counsel.

On December 14, 2007, the trial court held a hearing to address defendant's request for *Keenan* counsel and the prosecution's request for an inquiry regarding defense counsel's qualifications. The hearing began in chambers without defendant present. The "main thing" McDonald addressed with the court was the letter he received a few days earlier from the Pay Judge Panel. The trial court stated it would review the request for *Keenan* counsel again and "be prepared to . . . make an order concerning that."

When the court asked if there was "[a]nything else of substance" to address, McDonald reminded the court of the prosecution's request for a qualification inquiry, adding, "I'm prepared to address that at any time, and [defendant] is." The trial court acknowledged that although there was some authority to support the prosecution's request (see *People v. Ramirez* (2006) 39 Cal.4th 398 (*Ramirez*)), the court was "extraordinarily wary of interfering with the attorney/client relationship." The court surmised that if it were to appoint *Keenan* counsel, that would "go[] some way towards addressing the [prosecution's] concern." The court added that it "would appreciate both counsel's input in advance of any hearing . . . with respect to the appropriate manner in which to proceed, mostly to avoid any suggestion that there's an interference with the attorney/client relationship." After discussing trial scheduling, the court set a hearing on the qualification inquiry for January 25, 2008. The court and counsel agreed that the appointment of *Keenan* counsel in the meantime might obviate the need for the inquiry.

In open court, with defendant present, the court recited for the record that the chambers conference involved a discussion of "certain procedural and logistical matters" and that the court had set a hearing for January 25, 2008.

On December 26, 2007, the trial court issued an ex parte order vacating the January 25, 2008 qualification inquiry hearing. The order itself did not explain why the court vacated the hearing, but the record suggests it was because the court had appointed the Riverside Public Defender's office as *Keenan* counsel. When the Riverside Public Defender's office later declined the appointment, the trial court appointed the Criminal Defense Lawyers Panel "as second counsel, . . . with

actual counsel to be determined in the ordinary course of business."

In April 2008, McDonald filed a motion specifically requesting that the court appoint Thomas Eckhardt as *Keenan* counsel. The motion was supported by a declaration from Eckhardt setting forth his qualifications substantially in compliance with the rules that specify the qualifications required of appointed counsel in capital cases. (See Cal. Rules of Court, rule 4.117.)[14] At a later hearing on this request, the trial court observed that Eckhardt's declaration did not address all the applicable criteria, so the court swore in Eckhardt as a witness and confirmed that he satisfied the specific remaining requirements. The trial court then appointed Eckhardt as associate counsel. (See rule 4.117(e).)

b. *Absence from chambers conference*

Defendant contends the trial court violated his federal and state constitutional rights to due process and counsel by conducting the December 14, 2007 chambers conference in his absence. We reject this claim.

"A criminal defendant accused of a felony has the constitutional right to be present at every critical stage of the trial . . . ." (*People v. Bell* (2019) 7 Cal.5th 70, 114 (*Bell*); see *People v. Rundle* (2008) 43 Cal.4th 76, 177 (*Rundle*) [" 'The right derives from the confrontation clause of the Sixth Amendment to the federal Constitution and the due process clauses of the Fifth and Fourteenth Amendments, and article I, section 15 of the California Constitution' "]; *People v. Delgado* (2017)

---

[14] Further undesignated rule references are to the California Rules of Court.

2 Cal.5th 544, 568–569 [" ' " 'The state constitutional right to be present at trial is generally coextensive with the federal due process right' " ' "].) "A critical stage of the trial is one in which a defendant's ' "absence might frustrate the fairness of the proceedings" [citation], or "whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge" [citation].' " (*Rundle*, at p. 133.) A defendant "has no right to be present [at] routine procedural discussions that could not affect the outcome of the trial." (*People v. Perry* (2006) 38 Cal.4th 302, 314 (*Perry*).) "Thus a defendant may ordinarily be excluded from conferences on questions of law, even if those questions are critical to the outcome of the case, because the defendant's presence would not contribute to the fairness of the proceeding." (*Id*. at p. 312.) We review de novo a defendant's claim that he was entitled to be present during a chambers conference. (*People v. Waidla* (2000) 22 Cal.4th 690, 741.)

We have previously expressed serious "doubt[] as a matter of sound public policy that a criminal defendant's presence should be required at in-chambers inquiries regarding his counsel's competence, unless the defendant himself has initiated the inquiry," because "[a]ttendance at such hearings could well undermine the confidence and cooperation so necessary to insure an effective representation." (*People v. Hovey* (1988) 44 Cal.3d 543, 573.) More recently, however, we have also "acknowledged that a criminal defendant 'may be entitled to be present at a conference called to consider whether to remove his counsel for conflict of interest or any other reason.' " (*People v. Perez* (2018) 4 Cal.5th 421, 438 (*Perez*).) We need not resolve here any possible tension in these precedents because, even assuming that a hearing on the merits of the prosecution's

motion would have been a critical stage of the trial at which defendant was entitled to be present, the chambers conference in this case was not such a proceeding.

The record shows that the chambers conference was brief and addressed only preliminary procedural issues related to the motion. When McDonald reminded the court that the issue was still pending and stated that he and defendant were prepared to address the merits at any time, the trial court limited discussion to selecting a hearing date and advising that the court would seek counsel's prior input if any hearing were to proceed. In open court, the trial court characterized the chambers conference as having addressed "certain procedural and logistical matters." Indeed, defendant accurately refers to the chambers conference in his briefing on appeal as one "in which the court decided how to handle a motion by [the] prosecutor." Therefore, the conference was not a critical stage of the trial that entitled defendant to be present. (See *Rundle*, *supra*, 43 Cal.4th at p. 178 [holding that "ex parte meetings between the trial court and defense counsel concerning [a juror]'s alleged statement, at which defendant was not present, were not critical stages of the trial for constitutional purposes, because they were merely exploratory discussions concerning the potential problem of juror misconduct and possible courses of action that might be taken to resolve that issue"].)

Defendant argues that even if the chambers conference was not a critical proceeding when it occurred, it *became* critical when the "hearing date was . . . cancelled without explanation," thus leaving defendant "in the dark about the questions raised as to whether his attorney lacked the qualifications to try a capital case." However, McDonald advised the court in the chambers conference that he *and defendant* were prepared to

PEOPLE v. OYLER

Opinion of the Court by Guerrero, C. J.

address the merits of the prosecutor's motion "at any time," indicating that defendant was aware of the motion. (See *Perry, supra*, 38 Cal.4th at p. 312 [bench conference "to determine who will be allowed to sit as spectators at the trial" was not "*transformed . . .* into one at which defendant was entitled to be present" merely because defense counsel warned that "defendant might become violent and unmanageable if [his] wife were barred from attending the trial"].) And, in any event, we will not presume from a silent record that McDonald failed to inform defendant of the prosecutor's request. (See *Perez, supra,* 4 Cal.5th at pp. 439–440 ["just because the limited record on a direct appeal was devoid of such information does not mean that [the defendant] lacked knowledge of the [issue]"; see *id.* at p. 439 [noting counsel's ethical obligation to inform the defendant of ex parte discussions with the court], citing Rules Prof. Conduct, former rule 3-500 ["A member shall keep a client reasonably informed about significant developments relating to the employment or representation"]; ABA Model Rules Prof. Conduct, rule 1.4(b) ["A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation"].)[15]

Defendant also faults the court for not reaching the merits of the prosecutor's motion or otherwise advising defendant that he was entitled to qualified appointed lead counsel. Defendant fails to persuade. The only direct authority cited by either party pertaining to a trial court's obligation to inform a defendant of

---

[15]    Although defendant at times implies in his briefing that it would have been against McDonald's interest to disclose that the prosecutor had requested an inquiry into McDonald's qualifications, defendant expressly asserts he is not raising any conflict of interest claims in this appeal.

his or her right to appointed counsel is section 987, subdivision (b), which requires a trial court presiding over a capital case to advise the defendant of his or her right to appointed counsel "if the defendant appears for arraignment without counsel."[16] Here, however, defendant appeared for arraignment *with* counsel, so this provision does not apply.

Defendant further maintains that *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*) and its progeny are "relevant and instructive." We disagree. First, as defendant acknowledges, *Marsden* applies only to requests to replace appointed counsel, and McDonald was retained counsel. Second, a trial court is required to hold a *Marsden* hearing only when *the defendant* requests one — "the trial court is not required to conduct a *Marsden* hearing on its own motion" (*People v. Martinez* (2009) 47 Cal.4th 399, 421 (*Martinez*)) or in response to "criticism of appointed counsel that has been levied by a nonparty" (*id*. at p. 420). Here, defendant never expressed any concern about McDonald's qualifications.

Relatedly, this court has held that case law standing "for the proposition that the trial court has a 'duty to ensure that any counsel *appointed* to represent the accused is competent and

---

[16] Section 987, subdivision (b) provides in relevant part: "In a capital case, if the defendant appears for arraignment without counsel, the court shall inform the defendant that they shall be represented by counsel at all stages of the preliminary and trial proceedings and that the representation is at their expense if they are able to employ counsel or at public expense if they are unable to employ counsel, inquire of them whether they are able to employ counsel and, if so, whether they desire to employ counsel of their choice or to have counsel assigned, and allow them a reasonable time to send for their chosen or assigned counsel."

qualified to conduct the defense' . . . has no application" in the context of *retained* counsel. (*Ramirez*, *supra*, 39 Cal.4th at p. 424.) This is due, in part, to the greater protection afforded to a defendant's right to retained counsel of his or her choice. (See *People v. Woodruff* (2018) 5 Cal.5th 697, 728 (*Woodruff*) ["The Sixth Amendment right to counsel guarantees a criminal defendant the right to choose his or her own counsel when the defendant does not need appointed counsel. [Citation.] While a defendant has a constitutional right to competent representation, he also has the right to counsel of his choice so that he may defend himself in ' "whatever manner he deems best" ' "]; *People v. Verdugo* (2010) 50 Cal.4th 263, 310 ["The right to retained counsel of choice is — subject to certain limitations — guaranteed under the Sixth Amendment to the federal Constitution"].)

It is true that we have recognized that trial courts have *limited* discretion to inform a defendant that his or her retained counsel does "not meet the standards required of attorneys appointed by the court to represent capital defendants." (*Ramirez*, *supra*, 39 Cal.4th at p. 424; see *Woodruff*, *supra*, 5 Cal.5th at pp. 732–733 [finding no error in the trial court's failure to obtain a waiver of effective assistance where the prosecutor expressed concern about retained defense counsel's qualifications, the trial court inquired of defense counsel's qualifications and informed the defendant of his right to competent appointed counsel, and the court ultimately found that defense counsel had not rendered ineffective assistance].)[17]

---

[17]   Defendant acknowledges he "explicitly does not raise a claim that he received constitutionally inadequate representation."

But the fact that we found no error in the trial courts' having inquired in those cases does not mean it was error for the trial court not to inquire here. The trial court might have provided some advisement to defendant, if it concluded that the circumstances counseled in favor of one. But the trial court was in no way obligated to provide such an advisement.

Accordingly, we find no error arising from defendant's absence from the chambers conference or from the trial court's handling of the prosecution's motion.

c. *Lead counsel qualifications*

As noted, although defendant was represented by retained lead counsel (McDonald), the trial court appointed associate counsel (Eckhardt) to assist with the defense. Defendant contends the trial court erred by appointing associate counsel without first ensuring that either McDonald or Eckhardt met the qualifications to serve as appointed lead counsel. We reject this claim.

Defendant bases this claim on rule 4.117, which "defines minimum qualifications for attorneys *appointed* to represent persons charged with capital offenses in the superior courts." (Rule 4.117(a), italics added.) Beyond certain "[g]eneral qualifications" (rule 4.117(b)), the rule specifies different qualifications for "lead counsel" (rule 4.117(d)) and "associate counsel" (rule 4.117(e)).[18] It further provides that "[i]f the court

_____

[18] The rule also provides "[a]lternative qualifications" that authorize the trial court to appoint lead or associate counsel "even if he or she does not meet all of the qualifications" of lead or associate counsel. (Rule 4.117(f).) If the trial court relies on these alternative qualifications, it must state on the record its

appoints only one attorney, that attorney must meet the qualifications" of lead counsel. (Rule 4.117(c)(2).) Alternatively, "[i]f the court appoints more than one attorney, one must be designated lead counsel" and meet the corresponding qualifications, "and at least one other must be designated associate counsel" and meet the corresponding qualifications. (Rule 4.117(c)(1).)

Defendant argues that when the trial court appointed Eckhardt as additional counsel, rule 4.117(c) required that the trial court determine that either McDonald or Eckhardt met the rule's requirements to serve as lead counsel. That is, because the trial court "appoint[ed] only one attorney" — Eckhardt — "*that* attorney must [have met] the qualifications" of lead counsel. (Rule 4.117(c)(2), italics added.) Viewed in isolation, the language of rule 4.117(c)(2) might be read as supporting defendant's interpretation. Defendant concedes, however, that "[w]hen read as a whole, the plain language of Rule 4.117 strongly suggests that it did not contemplate a circumstance in which" — as here — "a defendant was represented by one retained counsel and one appointed counsel."

We agree. Every provision of rule 4.117 refers to appointed counsel and none refers to retained counsel. (See rule 4.117(a)–(i).) More specifically, rule 4.117(c)(1), which contemplates a scenario in which a defendant is represented by lead and associate counsel, applies only when both counsel are appointed. And rule 4.117(c)(2), which applies when "the court

reasons for doing so. (*Ibid.*) The trial court appointed Eckhardt under rule 4.117(e) and did not rely on rule 4.4117(f)'s alternative qualifications. Therefore, we do not discuss the alternative qualifications any further.

appoints only one attorney," appears to contemplate a scenario in which the defendant is represented by only one appointed attorney. In that context, the rule logically requires that the lone appointed attorney qualify as lead counsel.

Rule 4.117, read as a whole, therefore establishes that in the scenario presented here, where defendant is represented by retained lead counsel and appointed associate counsel, the rule's lead counsel qualifications simply do not apply. Thus, defendant has not shown error.

### 2. *Replacement of trial judge*

Defendant contends "the sudden and unexplained replacement" of the trial judge to whom the case had been assigned for all purposes was improper because it was done with "no findings" or "any legal basis" during an "unnoticed hearing" at which defendant was not present. We conclude that defendant forfeited this challenge by failing to object to the reassignment in the trial court and by failing to properly support his challenge on appeal. Even if we were to reach the merits of his claim, we would find them lacking.

### a. *Background*

At defendant's arraignment on November 2, 2006, the case was assigned "for all further proceedings" to Judge Jeffrey Prevost in Department 31 of the Riverside courthouse. Judge Prevost presided over the case for about the next year and a half and, as of June 2008, it appears he expected to preside over the trial he had set for November 3, 2008.

On August 29, 2008, however, the prosecutor and defense counsel appeared before Judge Helios Hernandez in Department 63. It is unclear from the record how they knew to

appear before Judge Hernandez on that date.  Defendant did not appear, but defense counsel purported to "waive his presence."

Judge Hernandez addressed counsel, "This case has previously been assigned to Judge Prevost, but as you know he has a new assignment.  So I'm going to reassign it."  Judge Hernandez then reassigned the case for all purposes to Judge W. Charles Morgan in Department 32 of the Riverside courthouse.  Judge Hernandez advised counsel to appear before Judge Morgan "in the next two or three minutes."  Defense counsel did not object to the reassignment.

About 45 minutes later, counsel appeared before Judge Morgan, who surmised that defendant was not present because the court had not previously ordered him transported to this proceeding.  Judge Morgan set a trial readiness conference for two weeks later (September 12, 2008) and ordered that defendant be transported to that proceeding.  The defense did not object to Judge Morgan about the reassignment.

On September 12, 2008, counsel and defendant appeared before Judge Morgan.  After conferring with counsel, Judge Morgan vacated the November 3, 2008 trial date and reset trial for January 5, 2009.  Neither defense counsel nor defendant objected to Judge Morgan continuing to preside over the case.

In December 2008, counsel and defendant appeared before Judge Morgan for further proceedings.  Judge Morgan trailed the trial date and ordered that the parties appear before Judge Prevost in Department 31 to correct any errors in the preliminary hearing transcript because "[h]e is going out to Banning, and it would be far more convenient" to do it in Riverside.  Defense counsel responded, "That's fine."  Counsel and defendant appeared before Judge Prevost the following

month and corrected the preliminary hearing record. Neither counsel nor defendant raised the reassignment issue with Judge Prevost.

b. *Analysis*

The People maintain that by failing to object to the judicial reassignment in the trial court defendant forfeited any challenge to the reassignment on appeal. We agree. (See *People v. Rogers* (2009) 46 Cal.4th 1136, 1172 (*Rogers*); *People v. Cowan* (2010) 50 Cal.4th 401, 460 (*Cowan*); *People v. Halvorsen* (2007) 42 Cal.4th 379, 429.) *Halvorsen* explains that this situation "perfectly exemplifies the basis for the forfeiture doctrine, for, had defendant objected, either the record would reflect why [the original judge] was unable to preside or [the original judge] would in fact have presided. Were the rule otherwise, defendants 'would be discouraged from making timely objections since, if the ultimate judgment were unfavorable, the defendant "would receive a second 'bite at the apple.' " ' " (*Halvorsen*, at p. 429; accord, *Rogers*, at p. 1172.) Likewise, here, had defendant objected to the judicial reassignment, Judge Hernandez likely would either have kept the case with Judge Prevost or explained in greater detail why the reassignment was necessary. By failing to object, defendant received the benefit of seeing how Judge Morgan would rule before seeking a second bite at the apple on appeal. Defendant has thus failed to preserve this challenge for appeal.

Even if we were to reach the merits of defendant's challenge, we would find it unpersuasive. First, trial courts are authorized to replace a judge — even midtrial — if the judge "shall die, become ill, or for any other reason be unable to proceed with the trial." (§ 1053; see rule 10.603(b)(1)(B)

53

[authorizing the presiding judge to "[a]pportion the business of the court, including assigning *and reassigning* cases to departments" (italics added)].) We have held that such substitutions "do[] not require the consent of the defendant or his counsel" (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1211) and do not violate a defendant's due process or jury trial rights (*Cowan*, *supra*, 50 Cal.4th at pp. 458–459; *Rogers*, *supra*, 46 Cal.4th at p. 1172). Defendant offers no persuasive rationale as to why a *midtrial* reassignment would withstand constitutional scrutiny but a *pretrial* reassignment such as the one that occurred here would not.[19]

Second, Judge Hernandez stated on the record his reason for reassigning the case — that, "as [counsel] know," Judge Prevost "ha[d] a new assignment." Defense counsel presumably "kn[e]w" about the "new assignment" because he neither objected nor requested additional information.

Third, defendant fails to persuade that the hearing was a critical proceeding that he was entitled to attend. He maintains the hearing was "unquestionably" critical because, had he been present, he would have learned that the case had been reassigned and "he could have done something — make an oral [Code of Civil Procedure section] 170.6 motion in court, or direct [defense counsel] to make a timely written motion, to disqualify

---

[19]     As we previously have found no due process right to object to a midtrial judicial reassignment without a criminal defendant's consent (*Cowan*, *supra*, 50 Cal.4th at pp. 458–459), we decline defendant's invitation to "recognize a limited due process right to object to the [pretrial] removal of judges who have been assigned to a case for all purposes without the consent of the parties."

Judge Morgan."[20]   But we will not presume from the silent record that defense counsel failed to timely notify defendant of the reassignment.  (See *Perez, supra*, 4 Cal.5th at pp. 439–440.)  Nor will we speculate about whether defendant would, in fact, have sought to disqualify Judge Morgan.  (See *id.* at p. 440 ["even if [the defendant] had been present, we do not know whether he would have filed a [Code of Civil Procedure] section 170.6 motion.  [¶]  Indeed, even now [the defendant] only states it is 'reasonably possible that he would have insisted that [the judge] be recused' — and does not state that he *would* have filed a Code of Civil Procedure section 170.6 motion"].)[21]

---

[20]   When its procedural requirements are met, Code of Civil Procedure section 170.6 entitles a litigant to disqualify a judge upon the mere assertion in an affidavit or declaration that the judge "is prejudiced against a party or attorney . . . so that the party or attorney cannot, or believes that he or she cannot, have a fair and impartial trial or hearing before the judge."  (Code Civ. Proc., § 170.6, subd. (a)(2); see *Perez, supra*, 4 Cal.5th at p. 439.)  "When a litigant has met the requirements of [Code of Civil Procedure] section 170.6, disqualification of the judge is mandatory, without any requirement of proof of facts showing that the judge is *actually* prejudiced."  (*Maas v. Superior Court* (2016) 1 Cal.5th 962, 972; accord, *Perez*, at p. 439.)  "When a criminal case has been assigned to a judge for all purposes, any [Code of Civil Procedure] section 170.6 challenge must be filed 'within 10 days after notice of the all purpose assignment, or if the party has not yet appeared in the action, then within 10 days after the appearance.'  ([Code Civ. Proc.,] § 170.6, subd. (a)(2).)"  (*Garcia v. Superior Court* (2023) 92 Cal.App.5th 47, 54; accord, *People v. Superior Court* (*Lavi*) (1993) 4 Cal.4th 1164, 1179.)

[21]   Although defendant suggests in his appellate briefing that Judge Morgan may have been biased against him and that the prosecutor may have played some role in causing the court to reassign the case, defendant expressly confirms that he is not

Finally, defendant asserts that the hearing at which Judge Hernandez reassigned the case was "unnoticed."  But the parties evidently had some notice of the proceeding because both the prosecution and counsel for the defense were present at the hearing, and defendant offers no persuasive authority supporting his suggestion that the procedures followed here were improper.  More importantly, to the extent defendant contends the purported lack of notice contributed to his absence from the hearing, for the reasons just explained, the hearing was not a critical proceeding that required his attendance.

Accordingly, defendant has not met his burden to show that the trial court erred in reassigning the case.

### 3. *Denial of motion to change venue*

Defendant contends the trial court violated his "federal and state constitutional rights to due process, a fair trial and a reliable determination of guilt and penalty" by denying without prejudice his motion for a change of venue and by failing "to conduct a searching voir dire."  (See U.S. Const., 5th, 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 1, 15, 16 & 17.)  We conclude defendant forfeited these contentions by failing to renew his motion after voir dire and by failing to object to the trial court's manner of conducting voir dire.  Were we to reach the merits of his motion, we would find them unpersuasive.

### a. *Background*

#### i. *Defendant's motion*

In August 2008, defendant filed a motion for a change of venue.  He argued he could not receive a fair trial in Riverside

---

raising claims of judicial bias or prosecutorial misconduct in this appeal.  We express no view on these claims.

County because "extensive" and "widespread" publicity surrounding his case lobbed a "constant barrage of predetermined allegations of guilt towards [him]" and portrayed him as "a man with prior criminal charges, a history of drug addiction, and a killer of beloved firefighters." Defendant supported his motion with a transcript of a press conference conducted by public officials on November 2, 2006; copies of 62 "representative" newspaper articles; and a media analyst's expert report analyzing the newspaper articles and a survey of potential jurors.

### (a) *Press conference*

Nine federal and county public officials spoke at a November 2, 2006 press conference addressing the Esperanza Fire and defendant's arrest. For the most part, the officials expressed their condolences for the loss of the firefighters and thanked the public safety personnel involved in fighting and investigating the Esperanza Fire. Several officials identified defendant as the arsonist who started the Esperanza Fire, announced that he would be charged with five counts of special-circumstance murder with a possible death penalty, and expressed confidence in his guilt. Two officials referred to the Esperanza Fire as a "heinous crime." And one county supervisor invoked biblical retribution and reassured area residents that they "can breathe a sigh of relief today that this sick individual is behind bars and is expected never to see the light of day."

### (b) *Newspaper articles*

Defendant submitted with his motion a "representative collection" of 62 local newspaper articles about the Esperanza Fire and his case. The articles covered the fire, the firefighters'

deaths, the identification of defendant as a person of interest, the filing of charges against him, the prosecution's decision to seek the death penalty, and other procedural aspects of the case. Some articles mentioned that defendant has tattoos and a criminal record. Many of the articles that discussed the facts of the case included statements from defendant or his counsel denying guilt and challenging the prosecution's evidence and theory of the case.

Defendant acknowledged in his motion that "local media has not fueled public consciousness of [him] in any significant way since the middle of 2007," but he expected coverage would increase as his trial approached.

### (c) *Expert's report*

To assess whether he could receive a fair jury trial in Riverside County, defendant retained media analyst Martin Buncher to conduct polling within the county and to analyze the 62 local newspaper articles described above. Buncher concluded that "the local juror pool ha[d] been significantly influenced by what they have heard and seen in the media, and [would] be unfavorably predisposed towards considering [defendant]'s role . . . in the Esperanza fire, making it very difficult for him to receive a 'fair trial.' " Buncher's findings showed that about 90 percent of the 198 survey respondents recalled how the fire started; about 74 percent "had detailed recollections of [defendant] and the Esperanza fire"; about 40 percent "felt that [defendant] was responsible for starting the Esperanza fire"; and about 36 percent "made specific negative references about [defendant]."

Buncher also opined that the tone and sequence of news coverage established "a strong negative link in memory between

[defendant] and the cause of the fire, not only by loaded articles (news material having a bias towards suggesting the guilt of this individual), but by its visual representation of [defendant]" in photographs that displayed facial characteristics typical of "contempt and disgust."

### ii. *The People's opposition*

The People opposed defendant's motion, asserting "that the pretrial publicity in this case has not been inherently prejudicial, that the asserted impact of publicity on potential jurors is, at best, speculative, and that it is necessary to review the responses of prospective jurors in voir dire in order to accurately assess the propriety of a change of venue." The People argued that, in light of case law holding that the nature of press coverage and the size of the relevant community are related factors, defendant had "fail[ed] to establish the requisite reasonable probability that [he] cannot receive a fair trial in Riverside County."

### iii. *Motion hearing*

The trial court heard the change of venue motion on November 7, 2008, about one month before trial was scheduled to begin. The court stated at the outset that it had read the parties' submissions.

The defense called Buncher as an expert in the field of polling. Regarding his review "primarily" of the newspaper articles' "headlines and immediate sub-headings and text most likely to be attended to and perceived" by readers, Buncher observed "an overall pattern" that began with a factual explanation of the Esperanza Fire and its associated tragedy, "and ended up with . . . very strong allegations concerning the responsibility of [defendant] for setting the fires." Buncher

opined that "prominent photographs" of defendant in some of the articles portrayed him "photographically as a villain," which "would lend towards a negative bias with respect to all other information which might be gathered by either a casual or more involved reader."

Buncher then testified about the results of his survey of 198 potential Riverside County jurors. About one-third (36 percent) of respondents spontaneously associated the Esperanza Fire with arson. Nearly half (48 percent) of all respondents considered themselves "extremely" or "somewhat" familiar with the fire.[22] Buncher found these responses significant because they indicated that "one out of two people . . . still feel familiar with the issues surrounding th[e] fire after 20 months," even though "there wasn't much publicity . . . over the last 12-month period." Buncher testified that 65 percent of respondents indicated they "paid 'a lot' or 'some' attention to media coverage" about the fire.[23] When asked about their

---

[22] Survey data attached to Buncher's report shows that the 48 percent was comprised of 5 percent who considered themselves "Extremely Familiar" and 43 percent who considered themselves "Somewhat Familiar" with the fire. On the other hand, the survey data also shows that 30 percent of respondents considered themselves "Not Too Familiar" and 21 percent considered themselves "Not At All Familiar" with the fire.

[23] Survey data attached to Buncher's report shows that the 65 percent was comprised of 27 percent who stated they "Paid *a lot* of attention to what was said and shown in the media" and 38 percent who stated they "Paid *some* attention." (Italics added.) On the other hand, the survey data also shows that 18 percent of respondents stated they "Did not really pay *much* attention" and 15 percent stated they "Did not really pay *any* attention." (Italics added.)

awareness of a suspect setting the fire, 16 percent of all respondents associated defendant, either spontaneously or when prompted, with starting the Esperanza Fire. Buncher admitted he "wouldn't use the term 'overwhelming' " to describe this subset of respondents.

The trial court then heard argument from counsel. Defense counsel found "troubling and disturbing the degree" to which officials at the November 2006 press conference "vilif[ied]" defendant, and although counsel acknowledged he did not "have a substantial basis for saying it," he believed it "would have had [a] substantial impact on people who saw [it]." The prosecutor responded, briefly, asserting the motion "isn't even close" because defendant's own "statistics support the idea that we, in fact, will get a fair jury in this county, in this courtroom."

The trial court denied defendant's motion without prejudice. Specifically, the court found that, based on the statistics and testimony presented, the county's population was large enough to provide a pool of jurors who were not familiar with the Esperanza Fire or the allegations against defendant. While the court found it "troubling" that defendant was "vilified in the . . . news conference," the court posited that "a great percentage [of prospective jurors] have not seen it" and that the slow "grind[]" of the legal process had rendered it "a distant memory." The court specified that it was denying defendant's motion without prejudice to renewing it if voir dire showed that the court could not empanel an impartial jury.

iv. *Voir dire*

The trial court screened 95 prospective jurors with a questionnaire prepared by the court with input from counsel.[24] The court then questioned prospective jurors over the course of several days, allowing counsel to ask questions after the court completed its preliminary questioning. Defense counsel neither objected to the manner in which the trial court conducted voir dire nor renewed his motion to change venue after jury selection.

After defense counsel used eight of his 20 allotted peremptory challenges, the trial court seated 12 jurors and four alternates.

b. *Discussion*

i. *Forfeiture*

"[W]hen a trial court initially denies a change of venue motion without prejudice, a defendant must renew the motion after voir dire of the jury to preserve the issue for appeal. Here, although expressly invited by the court to renew the motion after jury selection, defendant failed to do so." (*People v. Williams* (1997) 16 Cal.4th 635, 654–655.) "Because he did not renew his motion after voir dire, the claim is forfeited." (*People v. Hensley* (2014) 59 Cal.4th 788, 796 (*Hensley*); *People v. Johnson* (2015) 60 Cal.4th 966, 982 [same]; *People v. Hart* (1999) 20 Cal.4th 546, 598 [same].) Indeed, defendant implicitly acknowledges that he forfeited this challenge on direct appeal and must bring it, if at all, by way of a petition for writ of habeas corpus based on ineffective assistance of counsel.

---

[24] Defense counsel requested a correction to the questionnaire regarding the number of charged fires but otherwise made no suggestions aimed at discovering bias.

Additionally, to the extent defendant raises specific challenges to the trial court's juror questionnaire or manner of conducting voir dire, defendant has likewise forfeited those challenges by failing to raise them with the trial court when the court could have addressed them. (*People v. Foster* (2010) 50 Cal.4th 1301, 1324 [by failing to "object to the manner in which voir dire was conducted, . . . [d]efendant . . . has forfeited his claim that the voir dire was inadequate"]; *Rogers*, *supra*, 46 Cal.4th at p. 1149 [by "neither object[ing] to the questionnaire used, nor propos[ing] any modifications or additional questionnaire inquiries," the defendant "forfeited any claim that the questionnaire and its contents were inadequate"].)

### ii. *Merits*

Even if we were to reach the merits of defendant's claim, we would find them lacking. "On a defendant's motion, the court shall order a change of venue 'when it appears that there is a reasonable likelihood that a fair and impartial trial cannot be had in the county.' [Citations.] In deciding whether to change venue, a court must consider 'the nature and gravity of the offense, the nature and extent of the media coverage, the size of the community, the defendant's status within the community, and the victim's prominence.'" (*People v. Scully* (2021) 11 Cal.5th 542, 566–567 (*Scully*); see § 1033, subd. (a); *People v. Johnsen* (2021) 10 Cal.5th 1116, 1145–1146 (*Johnsen*).)

"On appeal, a defendant 'must show both error and prejudice, that is, that it was not reasonably likely the defendant could receive a fair trial at the time of the motion, and that it is reasonably likely he did not in fact receive a fair trial.' [Citation.] '[I]n rare and "exceptional cases," a defendant may

show circumstances so " 'extraordinary' " that a court may assume no fair trial could be had.' [Citations.] The United States Supreme Court has occasionally found such a showing adequate in cases where media coverage 'manifestly tainted a criminal prosecution' and resulted in ' "kangaroo court proceedings." ' (*Skilling v. United States* (2010) 561 U.S. 358, 379.) But the high court has made clear that the assumption 'attends only the extreme case.' " (*People v. Ramirez* (2022) 13 Cal.5th 997, 1032–1033; see *Scully, supra,* 11 Cal.5th at p. 567.) " 'On appeal, the defense bears the burden of showing both error and prejudice. It must establish a reasonable likelihood both that a fair trial could not be had at the time of the motion, and that the defendant did not actually receive a fair trial.' " (*Scully,* at p. 567.)

#### (a) *No error*

Considering all the relevant factors, we conclude the trial court did not err in denying defendant's motion to change venue.

##### (i) *Nature and gravity of the offense*

"The 'nature' of an offense refers to the ' "peculiar facts or aspects of a crime which make it sensational, or otherwise bring it to the consciousness of the community." ' [Citation.] The 'gravity' of an offense refers to ' "its seriousness in the law and to the possible consequences to an accused in the event of a guilty verdict." ' " (*Scully, supra,* 11 Cal.5th at p. 567.)

Here, "the gravity of the offense, capital murder, weighs in favor of a venue change. Yet we have repeatedly held that this factor is not dispositive [citation], and have rejected calls to establish a presumption of a venue change in all capital cases [citation]. Indeed, ' "every capital case involves a serious charge.

While this factor adds weight to a motion to change venue, it does not in itself require a change." ' " (*Scully*, *supra*, 11 Cal.5th at p. 567; see *People v. Suff* (2014) 58 Cal.4th 1013, 1045 (*Suff*) [denying change of venue in case involving 13 counts of murder].)

Other aspects of the nature and gravity of the offense weigh only modestly in favor of a change of venue. The underlying offenses — a series of wildland arson fires — "were not particularly aggravated in comparison with other capital murders. There were certainly gruesome details, but nothing approaching the sensational overtones of other cases in which we have upheld the denial of venue motions." (*Scully*, *supra*, 11 Cal.5th at p. 567; see, e.g., *Ramirez*, *supra*, 39 Cal.4th at p. 434 [serial rapes and murders].) Defendant argues that many people within the community were witnesses to, or directly or indirectly affected by, the fires involved in this case. To the extent the record may support this assertion, such impacts did not on their own compel a change of venue, especially given that substantial time had elapsed since the fires. (See, e.g., *Ramirez*, at p. 433 [finding no error in the denial of a change of venue motion notwithstanding a poll, undertaken in support of the motion, indicating that 46 percent of surveyed individuals "said their concern for their safety had increased when the murders were occurring"].) Nor does the fact that the victims were firefighters weigh heavily in favor of a change of venue. (Cf. *Scully*, at p. 568 ["The fact that the victim was a police officer . . . does not require a venue change"].)

(ii) *Nature and extent of the media coverage*

"Heavy media coverage may weigh in favor of a change of venue, but does not necessarily compel it." (*People v. Harris*

(2013) 57 Cal.4th 804, 825 (*Harris*); see *Ramirez*, *supra*, 39 Cal.4th at p. 434 [finding no error in the denial of a change of venue motion notwithstanding media coverage described as being at a " 'saturation, as much as they possibly can give' " level].) Neither the nature nor extent of media coverage weighs in favor of changing venue in this case. Regarding the nature, while defense expert Buncher based his opinion that coverage was negative "primarily" on the "headlines and immediate sub-headings" of the 62 selected news articles, a thorough review of the articles in their entirety shows that coverage was more fairly balanced and routinely included the defense perspective of the case. (See *People v. McCurdy* (2014) 59 Cal.4th 1063, 1077 (*McCurdy*) [emphasizing, in finding no error in the denial of a change of venue motion, that "the tone of most of the articles" relied upon by the defendant "was relatively neutral, and none was especially prejudicial or inflammatory"].) Buncher also opined that several newspaper articles were accompanied by unflattering photographs of defendant, but less than one-third of the articles included defendant's photograph, and about one-third of those showed him wearing a suit in court.[25] As for the negative comments by public officials at the press conference, those comments were only a fraction of the overall content of the event and it is unclear whether any prospective jurors watched the event. On balance, the nature of the news coverage does not warrant a change of venue.

Nor does the extent of coverage warrant a change in venue. The 62 articles that defendant cites reflect less coverage

---

[25] One article was devoted to "Defendant Makeovers" and commented on defendant's professional appearance at his preliminary hearing.

than what we have previously found insufficient to disturb a trial court's venue ruling. (See, e.g., *Scully*, *supra*, 11 Cal.5th at p. 564 [involving nearly 140 articles and collecting cases involving about twice as much media coverage]; *Suff*, *supra*, 58 Cal.4th at pp. 1045–1046 [more than 70 articles].) In addition, a substantial majority of the articles produced by defendant in his motion for change of venue had been published more than a year earlier. "Even in cases with saturated media coverage, we have concluded that 'the passage of more than a year from the time of the extensive media coverage served to attenuate any possible prejudice . . . .' " (*Scully*, at p. 570, quoting *Ramirez*, *supra*, 39 Cal.4th at p. 434.) Indeed, with respect to the November 2006 press conference, the trial court expressly found the passage of time would render the event "a distant memory." (*Scully*, at p. 568 [" ' "When pretrial publicity is at issue, 'primary reliance on the judgment of the trial court makes [especially] good sense' because the judge 'sits in the locale where the publicity is said to have had its effect' and may base her evaluation on her 'own perception of the depth and extent of news stories that might influence a juror' " ' "].)

This factor does not weigh in favor of changing venue.

### (iii) *Size of the community*

" 'The size of the community is important because in a small rural community, a major crime is likely to be embedded in the public consciousness more deeply and for a longer time than in a populous urban area.' " (*Johnsen*, *supra*, 10 Cal.5th at p. 1148.) "[T]he critical factor is whether the size of the population was sufficient to dilute adverse publicity." (*McCurdy*, *supra*, 59 Cal.4th at p. 1078; see also *People v. Lewis* (2008) 43 Cal.4th 415, 448; cf. *Lucero v. Superior Court* (1981)

122 Cal.App.3d 484, 492 [considering both a county's population and the geographic dispersal of its population].) "When . . . there is a 'large, diverse pool of potential jurors, the suggestion that 12 impartial individuals could not be empanelled is hard to sustain.' " (*People v. Famalaro* (2011) 52 Cal.4th 1, 23.)

Defendant submitted with his motion United States census data showing that Riverside County had a population of 2,073,571, making it the fourth most populous county in the state (behind only Los Angeles, Orange, and San Diego Counties). Although we previously found Riverside County's population of 1,357,000 in January 1994 to be "a neutral factor" on the question of a venue change (*Suff, supra*, 58 Cal.4th at p. 1045), we now find the "size of this community militates against a venue change" (*People v. Ramirez, supra*, 13 Cal.5th at p. 1039 [addressing Kern County's population of 648,400 in 2000]; see *Scully, supra*, 11 Cal.5th at pp. 564, 575 [holding that Sonoma County's population of 421,500 in 1996, ranking it 16th in the state, did not weigh in favor of changing venue]; *Johnsen, supra*, 10 Cal.5th at p. 1148 [holding that Stanislaus County's population of approximately 405,000 did not weigh in favor of changing venue]).

(iv) *Defendant's status within the community*

"In evaluating [a] defendant's status within the community, courts consider 'whether [he or she] was viewed by the press as an outsider, unknown in the community or associated with a group to which the community is likely to be hostile.' " (*Scully, supra*, 11 Cal.5th at p. 575.) Defendant has cited no evidence indicating he was "prominent or notorious apart from [his] connection with the present proceedings." (*People v. Prince* (2007) 40 Cal.4th 1179, 1214 (*Prince*); see

*Johnsen, supra,* 10 Cal.5th at p. 1148 ["The absence of any reputation in Modesto renders [defendant]'s social status a ' "neutral factor[]" ' "].)

Defendant argues this factor supports a change of venue because of his publicized "history of arrests, drug use, poverty and appearance." However, defendant cites " ' "no evidence of *unusual local hostility* to such persons, such that a change of venue would likely produce a less biased panel." ' " (*Scully, supra,* 11 Cal.5th at p. 575 [holding that references to the defendant "as a 'career criminal,' 'recent parolee,' or alleged member of the Aryan Brotherhood" did not weigh in favor of changing venue].) This factor does not weigh in favor of changing venue.

### (v) *Victims' prominence*

"The community status of the victim generally focuses on 'whether the victim had any prominence in the community *before* the crimes.' " (*Scully, supra,* 11 Cal.5th at p. 576.) Although it does not appear that the fallen firefighters had any prominence in the community before their deaths, "We have . . . considered the posthumous status of a [first responder] when the events and media coverage following the crimes made the [first responder] a celebrity after he was killed." (*Ibid.*) While it appears the media posthumously portrayed the fallen firefighters as heroes, as already noted the media coverage of this case tapered off after the initial flurry of coverage and the one-year anniversary of the Esperanza Fire. (See *ibid.* [finding posthumous celebrity status mitigated where media coverage "substantially predated defendant's trial"].) Additionally, it was the victims' status as first responders who were "killed in the line of duty" that "propelled [them] to prominence." (*Odle v.*

69

*Superior Court* (1982) 32 Cal.3d 932, 942.) Thus, this factor weighs only "somewhat" in favor of changing venue. (*Scully, supra,* 11 Cal.5th at p. 576.)

### (vi) *Summary*

We find no error. Only two of the factors reviewed above weigh in favor of a change of venue, and they do so only to a limited degree. Meanwhile, the substantial size of the community provides significant assurance that impartial jurors could be identified. On the whole, upon "[r]eviewing the legal question de novo based on the factors above, we conclude defendant has not shown a reasonable likelihood that a fair trial could not be had in [Riverside] County at the time of his venue change motion[]." (*Scully, supra,* 11 Cal.5th at p. 576; see *id.* at p. 567.)

### (b) *No prejudice*

"Defendant also fails to demonstrate a reasonable likelihood he was prejudiced, that is, that he did not in fact receive a fair and impartial trial." (*McCurdy, supra,* 59 Cal.4th at p. 1080.) Preliminarily, we would find that this is not one of those "exceptional" or "extraordinary" cases in which we presume prejudice from extensive adverse pretrial publicity. (*Prince, supra,* 40 Cal.4th at p. 1216, italics omitted; see *People v. Ramirez, supra,* 13 Cal.5th at p. 1042.) As noted, news coverage was fairly balanced and was not tantamount to the type of "media circus" (*People v. Ramirez,* at p. 1042) or " ' "kangaroo court" ' " (*ibid.*) giving rise to a presumption of prejudice.

Nor does further examination of the appellate record reveal any prejudice. Although 10 of the 12 seated jurors

70

reported that they had seen news coverage about the case, none had detailed knowledge of the case and four expressly stated they had only heard about it around the time of the fire, years before trial. The fact that jurors "had been exposed to some pretrial publicity . . . , standing alone, 'does not necessarily require a change of venue. [Citation.] " 'It is sufficient if the juror can lay aside his [or her] impression or opinion and render a verdict based on the evidence presented in court.' " ' " (*People v. Ramirez*, *supra*, 13 Cal.5th at p. 1040.) All the seated jurors at defendant's trial stated that they had no preconceived opinion about defendant's guilt and represented that they could and would decide the case based on the evidence. We have previously concluded that similar circumstances did not establish prejudice. (See, e.g., *id.* at pp. 1040–1041 [finding no prejudice where "11 of the 12 [seated jurors] had been exposed to some pretrial publicity" but stated it "would not affect their ability to be fair and impartial"]; *Prince*, *supra*, 40 Cal.4th at p. 1215 [finding no prejudice where "a high percentage of the prospective jurors and 12 of the 13 jurors who actually served at trial (one juror was excused after the guilt phase and an alternate was substituted) had been exposed to the publicity"]; *Ramirez*, *supra*, 39 Cal.4th at pp. 434–435 ["Although only one member of the jury indicated during voir dire that he never had heard of the case, they all stated they had not 'formed any opinion as to the guilt or innocence of [the defendant] regarding this case' and could be fair"]; *Harris*, *supra*, 57 Cal.4th at p. 830 [finding no prejudice where, "[a]mong the 12 seated jurors at defendant's trial, two knew nothing about his case and the remaining 10 recognized the case but remembered few specifics"].)

In addition, the fact that defendant did not use all his allotted peremptory challenges "suggests defendant at trial believed the jury was fair and impartial." (*McCurdy*, *supra*, 59 Cal.4th at p. 1080; see *Hensley*, *supra*, 59 Cal.4th at p. 796 ["Defendant's failure to exhaust his peremptory challenges . . . supports 'a reasonable inference that the defense did not believe that pretrial publicity had prejudiced the seated jurors' "].)

Finally, the fact that the jury deadlocked on three counts "tends to show that it was not prejudiced against [the defendant], but rather was able to fairly evaluate the evidence before it." (*Harris*, *supra*, 57 Cal.4th at p. 831.)

### 4. *Exclusion of juror*

Defendant contends the trial court's exclusion of an allegedly death-qualified juror violated his constitutional rights to due process, a fair trial, and a reliable death sentence. (See U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 16.) We reject this contention.

### a. *Background*

Several questions within the jury questionnaire probed prospective jurors' views regarding the death penalty and how those views might affect their ability to serve. Question 42 of the trial court's juror questionnaire asked jurors for their "GENERAL FEELINGS regarding the death penalty." Prospective juror E.W. responded, "I feel that it is a necessary penalty to have. I feel that it should be reserved for those who are cruel [and] unusal [*sic*] with their crimes, especially serial killers, rapists [and] criminals against children." In response to question 43(a), which asked whether the death penalty is used the right amount, E.W. responded, "No. Most people who get it

sit for long periods of time and don't actually get executed. I feel in most cases it is a waste of time."

Question 44 began by providing an overview of trial proceedings, including the penalty phase, explaining that if the case reached that stage, the jury would determine the penalty "by weighing and considering certain enumerated aggravating factors and mitigating factors (bad and good things) that relate to the facts of the crime and the background and character of the defendant, including a consideration of mercy. The weighing of these factors is not quantitative, but qualitative, in which the jury, in order to fix the penalty of death, must be persuaded that the aggravating factors are so substantial in comparison with the mitigating factors, that death is warranted instead of life imprisonment without parole." Subparts to this question asked how prospective jurors would approach these penalty deliberations. Question 44(c) inquired whether a prospective juror would, "because of any views that [they] may have concerning capital punishment, automatically refuse to vote in favor of the penalty of death and automatically vote for a penalty of life imprisonment without the possibility of parole, without considering any of the evidence of any of the aggravating and mitigating factors . . . regarding the facts of the crime and the background and character of the defendant." (Underlining omitted.) E.W. answered, "no." She gave the same answer to question 44(d), which asked prospective jurors if they would, "because of any views that [they] may have concerning capital punishment, automatically refuse to vote in favor of the penalty of life imprisonment without the possibility of parole and automatically vote for a penalty of death, without considering any of the evidence, or any of the aggravating and mitigating factors . . . regarding the facts of the crime and the background

73

and character of the defendant." (Underlining omitted.) E.W. wrote her initials next to question 44(e), which asked, "If your answer to either question (c) or question (d) was 'yes,' would you change your answer, if you are instructed and ordered by the court that you must consider and weigh the evidence and the above mentioned aggravating and mitigating factors regarding the facts of the crime and the background and character of the defendant, before voting on the issue of penalty." In response to question 44(f)'s inquiry whether she "[c]ould . . . set aside [her] own personal feelings regarding what the law ought to be and follow the law as the court explains it," E.W. responded, "Yes."

Voir dire of E.W. occurred one week after she completed her jury questionnaire. After questioning E.W. about her written responses disclosing connections to the legal profession, law enforcement, and firefighting, the trial court asked, "Are you, by virtue of your answer . . . on [question] 42, locked into a certain punishment for crimes, and in this case, would you be locked into a certain position?" E.W. responded, "I don't know." After the trial court responded, "Okay," E.W. elaborated: "I've been struggling with, you know, while we were gone, thinking about that in particular. And not knowing what the special circumstances are, I think also . . . ." The trial court interjected, "Well you've heard the special circumstance. It was read to you." When E.W. asked what the special circumstances were, the trial court clarified that "[o]ne of the special circumstances is arson that caused a death" — to which E.W. responded, "Okay" — "[a]nd the other special circumstance is multiple murders" — to which E.W. also responded, "Okay." The trial court explained, "If someone is convicted of multiple murders, first degree, one of them has to be first degree, and if someone's convicted of an arson that causes the death, then those special circumstances

74

could be found true. Now, we don't know if that's going to happen. [¶] . . . [¶] Please keep that in mind." E.W. responded, "Right."

The trial court focused its questioning: "We have to know your attitude, and everyone else's that sits on this jury, if we do get to that point. And my question to you is, are both options open to you, and real particularly, open to you if we were to get there?" E.W. responded, "No." The trial court followed up, "Okay. You believe that you would favor one position over the other?" E.W. answered, "I honestly do, yes." The trial court responded, "And that's all we need [¶] . . . [¶] your honest evaluation. Well, I want to thank you very much. You stop by the second floor. Let them know that you've been excused." Defense counsel did not object or ask to question E.W.

b. *Analysis*

" ' "Under state and federal constitutional principles, a criminal defendant has the right to be tried by an impartial jury. (Cal. Const., art. I, § 16; U.S. Const., 6th & 14th Amends.)" ' " (*People v. Frazier* (2024) 16 Cal.5th 814, 830 (*Frazier*).) " 'A prospective juror may be excluded for cause without compromising a defendant's right to trial by an impartial jury if the juror's views on capital punishment "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " ' " (*People v. Winbush* (2017) 2 Cal.5th 402, 428 (*Winbush*), quoting *Wainwright v. Witt* (1985) 469 U.S. 412, 424.) "A prospective juror is properly excluded if he or she is unable to conscientiously consider all of the sentencing alternatives, including the death penalty where appropriate." (*People v. Jones* (2003) 29 Cal.4th 1229, 1246 (*Jones*); accord, *Winbush*, at

p. 429.) " ' "There is no requirement that a prospective juror's bias against the death penalty be proven with unmistakable clarity. [Citations.] Rather, it is sufficient that the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law in the case before the juror." ' " (*Winbush*, at p. 429; accord, *Frazier*, at p. 831.)

We review a trial court's excusal of a prospective juror for cause for substantial evidence. (*Frazier*, *supra*, 16 Cal.5th at p. 831.) Generally, a trial court's rulings excusing a juror for cause " ' " ' "are afforded deference on appeal, for 'appellate courts recognize that a trial judge who observes and speaks with a prospective juror and hears that person's responses (noting, among other things, the person's tone of voice, apparent level of confidence, and demeanor), gleans valuable information that simply does not appear on the record.' " ' " ' [Citation.] Deference is also accorded to a trial court's rulings in the death penalty qualification context '[b]ecause prospective jurors "may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings." ' [Citation.] ' " 'When the prospective juror's answers on voir dire are conflicting or equivocal, the trial court's findings as to the prospective juror's state of mind are binding on appellate courts if supported by substantial evidence.' " ' " (*Ibid.*)

Substantial evidence supports the trial court's excusal of E.W. To review, in her questionnaire, E.W. stated that the death penalty "should be reserved for those who are cruel [and] unusal [*sic*] with their crimes, especially serial killers, rapists [and] criminals against children," but she also indicated that she would not automatically refuse to vote for the death penalty

without considering the evidence. These written responses, standing alone, were not disqualifying. (See *Lockhart v. McCree* (1986) 476 U.S. 162, 176.) However, on voir dire one week later, E.W.'s questionnaire response that the death penalty "should be reserved for those who are cruel [and] unusal [*sic*] with their crimes, especially serial killers, rapists [and] criminals against children," prompted the court to inquire whether E.W. would "be locked into a certain position" in this case. E.W. said that since she completed the questionnaire she had been "struggling with" and "thinking about" whether she could consider both penalty options. In response to the trial court's questioning, and after confirming the special circumstances alleged in this case, E.W. responded with a flat "[n]o" when asked if she would be "open" to both sentencing options, and said she "honestly" would favor one position over the other. The trial court — which had the benefit of witnessing E.W.'s demeanor, which we do not — could have reasonably determined from this development that E.W. "[was] unable to conscientiously consider all of the sentencing alternatives, including the death penalty where appropriate." (*Jones*, *supra*, 29 Cal.4th at p. 1246; see *Frazier*, *supra*, 16 Cal.5th at p. 831; *People v. Fuiava* (2012) 53 Cal.4th 622, 660–661 (*Fuiava*); *Martinez*, *supra*, 47 Cal.4th at pp. 427–432; cf. *People v. Beck and Cruz* (2019) 8 Cal.5th 548, 607–608 (*Beck and Cruz*) [" 'the mere theoretical possibility that a prospective juror might be able to reach a verdict of death in some case does not necessarily render the dismissal of the juror' erroneous"].)[26]

---

[26] Defendant argues the trial court erred by excluding E.W. without affording defense counsel the opportunity to question or rehabilitate her. Although the trial court did not expressly

Defendant argues that our decision in *People v. Leon* (2015) 61 Cal.4th 569 (*Leon*) establishes that the trial court erred in excusing E.W. without additional inquiry. The concurring and dissenting opinion agrees with defendant on this point. (Conc. & dis. opn. of Evans, J., *post*, at pp. 6–12.) The circumstances in *Leon*, however, are distinguishable. In *Leon*, three prospective jurors indicated in their respective questionnaire responses that they would automatically vote in favor of a life without the possibility of parole sentence if the case reached the penalty phase (*Leon*, at pp. 590–591), but they also "answered 'yes' to questions asking if they would *change their answers* on automatic voting if instructed to set aside personal feelings and weigh aggravating and mitigating evidence before voting on penalty" (*id*. at p. 591). The trial court began voir dire "by telling prospective jurors it was going to repeat questions about the death penalty they had already answered," and "then asked each panelist the first four *Witherspoon/Witt* questions from the questionnaire, with very little variation or elaboration." (*Ibid*.) "The three dismissed jurors repeated their previous answers, again stating they would automatically vote for life imprisonment without

---

invite defense counsel to examine E.W. after questioning but before dismissing her, the court had previously made clear at the outset of voir dire that counsel would have the opportunity to examine prospective jurors. Yet defense counsel did not ask to question E.W. Thus, we see no error in the trial court's dismissal of E.W. without explicitly inviting questioning by the defense at that time. Moreover, "Although defense counsel's failure to object to [E.W.'s] removal did not forfeit this claim on appeal . . . , [it] suggests that 'counsel concurred in the assessment that the juror was excusable.'" (*People v. Souza* (2012) 54 Cal.4th 90, 127.)

parole over death." (*Ibid.*) We found error in the excusal of these candidates, explaining that "[t]he cursory voir dire of the dismissed jurors here was simply not sufficient to permit an informed determination about their ability to serve." (*Id.* at p. 593.) We elaborated, "When the prospective jurors repeated their answers about automatically voting for life imprisonment without parole, the court excused them without exploring whether they were capable of setting aside this bias and imposing a verdict of death if the evidence of aggravating and mitigating factors required it. This was error. An adequate *Witherspoon/Witt* voir dire cannot simply reaffirm prospective jurors' biases without also asking whether they are capable of setting them aside and determining penalty in accordance with the law." (*Ibid.*)

The inquiries in *Leon* were deemed inadequate because the trial court's voir dire simply restated questions that appeared on the jury questionnaire and elicited responses similar to those that had already been provided, without further questioning that would draw from related questionnaire responses indicating an ability to serve. In this case, voir dire did not "simply reaffirm" a subset of questionnaire responses (*Leon, supra,* 61 Cal.4th at p. 593); it revealed instead that E.W.'s views regarding her ability to vote for the death penalty had evolved — evidently due to considerable thought on her part — since she completed the jury questionnaire. Again, in response to the trial court's questioning, E.W. stated that in the week since she had completed the juror questionnaire, she had "been struggling with" and "thinking about . . . in particular" whether she would be, in the trial court's words, "locked into a certain position" when it came to punishment. Then, after being reminded of the special circumstances that had been alleged

against defendant, E.W. said she was not open to both sentencing options that might be considered at a penalty phase, and, in response to another question, that she "honestly" believed she would favor one position over the other. This conversation conveyed that after substantial consideration of the relationship between her death penalty views and how they would affect her deliberations, E.W. would not consider both sentencing alternatives in defendant's case, as the law requires.[27] Even without additional follow-up questions, the

---

[27] The concurring and dissenting opinion offers a different interpretation of E.W.'s statements, opining that they could have merely communicated "her personal opposition to the death penalty without consideration of what the law requires." (Conc. & dis. opn. of Evans, J., *post*, at p. 18.) The record reflects that the trial court had a different interpretation of these statements. Indeed, the concurring and dissenting opinion's downplaying of these statements is simply not reasonable in light of the record as a whole. In evaluating the relationship between these responses and E.W.'s ability to follow the law as instructed, the trial court properly could have taken into consideration the detailed explanation within the jury questionnaire of jurors' responsibilities at any penalty phase, including the weighing process that jurors would have to undertake. Although E.W. indicated in her questionnaire responses that she would not vote automatically for either penalty and would be able to set aside her feelings and apply the law, her answers to questions posed at voir dire communicated that upon continued reflection triggered by the questionnaire, and in light of the special circumstances alleged in this case, she considered herself unable to "conscientiously consider" the death penalty as an option at any penalty phase, as the law requires. (*Jones, supra*, 29 Cal.4th at p. 1246; see *People v. Poore* (2022) 13 Cal.5th 266, 295; *People v. Baker* (2021) 10 Cal.5th 1044, 1086; *Winbush, supra*, 2 Cal.5th at p. 429 [" ' "The real question is ' " "whether the juror's views about capital punishment would prevent or impair the juror's ability to return a verdict of death *in the case before the juror*' " ' " ' "].)

trial court could have ascertained from this development, as articulated in unequivocal terms by E.W., a " ' "definite impression" ' " (*Winbush, supra,* 2 Cal.5th at p. 429) that E.W. would not be able to put aside her personal views and " ' "faithfully and impartially apply the law in the case before" ' " her (*ibid.*). The excusal of E.W. was therefore supported by substantial evidence.[28]

On these facts, *People v. Schultz* (2020) 10 Cal.5th 623 (*Schultz*), which involved a comparable evolution in a prospective juror's views, is more closely on point. There, we rejected a defendant's attempted analogy to *Leon* and found no error in the excusal of a prospective juror for cause when her statements during voir dire to the effect that she could not apply the death penalty, regardless of the evidence and the weighing of aggravating and mitigating circumstances at the penalty phase, "effectively repudiated her questionnaire responses." (*Id.* at p. 653.) Our decision in *Schultz* determined that the prospective juror's voir dire "responses were clear and unambiguous statements from which the trial court could properly conclude that [she] would not be able to set aside her beliefs and follow the court's instructions." (*Ibid.*) We reached this conclusion even though the prospective juror "indicated on her questionnaire that she did not have strong views regarding the death penalty and that she could follow the court's instructions" (*ibid.*), and the trial "court never asked [the prospective juror] directly whether her opposition to the death

---

[28] Defendant also relies on *People v. Stewart* (2004) 33 Cal.4th 425, but that case is plainly distinguishable as involving the exclusion of prospective jurors based solely on their questionnaire responses, with no follow-up voir dire by anyone. (See *id.* at p. 448.)

penalty meant she was not willing or able to set aside her views and to follow the court's instructions to determine the appropriate punishment" (*id.* at p. 652). This case involves an evolution in a prospective juror's views similar to what occurred in *Schultz*, and as in that case, we find no error in the excusal of the prospective juror. (See *Winbush*, *supra*, 2 Cal.5th at p. 432 [upholding the dismissal of a prospective juror for cause where the candidate's views "had apparently 'crystalized' over the course of her questioning and perhaps during [a] break"].)[29]

The concurring and dissenting opinion faults the trial court for not specifically asking E.W. "whether she could set aside her personal views and follow the law as instructed," whether she "would vote in favor of life without parole *regardless of the evidence* in aggravation and mitigation," or other questions that the concurring and dissenting opinion regards as necessary "to demonstrate that E.W. was incapable of following the law." (Conc. & dis. opn. of Evans, J., *post*, at p. 16; see *id.* at p. 19.) While responses to questions such as those set out in the concurring and dissenting opinion may support a finding that someone cannot fairly and impartially

---

[29] We explained in *Winbush*, "A refinement of views often occurs during voir dire. When panel members are sent to a courtroom, they learn for the first time that they have been called for a capital case. Then, appropriately, their opinions are probed in depth. These questions touch on matters of conscience, morality, social policy, and individual ability that panelists may never have considered in practical detail. The process encourages panelists to think deeply and seriously about their views. It falls to the discerning trial judge to carefully evaluate each panelist's state of mind on these weighty issues. The able trial court did so here." (*Winbush*, *supra*, 2 Cal.5th at p. 432.)

serve as a juror (see, e.g., *Schultz, supra,* 10 Cal.5th at p. 652), such an inability may be established in various ways (see, e.g., *Fuiava, supra,* 53 Cal.4th at pp. 660–661; *Martinez, supra,* 47 Cal.4th at pp. 427–432), and there is no required script that must be followed during voir dire (see *Beck and Cruz, supra,* 8 Cal.5th at p. 608). Although questions such as those proposed by the concurring and dissenting opinion may be helpful in certain circumstances, here the trial court undertook an adequate inquiry in light of E.W.'s responses; no further questioning was required.

For these reasons, we reject defendant's claim of error in jury selection.

## B. Guilt Phase Issues

### 1. *Substantial evidence*

Defendant challenges the sufficiency of the evidence supporting all but four of his convictions — those arising from the June 9 and June 10 fires from which his DNA was recovered from the layover devices (counts 14, 15, 34, and 35)[30] — and the special circumstance findings. " ' "In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves. Rather, we 'examine the whole record in the light

---

[30] In his opening brief, defendant also concedes that sufficient evidence supports his convictions arising from the June 3 layover device fire (counts 12 and 32) because it "was near [his] apartment" and, thus, "it is indisputable that [he] could have been in the vicinity of the fire." In his reply brief, however, defendant purports to "no longer concede[] there was sufficient evidence to convict him" on these counts. Despite defendant's concession in his opening brief, we exercise our discretion to evaluate the sufficiency of the evidence supporting defendant's convictions on these counts.

most favorable to the judgment to determine whether it discloses substantial evidence — evidence that is reasonable, credible and of solid value — such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence and to special circumstance allegations. [Citation.] '[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding.' [Citation.] We do not reweigh evidence or reevaluate a witness's credibility." ' " (*People v. Ramirez*, *supra*, 13 Cal.5th at pp. 1117–1118.)

Applying these principles, we find the evidence sufficient to support all of defendant's convictions and the special circumstance findings.

### a. *Background*

Defendant was charged in counts 1 through 5 with first degree murder on a felony-murder theory premised on the firefighters' deaths during the Esperanza Fire. (See § 189, subd. (a) ["All murder . . . that is committed in the perpetration of . . . arson . . . is murder of the first degree"].) The trial court instructed the jury that to find defendant guilty on these counts, the People had to prove that defendant committed arson, that he intended to commit arson, and that while committing arson he did an act that caused the death of another person. (See CALCRIM No. 540A.) The court instructed the jury that "[t]o

decide whether the defendant committed arson," the jury should "refer to the separate instruction . . . on that crime."

Defendant was charged in counts 6 through 8 and 12 through 28 with arson of forest land in violation of section 451, subdivision (c). Under section 451, "A person is guilty of arson when he or she willfully and maliciously sets fire to or burns or causes to be burned . . . any structure, forest land, or property." The punishment for arson depends on the type of damage caused by the fire. Under subdivision (c) of section 451, "Arson of a structure or forest land is a felony punishable by imprisonment in the state prison for two, four, or six years."[31] The trial court instructed the jury that to find defendant guilty on these counts, the People had to prove that he "set fire to or burned a forest land" and "acted willfully and maliciously" when he did so.[32] (See CALCRIM No. 1515.)

Defendant was charged in counts 29 through 45 with possession of an incendiary device in violation of section 453, subdivision (a). The trial court instructed the jury that to find defendant guilty on these counts, the People had to prove that

---

[31] In comparison, "Arson that causes great bodily injury is a felony punishable by imprisonment . . . for five, seven, or nine years" (§ 451, subd. (a)); "Arson that causes an inhabited structure or inhabited property to burn is a felony punishable by imprisonment . . . for three, five, or eight years" (§ 451, subd. (b)); and "Arson of property is a felony punishable by imprisonment . . . for 16 months, two, or three years" (§ 451, subd. (d)).

[32] The trial court correctly instructed the jury in accordance with section 451, subdivision (c) but erroneously stated that the instruction pertained to section 451, subdivision (b). Defendant does not assert any claim of error arising from this misstatement.

he "possessed an incendiary device in an arrangement or preparation" and "willfully and maliciously intended to use the material or device to set fire to or burn forest land." (See CALCRIM No. 1550.) As noted, each incendiary device count was paired with an arson count that corresponded to a remote device or layover device fire.[33]

As to the arson-murder special circumstance attached to the murder counts, the trial court instructed the jury that to find the allegation true, the People had to prove: "One, the defendant set fire to or burned forest land; [¶] A, he acted willfully and maliciously; [¶] And B, the fire burned an inhabited structure. [¶] Two, the defendant intended to commit an arson; [¶] Three, the defendant did an act that caused the death of another person; [¶] And four, the act causing the death and the arson of the inhabited structure were part of one continuous transaction." (See CALCRIM No. 730; § 190.2, subd. (a)(17)(H).)

The court also instructed the jury regarding the multiple-murder special circumstance. (See § 190.2, subd. (a)(3); CALCRIM No. 721.)

b. *Analysis*

i. *Convictions*

There is no serious dispute that substantial evidence supports the jury's findings that whoever started each charged

_____

[33] The only arson counts on which defendant was convicted that did not correspond to an incendiary device count were count 20 (June 16 loose matchstick fire), count 25 (Orchard Fire), and count 27 (Mias Canyon Fire). The jury was unable to reach a verdict on three other arson counts (counts 9–11) that did not involve an incendiary device (the May 28, 29, and 31 loose matchstick fires).

fire willfully and maliciously caused forest land to burn, that whoever possessed each incendiary device did so with the intent to willfully and maliciously set fire to forest land, or that whoever started the Esperanza Fire intentionally committed an act of arson that caused the death of five firefighters. Rather, defendant challenges only the sufficiency of the evidence supporting the jury's finding that *he* was the perpetrator of all these offenses. He argues that the presence of general similarities across the charged fires, such as the fact that they all were ignited in the Banning Pass area within a five-and-a-half-month time frame, does not by itself provide sufficient evidence that they were all the work of a single arsonist. Viewing the record as a whole in the light most favorable to the judgment, we conclude that substantial evidence supports all of defendant's convictions.

Several arson investigators identified an array of factors that supported the prosecution's single arsonist theory. First, there were many commonalities among the methods used to start the fires. The use of wooden matches in most of the fires — 18 of the 20 fires on which defendant was convicted — was, standing alone, unusual for wildland fires. As was the use of incendiary devices constructed from cigarettes — almost always some variety of Marlboro[34] — and matches. The combination of wooden matches and cigarettes in time delayed incendiary devices rendered the devices even more unusual. Prosecution

---

[34] At least 14 out of the 17 fires that were started with a cigarette-and-matches device used some variety of Marlboro cigarette; investigators could not determine the brand of the remaining three cigarettes.

and defense witnesses agreed that the layover devices were unique such that they were all the work of a single arsonist.

There were also numerous commonalities between the layover devices and the remote devices that indicated both types were the work of a single arsonist. Aside from the three remote device fires on May 16 that used 30 or 31 matches each, the layover devices and the later remote devices (including those that used paper matches) all used between five and seven matches.[35] In addition, many of the remote devices (including the Esperanza Fire device) and at least one layover device had a match placed over the cigarette filter in an apparent attempt to destroy evidence. Defendant's own experts acknowledged they had never encountered in a wildland fire the exact type of remote devices as the ones used in the charged offenses.

Prosecution experts proffered a plausible "evolution" theory that accounted for the single arsonist's use of different means to start the charged fires. The arsonist started the first three fires with a remote device that used 30 to 31 matches, which was "clumsy" and "overkill" and posed a risk of injury to the arsonist. The arsonist started the next three fires (on which the jury deadlocked) with two to four loose wooden matchsticks, which allowed the arsonist to select an ideal fuel bed but increased the risk of being detected because there was no time delay. The arsonist then evolved to unique layover devices that allowed for the selection of ideal fuel beds but still came with some risk of detection while deploying the device, though that

---

[35] The remote devices constructed from paper matches were constructed more similarly to the unique wooden match and cigarette devices than to the more "typical[]" paper *matchbook* devices in which paper matches are used.

risk was reduced by the devices' time delay. The use of a blue paper towel with the first layover device further suggested experimentation and evolution. Finally, the arsonist returned to remote devices that adopted the reduced number of matches that had proven effective with the layover devices, but which reduced the arsonist's risk of being detected, which prosecution experts opined was likely a growing concern for the arsonist as the series of fires persisted.

Beyond the commonalities among the devices, prosecution experts testified there were additional indications that a single arsonist started all the charged fires. First, the arsonist tended to use the same type of incendiary devices for a string of fires (e.g., three remote device fires, then 10 layover device fires, and then four remote devices fires), whereas one prosecution expert testified he would have expected to see "a totally different device show up" in the same time frame if multiple arsonists were active in the area. Second, multiple fires were set on a single day, often near each other, making it more likely that it was the same arsonist because it is unlikely that two or more arsonists would randomly select the same time and place to start their fires. Third, the series of fires reflected an evolution toward more sophisticated selections of fuel and terrain likely to yield larger, more destructive fires. Fourth, the points of origin had similar roadside locations, often in sparsely populated areas. Fifth, the fires were in a small geographic area, with multiple fires having been started at the same general location on

separate occasions (e.g., the June 14 layover device and the Esperanza Fire both occurred in the same general area).[36]

Defendant argues that the June 16 loose matchstick fire, which interrupted the series of 10 layover device fires, undermines the prosecution's single arsonist and evolution theories. However, an arson investigator testified that the point of origin of the June 16 fire likely had been disturbed by wind conditions and fire suppression activity, which may have accounted for the absence of a layover device; prosecution experts opined the fire was consistent with the arsonist impulsively starting "a fire of opportunity"; the wooden match, which, to begin with, is uncommon in wildland arson fires, bore elemental similarities to the wooden matches used in three layover devices; and the prosecution presented substantial evidence apart from the similar manners of ignition of the charged fires to support the finding that a single arsonist started all of them.

Defendant also asserts that his own experts contradicted the prosecution's experts, whom defendant contends were biased by their "strong ties to the firefighting community in Riverside." However, "It is 'not the role of this court to redetermine the credibility of experts or to reweigh the relative strength of their conclusions.'" (*People v. Kirvin* (2014) 231 Cal.App.4th 1507, 1514; see *People v. Ramirez*, *supra*, 13 Cal.5th at p. 1118 ["' "We do not reweigh evidence or reevaluate a witness's credibility" '"].)

---

[36] Defense expert Smith acknowledged several of these factors — that the series of fires "happened within a relatively short time frame," in "a relatively small geographic area," with "a pretty small population base."

The record thus contains substantial evidence to support the finding that a single arsonist started all the charged fires.

Substantial evidence also supports the finding that defendant was that single arsonist. Defendant does not challenge the sufficiency of the evidence supporting his arson and incendiary device convictions arising from the June 9 and June 10 fires at which his DNA was recovered from the layover devices. Based on this DNA evidence and the uniqueness of the layover devices, defendant's trial counsel and expert conceded at trial that defendant was responsible for all 10 of the layover device fires.[37] By extension, the concession that defendant started 10 of the charged fires, coupled with the substantial evidence showing that a single arsonist started all the charged fires, constitutes substantial evidence that it was defendant who started all the charged fires. Additional specific evidence further supports this conclusion.

We begin with the additional evidence related to the charged fires leading up to the Esperanza Fire. Regarding the three May 16 remote device fires, defendant admitted to his fiancée Crystal that he wrapped something around a cigarette and matches — consistent with the remote devices recovered from the scenes of these fires — to start fires to frame and gain leverage over cousins with whom defendant was involved in a

---

[37] Additional evidence supports defendant's convictions on the layover device counts. As noted, eyewitnesses testified they saw a Taurus similar to defendant's near the scenes of the June 14 and June 28 layover device fires. Investigators found tire treads similar to defendant's at one of the June 14 layover device fires. And the June 3 layover device fire was near defendant's residence and employed a blue paper towel like those at defendant's workplace.

custody dispute.  The first of these fires was located within one mile of the cousins' residence and occurred around the time of a custody hearing.  Investigators also found rubber bands — a component of the remote devices — in a duffel bag at defendant's apartment.

As to the June 16 loose matchstick fire, the single wooden matchstick recovered from the point of origin was "similar in the morphological features as well as elemental composition" to the wooden matchsticks used in several of the layover devices. Investigators found wooden matchsticks in defendant's Taurus, near his belongings at his parents' residence, and wrapped in cellophane at Crystal's mother's residence (near the scene of the Orchard Fire).

Regarding the Orchard Fire, the jury heard testimony that defendant admitted to Crystal that he started the fire and that he admired it from a distance with binoculars.  Investigators found binoculars at defendant's apartment.

At the scene of the September 17 fire — ignited with a paper match remote device — investigators observed that the cigarette filter had been cleanly cut off, consistent with clipped cigarette filters recovered from defendant's workplace toolbox and described by his manager as defendant's common practice when borrowing non-Marlboro cigarettes.

As for the October 22 Mias Canyon Fire, defense counsel conceded in closing argument that this count had been "proven beyond a reasonable doubt" because hidden surveillance camera footage placed defendant in the area at the time of the fire and

"there's testimony he had been talking about setting a fire, that day."[38]

More generally, investigators found empty Marlboro cigarette packs and wooden and paper matches in defendant's Taurus. They also found a slingshot with apparent burn marks, consistent with prosecution testimony explaining that remote devices can be deployed from a car via slingshot. Defendant's possession of the toggle switch device and chapters of *The Anarchist Cookbook* pertaining to explosive devices, and his workplace access to blue paper towels like the one used in the first layover device, are consistent with the prosecution's theory that the arsonist experimented with incendiary devices and evolved in sophistication.

We turn now to the additional evidence supporting the jury's finding that defendant started the Esperanza Fire. First, defense expert Smith "conclusively" opined that the same person started the May 16 fires and the Esperanza Fire. Thus, the same evidence that supports the finding that defendant started the May 16 fires — his admission to Crystal that he used remote devices to start fires around the time and place of the May 16 fires — likewise supports the finding that he started the Esperanza Fire.

Second, just days before the Esperanza Fire, defendant had conversations with his sister and second cousin about setting a fire near the Esperanza Fire location as a diversion to free his sister's dog from the shelter. Although the dog was redeemed from the shelter on October 25 — the day before the

---

[38] Counsel went further, positing there "probably was a layover device that just burned up" at the scene.

Esperanza Fire — the jury could reasonably have concluded that defendant's diversion motive was merely pretext for starting a fire he intended to start anyway, or that he followed through on starting the contemplated fire even after the ostensible impetus for starting it had been resolved.

Third, although defendant's Taurus was immobilized with a flat tire and his other vehicle, the Malibu, was with Crystal at Walmart when the Esperanza Fire was started, defendant had access at that time to the Saturn vehicle that his sister Joanna borrowed from her friend Colete. Cell phone records for Colete's cell phone, which she left in her vehicle, show the phone was active before and after the Esperanza Fire, but inactive for about an hour surrounding the fire's estimated start. Additionally, because Joanna had never smoked in the Saturn when she borrowed it on previous occasions, the fact that there were cigarettes and ashes in its ashtray when she returned it to Colete supports the reasonable inference that someone other than Joanna had driven it that night. Notably, investigators found cigarette butts in the ashtray of defendant's Taurus. Moreover, the fact that Joanna left her home in the borrowed Saturn while wearing slippers supports the prosecution's theory that she stayed at defendant's apartment to watch his daughter while defendant drove the Saturn to the scene of the Esperanza Fire.[39]

---

[39] Although Joanna testified at trial that she was driving the Saturn around Banning and using Colete's cell phone looking to buy drugs when the Esperanza Fire started, she admitted she had neither mentioned this to detectives during any of her four interviews with them nor testified to it during the preliminary hearing. The jury was entitled to disregard her trial testimony

Fourth, a fuel truck delivery driver testified that he saw defendant around 2:30 a.m. on October 26 — about an hour and a half after the Esperanza Fire started — watching the fire from about one-half to three-quarters of a mile from its point of origin. Defendant made comments about the fire's behavior that gave the driver the impression that defendant had "some type of knowledge or training of what he was looking at." In that vein, evidence showed that defendant had begun training as a volunteer firefighter in 2000 and inquired again about volunteering in June or July 2006, and routinely monitored police scanners for fire activity.

Fifth, during an interview with a sheriff's detective, defendant initially said he was home all night the night of the Esperanza Fire, but later stated he left home around 1:00 a.m. in the Malibu to go to a casino. The jury could conclude this was demonstrably and intentionally false, as security camera footage and Crystal's testimony established that the Malibu was at Walmart when defendant claims to have driven it to the casino, and defendant did not appear in security camera footage from the casino locations he claimed to have been. Defendant also told a detective his favorite type of cigarette was Kool menthols, but ample evidence shows that defendant typically smoked Marlboro Red — the same type of cigarette used in at least six layover devices. The trial court properly instructed the jury that a knowingly false or misleading statement about a

_____

as not credible. (*People v. Mumin* (2023) 15 Cal.5th 176, 202 [" 'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge [in a court trial] or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends' "].)

95

charged crime may indicate the defendant's awareness of his guilt. (See CALCRIM No. 362.)

Similarly, Crystal admitted at trial that she lied to Jill about being home with defendant all night the night of the Esperanza Fire, when in fact she had been out from about 1:00 a.m. to nearly 3:00 a.m., with defendant leaving sometime around or after 3:30 a.m. following an argument.

More generally, as to all the charged fires, the prosecution introduced evidence showing they occurred outside of defendant's work hours and within a small radius of his home, his work, and the home of his fiancée's mother.

Defendant questions the credibility of several prosecution witnesses. For example, he asserts Crystal's statements to detectives were motivated by fears "of having her baby taken"; Joanna "was obviously trying . . . to help her brother"; and Jill was trying to get "a share of [a] $500,000 reward" offered for finding the Esperanza Fire arsonist. We do not reevaluate the jury's resolution of these quintessential credibility issues. (See *People v. Ramirez*, *supra*, 13 Cal.5th at p. 1118.)

Relatedly, defendant questions the accuracy of the fuel truck delivery driver's testimony, which defendant maintains is the only evidence placing him near the Esperanza Fire around 2:30 a.m. Defendant asserts the testimony is contradicted by the gas station cashier's testimony identifying himself as the person with whom the driver spoke, as well as cell tower data showing that Colete's borrowed cell phone, which the prosecution contended was in defendant's possession, was switching between cell towers, thus suggesting the phone was changing locations when the driver said he saw defendant at the gas station. Again, however, " 'Resolution of conflicts and

inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.] Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction.' " (*People v. Brown* (2014) 59 Cal.4th 86, 106.) Thus, it was the jury's role — not ours — to decide whether the driver's testimony or the cashier's testimony was more credible. In addition, the cell tower data does not render the driver's testimony " 'physically impossible or inherently improbable' " (*ibid.*) because a witness from the cell phone provider testified at trial that the data is not "a very reliable way" "to determine where the cell phone was physically" located because a variety of considerations unrelated to location factor into the determination of which cell tower a cell phone connects to.

In sum, substantial evidence supports defendant's convictions.

### ii. *Special circumstances*

Defendant also challenges the sufficiency of the evidence supporting the multiple-murder and arson-murder special-circumstance findings. His challenge to the multiple-murder finding is entirely derivative of his challenge to the sufficiency of the evidence supporting his murder convictions. He argues only that if the evidence is insufficient to support his murder convictions, then it is likewise insufficient to support the multiple-murder special circumstance. Because we find the evidence sufficient to support defendant's murder convictions, we also reject his derivative challenge to the multiple-murder special-circumstance finding.

Defendant's challenge to the arson-murder special-circumstance finding is more elaborate and implicates a related

claim of instructional error.  He argues that because his felony-murder conviction was premised on a violation of *subdivision (c)* of section 451 — arson of forest land — while the jury's felony-murder special-circumstance finding was premised on a violation of *subdivision (b)* of section 451 — arson of an inhabited structure — the evidence supporting his convictions was insufficient to support the special circumstance.

As defendant acknowledges, arson is a general intent crime.  (*People v. Atkins* (2001) 25 Cal.4th 76, 84.)  Because "arson requires only a general criminal intent," we have held that "the specific intent to set fire to or burn or cause to be burned the relevant structure or forest land is not an element of arson."  (*Ibid.*; *id.* at p. 86 ["The statute does not require an additional specific intent to burn a 'structure, forest land, or property,' but rather requires only an intent to do the act that causes the harm.  This interpretation is manifest from the fact that the statute is implicated if a person 'causes to be burned . . . any structure, forest land, or property' "]; *In re V.V.* (2011) 51 Cal.4th 1020, 1028–1029; *People v. Shiga* (2019) 34 Cal.App.5th 466, 481 ["Arson can be accomplished by indirectly causing a structure, forest land, or property to burn"].)

But while arson is a general intent crime, when a felony-murder conviction is predicated on arson, the People must prove that the defendant acted with the specific intent to commit arson.  (*People v. Brooks* (2017) 3 Cal.5th 1, 64 (*Brooks*); cf. *Jones*, *supra*, 29 Cal.4th at pp. 1256–1257 ["although rape itself is a general intent crime, the jury here was required to find that defendant had the specific intent to rape in order to find him guilty of first degree felony murder"].)  Defendant reasons, by extension, that the felony-murder *special circumstance* likewise requires proof of the defendant's specific intent to commit arson.

In this respect, defendant argues that the trial court erred by failing to instruct the jury that, to find the special-circumstance allegation true, the jury had to find that he "specifically intended that an inhabited structure be burned," and he further argues that the evidence at trial was insufficient to show such an intent.

We perceive no reason to address defendant's argument because even assuming that the trial court erroneously instructed the jury as to this special circumstance, or that the evidence failed to support the specific intent defendant contends was required, any error would be harmless in light of the remaining, valid multiple-murder special circumstance. (See *People v. Thomas* (2023) 14 Cal.5th 327, 381 [declining to address a claim of error as to the prior-murder special circumstance because "[t]he jury also found true the robbery-murder special circumstance, which . . . was supported by sufficient evidence and provides an independent basis to support defendant's guilt verdict and death judgment"].) Furthermore, because defendant's murder convictions and special-circumstance findings were all premised on the same underlying conduct, virtually all the same evidence would have been admitted at trial regardless of whether the felony-murder special circumstance had been alleged as well.[40] (See *People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1186 ["As the United States Supreme Court recognized in *Brown v. Sanders* (2006) 546 U.S. 212 . . . , the invalidation of a special circumstance does

---

[40] The only relevant difference in proof was the prosecution's additional evidence on the arson-murder special circumstance showing that an inhabited structure burned in the Esperanza Fire. This evidence was brief, and its absence surely would not have affected the outcome of defendant's trial.

not require reversal of the death sentence under California's statutory scheme if 'one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances' "]; *People v. Debose* (2014) 59 Cal.4th 177, 196 ["All of the facts and circumstances admissible to establish the [invalidated] arson-murder special circumstance 'were also properly adduced as aggravating facts bearing upon the "circumstances of the crime" sentencing factor. They were properly considered whether or not they bore upon the invalidated eligibility factor[]' "]; accord, *Thomas*, at p. 381.) Thus, even if the felony-murder special circumstance were improperly presented to the jury, defendant suffered no prejudice as a result.

We therefore conclude that defendant's substantial evidence and instructional error challenges to the arson-murder special-circumstance finding do not provide grounds for disturbing the judgment.

### 2. *Evidentiary rulings*

Defendant contends the trial court erred by admitting evidence of two items recovered during a search of his belongings (excerpts from *The Anarchist Cookbook* and the toggle switch device) and by allowing the forensic pathologist to testify regarding the condition of the victims' bodies. To the extent defendant has preserved these challenges for appeal, we reject them.

### a. *Items recovered during searches*

### i. *Background*

During the prosecution's case-in-chief, the defense objected that the toggle switch device recovered from defendant's apartment should be excluded under Evidence Code

section 352 because it bore no similarity to the incendiary devices at issue in the case and thus would "create[] a dark cloud over [defendant]." The prosecutor argued the device was probative of defendant's intent because "it looks exactly like a device from [*The Anarchist Cookbook*]" recovered from defendant's belongings and the prosecution would provide expert testimony that the device "would function as an ignition device." The trial court excluded evidence of the device during the prosecution's case-in-chief.

The next day, the prosecutor questioned a sheriff's detective about the excepts from *The Anarchist Cookbook* recovered from defendant's belongings. When asked to describe "just generally" the subject matter of those excerpts, defense counsel objected on hearsay grounds. The trial court overruled the objection, and the detective testified that the chapters addressed "[h]ow to make explosive and booby trap devices." He confirmed, however, that he did not recall seeing anything about incendiary devices constructed from matches, cigarettes, and rubber bands. The book excerpts were admitted in evidence.

A few weeks later, during a recess in the cross-examination of defense expert Smith, the trial court clarified that Smith's "unequivocal[]" opinion that the various incendiary devices used in the charged fires were not the work of a single arsonist conflicted with the prosecution's experts and opened the door for further inquiry regarding ignition devices. The prosecutor argued that the discovery of the toggle switch device in defendant's apartment "direct[ly] contradict[ed]" Smith's signature device theory and opened the door for use of the device in rebuttal. After the defense reiterated Smith's view that a serial arsonist will "always use the same device" even when switching between wildland and structure fires, the trial court

found that defendant's possession of the device "undermine[d] [Smith's] opinion." The court explained that while it had earlier agreed with the defense that the device was more prejudicial than probative, the court now saw "great merit in asking . . . an expert, what this device is and what it would be used for" because it would "go[] directly to the credibility of the expert."

As noted, Smith testified he considered the device a "contraption" incapable of doing anything, although he conceded it could start a fire if connected to a power source. The prosecution's hazardous device expert testified the device was "an improvised initiating system or incendiary device" that could start a structure fire.

### ii. *Analysis*

Defendant contends the trial court erred in admitting the excerpts from *The Anarchist Cookbook* and evidence about the toggle switch device because the evidence was irrelevant and unduly prejudicial, with the book excerpts also constituting improper character evidence under Evidence Code section 1101, subdivision (a).

We conclude that defendant forfeited his evidentiary challenges to the admissibility of evidence concerning *The Anarchist Cookbook*. " ' "[Q]uestions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal." ' " (*People v. Williams* (2008) 43 Cal.4th 584, 620 (*Williams*); see Evid. Code, § 353.) " 'The objection requirement is necessary in criminal cases because a "contrary rule would deprive the People of the opportunity to cure the defect at trial and would 'permit the defendant to gamble on an acquittal at his trial secure in the

knowledge that a conviction would be reversed on appeal.' " ' " (*Williams*, at p. 620.) Defendant raises relevance, undue prejudice, and improper character evidence challenges on appeal, but in the trial court he raised only a hearsay objection. This was insufficient to preserve the challenges defendant raises here; thus, he has forfeited them. (See *People v. Ervine* (2009) 47 Cal.4th 745, 777 (*Ervine*) [hearsay objection did not preserve undue prejudice challenge]; *People v. Pearson* (2013) 56 Cal.4th 393, 437–438 (*Pearson*) [hearsay objection did not preserve relevance challenge]; *People v. Camacho* (2022) 14 Cal.5th 77, 118–119 (*Camacho*) [hearsay and undue prejudice objections did not preserve improper character evidence challenge].)

Turning to the toggle switch device, we review the trial court's relevance and undue prejudice rulings for an abuse of discretion. (*People v. Doolin* (2009) 45 Cal.4th 390, 437.) The court found that evidence of the device related "directly to the credibility" of defense expert Smith's theory that serial arsonists always adhere to a single, signature incendiary device. Evidence regarding a witness's credibility is relevant. (See Evid. Code, §§ 210 [defining " '[r]elevant evidence' " to include "evidence relevant to the credibility of a witness"], 780 [identifying factors the jury may consider "in determining the credibility of a witness"]; *People v. Rodriguez* (1999) 20 Cal.4th 1, 9 ["the existence or nonexistence of any fact testified to by [a] witness" is "always relevant for impeachment purposes"].)

The trial court also found that evidence regarding the device had "great merit" under Evidence Code section 352 in proving the nature of the device and its potential use as an incendiary device. In light of the competing expert opinions on the central issue of whether arsonists adhere to a signature

device or experiment with different devices, the trial court acted within its discretion in finding this evidence's probative value was not substantially outweighed by the probable risk of undue prejudice.

### b. *Victims' conditions*

Defendant contends the trial court erred by allowing the forensic pathologist who conducted or reviewed the victims' autopsies to testify about their condition because the testimony was irrelevant and unduly prejudicial. We conclude defendant forfeited these challenges by failing to object on these grounds at trial.

### i. *Background*

Before the forensic pathologist testified during the guilt phase, defendant objected under Evidence Code section 352 to the People's proposed use of photographs from the victims' autopsies. Finding them to be "the worst photographs" it had seen, the trial court sustained the objection but indicated the autopsy photos could be introduced in the penalty phase. Defendant did not seek to exclude or limit testimony regarding the condition of the victims' bodies.

Joseph Cohen, the Chief Forensic Pathologist for Riverside County, testified as to the five victims' causes of death. Captain Loutzenhiser, who survived for about three hours after the burnover, had second- and third-degree burns on about 80 percent of his body and "severe inhalational injury" to his lungs "from the inhalation of superheated air" and soot. Loutzenhiser's body was in the "pugilistic stance" — "a boxer's stance" in which "the upper extremities are flexed at the elbow," the hands are clenched in fists, and the legs are flexed at the knee and ankles due to skin and muscle tightening in response

to heat. He also had signs of therapeutic interventions — a breathing tube and "at least two or more escharotomies" (incisions to relax swollen tissue). Dr. Cohen opined that Loutzenhiser died from "thermal burns with smoke inhalation."

Dr. Cohen described the condition of Jess McLean's body as "just horrific" — "[a]bout as bad as you can get, short of being cremated." McLean's "entire body was charred" with fourth-degree burns and the intensity of the fire caused his bones to fracture and his torso to expand and "pop[]," causing his internal organs to "c[o]me out." Dr. Cohen compared the charred state of McLean's body to a steak that has been forgotten about and left on the barbecue. McLean's cause of death was "total body thermal injury and inhalation of products of combustion," which caused his death "within a number of seconds of sustaining the injury."

Dr. Cohen testified that Daniel Hoover-Najera and Jason McKay likewise died from total body thermal injury and inhalation of products of combustion, "measured in a time interval of seconds from the receipt of injury to the time that their heart stopped." McLean, Hoover-Najera, and McKay were all so badly burned that their bodies — all in the pugilistic stance — were unidentifiable and had to be identified by comparison to their dental records.

Dr. Cohen testified that Pablo Cerda survived for five days after the burnover and exhibited signs of therapeutic interventions, including escharotomies. The condition of Cerda's body was "horrific" — it was swollen to almost twice its normal size and "over 90 percent of the body surface" was covered with "[m]ostly third-degree burns." Cerda's body was unrecognizable and "required dental comparison for

identification." While he was still alive, Cerda was conscious and communicative. Dr. Cohen opined that Cerda's cause of death was "complications of severe thermal burn injury to over 90 percent body surface measured in days from the time of injury to the time of death."

As to all the victims, Dr. Cohen determined that "[n]atural disease did not cause or contribute to the[ir] death."

Defense counsel neither objected during Dr. Cohen's direct examination nor cross-examined him.

ii. *Analysis*

We conclude that by failing to object at trial to Dr. Cohen's testimony *on any ground*, defendant failed to preserve any evidentiary challenges for appeal. (*Williams*, *supra*, 43 Cal.4th at p. 620; Evid. Code, § 353.) Absent an objection, the trial court was not obligated to limit Dr. Cohen's testimony. (*People v. Freeman* (1994) 8 Cal.4th 450, 490 ["The trial court . . . has no sua sponte duty to exclude evidence or to remedy misconduct"]; accord, *People v. Cain* (1995) 10 Cal.4th 1, 28 (*Cain*).) The fact that the trial court sustained defendant's objection to the autopsy photos suggests it would not have been futile for defendant to object to at least some of Dr. Cohen's testimony. (See *People v. Linton* (2013) 56 Cal.4th 1146, 1206 ["Nothing suggests an objection . . . would have been futile, given that defense counsel made other objections, some of which the trial court sustained"].) Thus, defendant has forfeited all evidentiary challenges to Dr. Cohen's testimony.

3. *Alleged charging and instructional error*

Defendant contends the information's formulation of the murder charges is defective because it alleges premeditated murder under section 187 rather than felony murder under

106

section 189. "[O]ur cases have long made clear that an accusatory pleading charging malice murder supports conviction of first degree murder on a felony-murder theory. Malice murder and felony murder are two forms of the single statutory offense of murder. Thus, a charge of murder not specifying the degree is sufficient to charge murder in any degree. The information also need not specify the theory of murder on which the prosecution relies at trial." (*People v. Contreras* (2013) 58 Cal.4th 123, 147; *People v. Jones* (2013) 57 Cal.4th 899, 968 ["To the extent defendant argues the information was faulty for mentioning section 187 and not section 189, we disagree"].) We decline to revisit our precedent, particularly in light of defendant's concession that, "[b]ased on discovery and the preliminary hearing, the defense knew from the beginning of the case that the prosecutor's only theory was felony murder."

Defendant also argues the trial court erred by referring to the murder counts as "murder by arson" in the jury instructions. Citing *Clark v. Brown* (9th Cir. 2006) 450 F.3d 898, defendant asserts that " '[m]urder by arson' is not a specific crime" and, instead, the phrase "is commonly used to refer to intentional murders that are committed by setting a fire." But *Clark v. Brown* never uses or defines the phrase "murder by arson." By contrast, consistent with the trial court's wording here, we have used the phrase "murder by arson" in the context of the felony-murder statute. (See *People v. Clark* (1990) 50 Cal.3d 583, 602, fn. 9 (*Clark*) ["Use of explosives to commit a murder was added as a category of first degree murder long after *murder by arson* was so categorized" by "[s]ection 189[, which] has provided since its adoption in 1862 that murder in the perpetration of arson is

murder of the first degree" (italics added)].)  Defendant has not shown error.

### 4. *Senate Bill 1437*

Following the completion of merits briefing in this case, defendant filed a supplemental brief arguing that we must reverse his murder convictions and grant him a new trial because these convictions are invalid under Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437).  We conclude defendant is not entitled to relief on appeal under this new legislation.

### a. *Legal background*

" 'Under the felony-murder doctrine as it existed at the time of [defendant's] trial, "when the defendant or an accomplice kill[ed] someone during the commission, or attempted commission, of an inherently dangerous felony," the defendant could be found guilty of the crime of murder, without any showing of "an intent to kill, or even implied malice, but merely an intent to commit the underlying felony." [Citation.]  Murders occurring during certain violent or serious felonies were of the first degree, while all others were of the second degree.' " (*People v. Wilson* (2023) 14 Cal.5th 839, 868 (*Wilson*).)

"In 2017," however, "the Legislature adopted a concurrent resolution declaring a need to reform the state's homicide law 'to more equitably sentence offenders in accordance with their involvement in the crime.' (Sen. Conc. Res. No. 48, Stats. 2017 (2017–2018 Reg. Sess.) res. ch. 175 . . . .)  The next year, the Legislature followed through with Senate Bill 1437." (*People v. Strong* (2022) 13 Cal.5th 698, 707 (*Strong*), citing Stats. 2018, ch. 1015, § 1, subd. (c).)  "Senate Bill 1437 'amend[ed] the felony murder rule and the natural and probable consequences

doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' (Stats. 2018, ch. 1015, § l, subd. (f).)" (*People v. Gentile* (2020) 10 Cal.5th 830, 842 (*Gentile*).)

As relevant here, "to amend the felony-murder rule, Senate Bill 1437 added section 189, subdivision (e): 'A participant in the perpetration or attempted perpetration of [qualifying felonies] in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (*Gentile, supra,* 10 Cal.5th at p. 842; see *Strong, supra,* 13 Cal.5th at pp. 707–708.) "This provision repurpose[d] preexisting law governing felony-murder special-circumstance findings . . . to define eligibility for sentencing relief." (*Strong,* at p. 703.)

"Senate Bill 1437 also created a procedural mechanism for those convicted of murder under prior law to seek retroactive relief. [Citations.] Under section 1172.6, the process begins with the filing of a petition declaring that '[t]he petitioner could not presently be convicted of murder or attempted murder because of changes to Section 188 or 189' made by Senate Bill 1437. (§ 1172.6, subd. (a)(3).) The trial court then reviews the petition to determine whether a prima facie showing has been made that the petitioner is entitled to relief. (*Id.*, subd. (c).) 'If

the petition and record in the case establish conclusively that the defendant is ineligible for relief, the trial court may dismiss the petition. (See § 1172.6, subd. (c); [*People v. Lewis* (2021) 11 Cal.5th 952,] 970–972. . . .)' [Citation.] Otherwise, the court must issue an order to show cause (§ 1172.6, subd. (c)) and hold an evidentiary hearing at which the prosecution bears the burden 'to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder' under the law as amended by Senate Bill 1437 (§ 1172.6, subd. (d)(3)). In addition to evidence admitted in the petitioner's prior trial, both '[t]he prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens.' (*Ibid.*) 'If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges.' (*Ibid.*)" (*Wilson, supra,* 14 Cal.5th at p. 869.)

We held in *Gentile* that the availability of this "specific mechanism for retroactive application of [Senate Bill 1437's] ameliorative provisions" (*Gentile, supra,* 10 Cal.5th at p. 853) reflected the Legislature's intent that that procedure be "the exclusive mechanism for retroactive relief and thus the ameliorative provisions of Senate Bill 1437 do not apply to nonfinal judgments on direct appeal" (*id.* at p. 839). A year later, the Legislature abrogated *Gentile*'s holding by expressly authorizing challenges on direct appeal. (See *Wilson, supra,* 14 Cal.5th at p. 869.) Accordingly, subdivision (g) of section 1172.6 provides: "A person convicted of murder, attempted murder, or manslaughter whose conviction is not final may challenge on direct appeal the validity of that conviction based

on the changes made to Sections 188 and 189 by Senate Bill 1437."

b. *Factual background and parties' positions*

The jury in defendant's case was instructed with a version of CALCRIM 540A used in felony murder cases where the defendant is alleged to have committed the fatal act. As modified for use at defendant's trial, this instruction required the People to prove beyond a reasonable doubt that "the defendant committed arson"; "the defendant intended to commit arson"; and "while committing an arson, the defendant did an act that caused the death of another person." The jury was further instructed that "[t]he defendant must have intended to commit the arson before or at the time of the act causing the death" and that "[i]t is not required that the person die immediately, as long as the act causing the death and the felony are part of one continuous transaction."

Defendant contends that the addition of subdivision (e) to section 189 added new elements to felony murder on which his jury was not instructed. Specifically, he maintains the jury should have been — but was not — instructed that it could find him guilty of murder "only if" it "is proven" that he was "the actual killer" (§ 189, subd. (e)(1)) or "a major participant in the underlying felony and acted with reckless indifference to human life" (*id.*, subd. (e)(3)). According to defendant, to be found guilty of first degree felony murder as an "actual killer," the jury had to find beyond a reasonable doubt that defendant "personally committed [an/the] act[s] that directly caused the death of another person." Furthermore, in defendant's view, this theory also requires an instruction, even in a sole-participant case such as this, that "[a]n act causes death if the death is the direct,

111

natural, and probable consequence of the act and the death would not have happened without the act. A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all the circumstances established by the evidence." Defendant also argues that the omitted element error he perceives is not subject to harmless error analysis, and if it is, the error cannot be regarded as harmless beyond a reasonable doubt.

The Attorney General counters that defendant's "claims fail because his jury received instructions that were correct at the time and remain correct today" inasmuch as, in his view, Senate Bill 1437 "made significant changes to murder liability but only to theories applicable to accomplices" and not to actual killers like defendant who "acted alone and [were] not charged or tried under any accomplice theory." Alternatively, the Attorney General contends the record shows that any error was harmless beyond a reasonable doubt. (See, e.g., *People v. Delgadillo* (2022) 14 Cal.5th 216, 233 [holding that the defendant was "not entitled to any relief under section 1172.6" because "the record here makes clear that [he] was the actual killer and the only participant in the killing" via drunk driving].)

c. *Analysis*

This case does not require us to resolve the statutory interpretation question that the parties have framed. We instead assume — without deciding — that the instructions given to the jury were deficient on the grounds identified by defendant. We conclude that this assumed error is susceptible

to harmless error analysis and any assumed error was harmless beyond a reasonable doubt.

"Not instructing on the[] elements of [a charged offense] is constitutional error. The trial court has a sua sponte duty to instruct the jury on the essential elements of the charged offense. [Citation.] It is, indeed, very serious constitutional error because it threatens the right to a jury trial that both the United States and California Constitutions guarantee. [Citations.] All criminal defendants have the right to 'a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt.' " (*People v. Merritt* (2017) 2 Cal.5th 819, 824 (*Merritt*).)

Omitted element error is generally subject to harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). (*Neder v. United States* (1999) 527 U.S. 1, 4 (*Neder*) [omission of materiality element of tax fraud was subject to *Chapman* analysis]; *Wilson*, *supra*, 14 Cal.5th at p. 871 [conducting harmless error analysis on retroactive alternative error theory]; *In re Lopez* (2023) 14 Cal.5th 562, 581; *People v. Aledamat* (2019) 8 Cal.5th 1, 9 (*Aledamat*) ["The same beyond a reasonable doubt standard applies to all such misdescriptions, including alternative-theory error"]; *Merritt*, *supra*, 2 Cal.5th at p. 831.)

Under this analysis, "[w]e must determine whether it is clear beyond a reasonable doubt that a rational jury would have rendered the same verdict absent the error" in omitting a necessary element of the offense. (*Merritt*, *supra*, 2 Cal.5th at p. 831.) " '[W]here a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict

would have been the same absent the error, the erroneous instruction is properly found to be harmless.' " (*Id.* at p. 832, quoting *Neder*, *supra*, 527 U.S. at p. 17; see *In re Lopez*, *supra*, 14 Cal.5th at p. 568 ["[m]isdescriptions (or omissions) of the elements . . . may be found harmless if it would be impossible, based on the evidence, for a jury to make the findings reflected in its verdict without also finding the missing fact as well"].) "This test is exacting, and it requires much of a reviewing court. '[S]afeguarding the jury guarantee will often require that a reviewing court conduct a thorough examination of the record. If, at the end of that examination, the court cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error — for example, where the defendant contested the omitted element and raised evidence sufficient to support a contrary finding — it should not find the error harmless.' " (*In re Lopez*, at p. 581, quoting *Neder*, at p. 19.)

In conducting this analysis, the reviewing court, " 'in typical appellate-court fashion, asks whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element. If the answer to that question is "no," holding the error harmless does not "reflec[t] a denigration of the constitutional rights involved." [Citation.] On the contrary, it "serve[s] a very useful purpose insofar as [it] block[s] setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial." ' " (*In re Lopez*, *supra*, 14 Cal.5th at p. 581; see *Aledamat*, *supra*, 8 Cal.5th at p. 15 ["The reviewing court examines what the jury necessarily did find and asks whether it would be impossible, on the evidence, for the jury to find *that* without *also* finding the missing fact as well"].) "The Attorney General bears

the burden of showing that the error was harmless beyond a reasonable doubt." (*In re Lopez*, at p. 585.)

*Merritt* is instructive. In that case, the trial court instructed the jury on the mental state required for robbery but failed to instruct the jury on the remaining elements of that offense. (*Merritt*, *supra*, 2 Cal.5th at pp. 822–823.) We held that this "obvious and serious error" (*id.* at p. 833) was nonetheless harmless under *Chapman* for multiple reasons. As relevant here, we noted that "[a]fter reviewing the elements, defense counsel, in an obvious attempt to maintain credibility with the jury and to focus its attention on the defense theory of the case — defendant was not the perpetrator — expressly conceded that the perpetrator, whoever he was, committed robbery." (*Id.* at p. 831; see *ibid.* [" 'One situation in which instructional error removing an element of the crime from the jury's consideration has been deemed harmless is where the defendant concedes or admits that element' "].) We found that the evidence "virtually forced this concession" — the charged offenses "were captured on tape that was played to the jury." (*Id.* at p. 832.) Thus, while "[t]he recordings were such that defendant could argue he was not the person in the recording, . . . they did not allow him to argue credibly that no robbery occurred." (*Ibid.*) The victims' testimony describing the charged robberies was also "unchallenged." (*Ibid.* ["the evidence that both robberies occurred was overwhelming and uncontroverted"].) Furthermore, we noted that "[t]he jury resolved the only contested issue in the prosecution's favor when it found defendant was the perpetrator. [Citation.] It also found that defendant acted with the mental state required for robbery and used a firearm during the commission of the offenses. No reasonable jury that made all of these findings could have failed

to find the remaining elements of robbery." (*Ibid.*; see *id.* at p. 829 ["The error here vitiated some of the jury's findings, but not all of them. . . . Perhaps crucially, it did not vitiate the finding on the only *contested* issue at trial: defendant's identity as the perpetrator"]; *id.* at p. 830 ["Defendant received a full and fair jury trial, with complete and correct instructions, on the question of identity, the only *contested* issue at trial. There was no total deprivation of a jury trial"].)

Defendant argues that this general approach toward ascertaining whether the omission of an element was harmless does not apply here. According to defendant, "except in cases . . . where the facts necessary to support the omitted instruction were uncontested at trial, conducting a harmless error analysis without permitting the defendant (and the prosecutor) to present readily available new evidence is unfair to both parties, violates the defendant's rights to due process and equal protection, and wastes scarce judicial resources." We perceive no unfairness or constitutional violation in applying harmless error analysis in this case. We have applied the *Chapman* standard to omitted element error in similar circumstances (see, e.g., *People v. Lamb* (2024) 16 Cal.5th 400, 448 [reviewing for harmlessness a failure to instruct the jury on the modified definition of a " 'pattern of criminal gang activity' "]; § 186.22, subd. (e)(1)), as amended by Assembly Bill No. 333 (2021–2022 Reg. Sess.)), and Courts of Appeal have applied harmless error review to claims of instructional error under Senate Bill 1437 that resembled the argument raised by defendant (*People v. Madrigal* (2023) 93 Cal.App.5th 219, 239; *People v. Birdsall* (2022) 77 Cal.App.5th 859, 867–869). This approach comports with our role as a reviewing court (see *Wilson*, *supra*, 14 Cal.5th at p. 872 ["Unlike trial court proceedings on section 1172.6

resentencing petitions, parties on appeal are generally prevented from presenting new evidence to support their positions"]) and our directive under the state Constitution to reverse a judgment only when we are "of the opinion that the error complained of has resulted in a miscarriage of justice" (Cal. Const., art. VI, § 13). If there is evidence that would provide a basis for postconviction relief, defendant may put that evidence forward and seek such relief in appropriate proceedings.

Applying harmless error analysis, we conclude that any assumed omitted element error was harmless under *Chapman*. Here, we focus upon the "actual killer" theory, as described by defendant. As noted, defendant argues that his jury should have been instructed that to convict under this theory, it had to find beyond a reasonable doubt that he was the "actual killer" who personally and directly caused the victims' deaths, and further instructed that "[a]n act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act," and "[a] natural and probable consequence" is "one that a reasonable person would know is likely to happen if nothing unusual intervenes." We conclude that any rational jury who convicted defendant of felony murder under the instructions provided at trial would still have convicted defendant after receiving these instructions.

The jury, through its verdict on the arson and murder counts and the arson-murder special circumstance, necessarily determined that defendant started the Esperanza Fire and personally committed an act that caused the death of the firefighters. Although defendant did not expressly concede that whoever started the Esperanza Fire killed the firefighters, the issue was effectively uncontested. The defense did not request

either the pattern jury instruction regarding general causation principles (CALCRIM No. 240) or optional causation language in the instruction pertaining to felony murder committed by a direct perpetrator (CALCRIM No. 540A). The defense case instead focused on the *identity* of the perpetrator of the Esperanza Fire. The defense advanced this theory by challenging the prosecution's single arsonist theory and by presenting an alibi defense.

The prosecution's evidence that the Esperanza Fire directly caused the firefighters' deaths was overwhelming and unchallenged. Arson investigators testified that the fire was intentionally set. Predictably, firefighters responded to the fire. The fire advanced rapidly toward the firefighters' position, pushed by Santa Ana winds the area had been experiencing and Red Flag conditions that had been forecasted the day before. The fire burned over the firefighters' position before they could deploy their emergency protective gear. And the medical examiner testified that the firefighters died from thermal injuries and that "[n]atural disease did not cause or contribute to the[ir] death." Defense counsel neither objected during the medical examiner's direct examination nor cross-examined him. On this record, we conclude beyond a reasonable doubt that any rational juror would have found, likewise beyond a reasonable doubt, that the victims' deaths were the direct, natural, and probable consequence of the act of intentionally setting the Esperanza Fire, and their deaths would not have happened without that act.

Both the prosecution and the defense requested only that the jury be instructed on a direct perpetrator theory of felony murder. At closing argument, the prosecutor expressly stated that defendant "killed" the firefighters. He argued that "[w]hile

committing arson, defendant did an act that caused the death of another," with that act being "the fire burning — overrunning and burning the fire fighters." The prosecutor further argued that "there has to be, according to the law, a link between the fire that Mr. Oyler set and the deaths of these five men. And there is. There is. It's obvious. The fire was one continuous fire. There was nothing. There was no break. There was no lightning strikes. There was nothing. You can go back to the source of the Esperanza fire and find the device, the incendiary device, left there by Ray Oyler, and it leads to the death of those men. Directly." In its closing statement, the defense did not dispute that the Esperanza Fire caused the firefighters' deaths. Defense counsel argued, "Oyler's fight is not against the evidence in this case. The evidence . . . has spoken. It's clear. . . . And there's a big, big fire that resulted in the deaths of five people." The defense instead concentrated on the identity of the perpetrator, arguing that someone else started the Esperanza Fire and some (but not all) of the other charged fires.

In short, defendant was tried and convicted under the theory that he personally committed an act that directly caused the victims' deaths. Defendant did not dispute this direct causal chain; he disputed only his identity as the initiator of it. And having carefully reviewed the record, we find nothing that might have inspired reasonable doubt in a rational jury deliberating whether defendant personally and directly caused the victims' deaths.

These circumstances distinguish this case from those defendant relies upon, even assuming they were correctly decided — a premise we express no view on at this time. (*People v. Vang* (2022) 82 Cal.App.5th 64, 80 [finding instructional errors prejudicial where the record of conviction showed the

kidnapping victim died after jumping "of her own volition" from the defendant's moving truck]; *People v. Lopez* (2022) 78 Cal.App.5th 1, 4, 15–19 [holding, in the context of a resentencing proceeding, that the record of conviction did not conclusively establish that the defendant was the "actual killer" of a robbery victim who was bludgeoned to death, where the defendant was one of two perpetrators of the robbery and there was no direct evidence that the defendant was the bludgeoner]; *People v. Garcia* (2020) 46 Cal.App.5th 123, 155 [finding instructional error prejudicial where the record of conviction showed that an accomplice who handed duct tape to another accomplice, who asphyxiated the victim by taping the victim's mouth closed, was not "the actual killer"].)

Because "[t]he jury resolved the only contested issue in the prosecution's favor when it found defendant was the perpetrator" (*Merritt*, *supra*, 2 Cal.5th at p. 832), we are convinced that any assumed instructional error was, on the record before us, harmless beyond a reasonable doubt.

## C. Penalty Phase Issues

### 1. *Lack of remorse*

Defendant contends the trial court violated his due process and fair trial rights by admitting in the penalty phase evidence regarding two uncharged fires to show he lacked remorse. We conclude this claim lacks merit.

#### a. *Background*

In October 2007 — over a year before jury selection began in the guilt phase — the prosecution filed its "Notice of Evidence to be Presented in Aggravation" if defendant were to be convicted. (See § 190.3.) The anticipated evidence included the "nature and circumstances of the offenses charged and the

impact and effects that the commission of the offenses has had on the victims' family, friends, and community in the instant prosecution and all acts perpetrated by the defendant in furtherance of said crimes, whether or not said acts resulted in a criminal conviction."

After the guilt phase, the court held a hearing in March 2009 to prepare for the penalty phase. At this hearing, the prosecutor stated that he intended to introduce evidence regarding two uncharged fires started after the Esperanza Fire on October 26. The evidence would respond to a pinpoint jury instruction he expected the defense would request regarding "remorse and lack of remorse by the defendant." The prosecutor referred to these uncharged fires as "Uncharged Act V"[41] — a fire started at Dump Road and Lambs Canyon at about 7:30 a.m. (about six hours after the Esperanza Fire started) — and "Uncharged Act W" — a fire started near the intersection of Avenida Altura Bella and International Park Road at "approximately 5:06 p.m." The prosecutor acknowledged he could not affirmatively "argue lack of remorse as an aggravating factor," but he maintained he could "present evidence of lack of remorse to counter any . . . mitigating evidence" purporting to show remorse. The prosecutor argued the uncharged fires showed defendant lacked remorse because he started them

---

[41] This nomenclature was derived from a motion in limine the prosecution filed before the guilt phase seeking to determine the admissibility of 23 uncharged fires that occurred between May 16 and October 26, 2006. The trial court excluded evidence as to all but two uncharged fires — the June 11 fire on Highway 243 near which defendant was seen driving his Taurus, and the June 18 fire near defendant's apartment — reasoning that "the prejudicial effect of all these uncharged [acts] would be potentially devastating."

when "[a]nybody in th[e] area would know" the Esperanza Fire was "already burning out of control," and "even more so," the second fire was started "after the news of the death of the five men [was] all over."

Defense counsel objected on the basis that the trial court had previously excluded the uncharged fires from the guilt phase. The defense also expressed concern that, because the fires were not charged, the jury could find them aggravating by a preponderance of evidence rather than beyond a reasonable doubt. The trial court responded that it appeared the evidence would be admissible under section 190.3 both as evidence of the circumstances of the crime under factor (a), and as evidence of additional crimes of violence under factor (b). The court also stated that it would require the jury to find beyond a reasonable doubt that defendant started the uncharged fires before the jury could consider them as factors in aggravation.

During the penalty phase, a CalFire battalion chief testified about his investigation of Uncharged Act V (the fire on the morning of October 26). He eliminated all possible causes other than vehicle and arson, though nothing suggested it was caused by a vehicle.

The prosecution introduced defendant's employment records, which showed that he clocked in to work at 7:52 a.m. on October 26. Defendant's manager testified that on that day, the television in the shop was on; the manager and "the other employees" were talking about the Esperanza Fire; and he heard employees talking about the death of the firefighters — it was "the talk of the town" and "the talk of [the] shop that day." Defendant clocked out at 4:30 p.m.

The prosecution called CalFire Chief Greg Everhart to testify about his investigation of Uncharged Act W, to which firefighters were dispatched at 5:01 p.m. on October 26. About five feet from the road, Everhart found the remains of a remote device constructed from a cigarette of undetermined brand, six paper matches oriented such that one abutted the cigarette filter, and some type of adhesive. Everhart considered the device similar to the one found at the September 16 fire at Cherry Valley Road and Roberts Road in Cherry Valley (counts 24 and 43). "[E]xtrapolating back from the dispatch time," and based on weather conditions and his experience with time delayed incendiary devices, Everhart "estimate[d]" that the fire "probably" started "between 4:45 and 4:50 [p.m.]"

Surveillance video from a gas station admitted during the guilt phase showed defendant leaving the station around 4:45 p.m. on October 26.[42] An investigator testified that it took him about seven and a half minutes to drive from the gas station to the scene of Uncharged Act W.

After the close of evidence, the trial court and counsel discussed jury instructions. Defense counsel stated he wanted "to make the equivalent of" a motion to acquit under section 1118.1 as to Uncharged Act V (the morning fire). In response, the prosecutor clarified that he did not intend "to bring up [Uncharged Act V] as a lack of remorse" and that he was "only

---

[42] Defendant asserts in a footnote in his opening brief that the surveillance footage "was improperly and deceitfully introduced in the guilt phase." He does not develop this argument or support it with citations to authority. We therefore deem it forfeited. (See *People v. Williams, supra,* 16 Cal.4th at p. 206 ["Points 'perfunctorily asserted without argument in support' are not properly raised"].)

going to talk about the fire after 5:00 [p.m.]" In terms of how to instruct the jury, the trial court and the prosecutor agreed that evidence of Uncharged Act W fell under factor (a) of section 190.3, relating to the circumstances of the crime of which defendant was convicted, but that the court would instruct the jury as if it fell under factor (b), relating to other violent crimes, because the jury had not yet found that defendant committed the uncharged act and this instruction would require that the jury first make such a finding beyond a reasonable doubt.[43] The trial court instructed the jury accordingly.[44]

In closing argument, the prosecutor argued that Uncharged Act W revealed defendant's murderous intent in starting the Esperanza Fire because it showed that he knowingly started another fire after he became aware that the Esperanza Fire had killed four firefighters (Cerda had not yet died). To dispel any confusion arising from the trial court's use of the instruction applicable to factor (b) of section 190.3, the prosecutor clarified that "[t]here was no evidence presented" regarding prior violent acts, but only as to the circumstances of the crime.

---

[43] For his part, defense counsel was "not sold that it comes in under [section 190.3, factor] (a)" because the uncharged act was "clearly not a crime of which he was convicted."

[44] The instruction refers only to Uncharged Act W. In light of this instruction and the prosecutor's abandonment of Uncharged Act V as evidence in aggravation, even assuming the trial court erred in admitting the minimal evidence as to Uncharged Act V, we find the admission of that evidence harmless beyond a reasonable doubt.

b. *Discussion*

Section 190.3 identifies several aggravating and mitigating factors that "the trier of fact shall take into account" when "determining the penalty" in a capital case. " 'Overt remorselessness [at the immediate scene of the crime] is a statutory sentencing factor . . . because factor (a) of . . . section 190.3 allows the sentencer to evaluate all aggravating and mitigating aspects of the capital crime itself. Moreover, there is nothing inherent in the issue of remorse which makes it mitigating only. The defendant's overt indifference or callousness toward his misdeed bears significantly on the moral decision whether a greater punishment, rather than a lesser, should be imposed. [Citation.] [¶] On the other hand, postcrime evidence of remorselessness does not fit within any statutory sentencing factor, and thus should not be urged as aggravating.' " (*People v. Rivera* (2019) 7 Cal.5th 306, 343.)

Before the prosecution can present evidence in aggravation, it must give "notice of the evidence to be introduced . . . within a reasonable period of time as determined by the court, prior to trial." (§ 190.3; see *People v. Tully* (2012) 54 Cal.4th 952, 1032; *People v. Mayfield* (1997) 14 Cal.4th 668, 798 (*Mayfield*).) "To be timely, the notice must be given 'before the cause is called to trial or as soon thereafter as the prosecution learns the evidence exists.' " (*Mayfield*, at p. 798, quoting § 190.3; see *Tully*, at p. 1032.) "To be sufficient as to content, the notice must afford the defendant ' "a reasonable opportunity to prepare a defense to the allegation[]." ' " (*Mayfield*, at p. 798.)

Preliminarily, defendant contends the prosecution failed to provide timely notice that it intended to introduce evidence of

125

the uncharged acts as evidence in aggravation on the issue of defendant's remorselessness. He maintains that the prosecution's October 2007 pretrial notice failed to sufficiently identify this evidence and that the prosecution's March 2009 notice before the penalty phase was untimely. However, although defendant objected at trial that the evidence was inadmissible as evidence in aggravation, he neither objected regarding a lack of timely notice nor sought a continuance to prepare to meet the prosecution's evidence. Accordingly, defendant forfeited his notice-based challenge on appeal. (*Clark*, *supra*, 50 Cal.3d at p. 626, fn. 34 ["If a defendant believes the notice given was not adequate he may object and seek a continuance for that purpose. The failure to object, however, waives any subsequent claim that the notice was not adequate"]; accord, *Mayfield*, *supra*, 14 Cal.4th at p. 798; *People v. Williams*, *supra*, 16 Cal.4th at pp. 241–242.)

Substantively, defendant contends evidence regarding Uncharged Act W was improperly admitted as evidence of remorselessness under factor (a) of section 190.3 because it did not occur " 'at the scene of the crime' " (*People v. Pollock* (2004) 32 Cal.4th 1153, 1184), but rather, about 16 hours after the Esperanza Fire was started. We have not construed this factor so narrowly. For example, in *People v. Edwards* (1991) 54 Cal.3d 787, we held that the trial court acted within its discretion in admitting under factor (a) "evidence that for five days after [a fatal] shooting, multijurisdictional law enforcement personnel conducted a massive but futile ground and air search for [the] defendant." (*Edwards*, at p. 831.) We reasoned that the evidence "was relevant for the jury to know that despite a major manhunt, [the] defendant had the presence of mind after the shooting to elude capture and slip out of the

area," which "suggest[ed] advance planning and, rather than remorse, a cool determination to avoid the consequences of his actions. It also tend[ed] to negate a possible defense claim that the shooting was a spur-of-the-moment affair by a momentarily deranged individual." (*Id.* at p. 832.)

Similarly, in *People v. Rodriguez* (2014) 58 Cal.4th 587, 652, we held that evidence that the defendant twice attempted to murder her husband before successfully doing so on the third attempt was "a proper aggravating circumstance" under factor (a) of section 190.3 because "her actions showing *overt* remorselessness at or near the time of [her] crime" showed that the eventual murder "was truly a remorseless murder." And in *Cain, supra,* 10 Cal.4th at page 77, we held that "evidence that [the] defendant, still bloody from the killings, returned to his friends and boasted of what he had just done," was properly admitted as factor (a) evidence because it supported a reasonable inference that the defendant's "attitude during the crimes was one of callousness towards the victims." (See *Cain,* at pp. 77–78 [evidence of a detective's question and the defendant's response about whether the defendant "felt sympathy for the victims when he saw them dead" — asked days after the crime — was properly admitted under factor (a) because the "question related to [the] defendant's emotions *during* the [crime], and [the] defendant's answer tended to show his attitude at that time"].)

Likewise, here, we conclude the trial court acted within its discretion in admitting evidence of Uncharged Act W as evidence in aggravation showing that defendant's remorselessness reflected his intent in starting the Esperanza Fire and, thus, constituted a circumstance of the charged crime under factor (a) of section 190.3. When the fire in Uncharged

Act W was started, the Esperanza Fire was still burning out of control and word of four firefighters' deaths was "the talk of the town." The jury could reasonably infer from defendant's action in starting another fire under these circumstances that he lacked remorse when he started the deadly Esperanza Fire nearby about 16 hours earlier. The jury could also reasonably infer that the new fire related to the circumstances of the Esperanza Fire in that the new fire may have diverted firefighting resources away from the Esperanza Fire — as the jury heard during the guilt phase had happened in connection with another fire in the early morning hours of October 26 — thus increasing the Esperanza Fire's potential for death and destruction.

Defendant contends the evidence is insufficient to show he started the fire in Uncharged Act W or that he was aware at that time that any firefighters had died. We are not persuaded. As discussed in connection with defendant's challenge to the sufficiency of evidence supporting his convictions, the totality of the evidence regarding the incendiary devices and circumstances of the charged fires likewise supports a reasonable inference that defendant used the similar incendiary device in Uncharged Act W.

Defendant maintains the timeline shows that he could not have started the uncharged fire because Chief Everhart testified that the fire started between 4:45 and 4:50 p.m., whereas security camera footage showed that defendant was at a gas station seven and a half minutes away at 4:45 p.m., thus establishing he could not have arrived at the scene of the fire until 4:52 p.m. — two minutes after the latest estimated time at which the fire ostensibly started. However, Chief Everhart made clear that he was merely "estimat[ing]" what time the fire

had "probably" started by "extrapolating" backward from the 5:01 p.m. dispatch.[45] The jury could reasonably have concluded that defendant arrived in time to have started the fire.

Nor are we persuaded by defendant's argument that his manager's testimony was insufficient to establish that defendant was aware that four firefighters had died in the Esperanza Fire before he started the fire in Uncharged Act W. The manager testified that the television in the shop was on all day and he and "the other employees," a description broad enough to include defendant, were discussing the Esperanza Fire and the firefighters' deaths. From this, the jury could reasonably infer that defendant was aware of "the talk of [the] shop that day."

## 2. *Admission of allegedly inflammatory evidence*

Defendant contends the trial court erred in admitting several categories of allegedly inflammatory evidence during the penalty phase: victim impact testimony from the victims' loved ones, testimony from the fire personnel who found the victims at the burnover site, and autopsy photos. To the extent defendant has preserved these challenges for appeal, we reject them.

### a. *Victim impact testimony*

As summarized above, 14 of the victims' survivors provided victim impact testimony during the penalty phase. (See pt. I.B.1.c., *ante*.) Defendant argues in his opening brief on

---

[45] Because it is undisputed that the dispatch call for this fire occurred at 5:01 p.m., we are unpersuaded by defendant's claim that the trial court erred by referring to this fire in the applicable jury instruction as an allegation of "arson at 5:01 p.m."

appeal that, "[b]y its volume and emotional content, the victim impact evidence . . . was 'so unduly prejudicial that it render[ed]' " his trial " 'fundamentally unfair' " in violation of his due process rights.**46**  In the trial court, however, defense counsel acknowledged that "the prosecution is allowed to present evidence of the impact of the offenses on victims' family members."  Counsel objected to the prosecution having three witnesses per victim as excessive, reasoning instead that "[o]ne or two . . . is more appropriate."  The trial court overruled the objection, explaining that because three witnesses would not be unreasonable in a single victim case, it did not become unreasonable simply because of "the [sheer] numbers of people who died here."

We conclude that the trial court's ruling allowing 14 victim impact witnesses "fell within permissible parameters." (*Pearson, supra,* 56 Cal.4th at p. 467; see, e.g., *ibid.* [upholding 13 witnesses for two victims]; *Suff, supra,* 58 Cal.4th at

---

**46**     Defendant retreats from this claim in his reply brief:  "To be clear, [defendant] did not argue and does not assert that the testimony of the family members was inflammatory.  With a very few exceptions, that testimony was both appropriate and unobjectionable."     Instead,  he  argues  that  "what  was inappropriate and objectionable was the way in which [the] prosecutor . . . presented an emotional flood of graphic and gruesome evidence of the discovery of the three dead and two dying fire fighters by their fellow fire fighters and autopsy photographs of each of the fire fighters to the jury in open court with  members  of  the  fire  fighters['] families present."     We address defendant's contentions in the manner he framed them in his opening brief rather than as he attempts to recast them in his reply brief.  (See *People v. Ng* (2022) 13 Cal.5th 448, 568, fn. 13 [arguments raised for the first time in a reply brief are forfeited].)

pp. 1073–1075 [upholding 16 witnesses for 12 victims, with some victims having two or three witnesses each, and others having only one].)  Further, despite the number of witnesses, their testimony — spanning only about 87 pages in the reporter's transcript — was neither voluminous nor unduly time-consuming.  (See, e.g., *People v. Spencer* (2018) 5 Cal.5th 642, 677 [upholding seven witnesses for one victim, "with testimonies spanning about 73 pages"].)

b. *Testimony from victims' colleagues*

As described above, four fire chiefs or captains testified during the penalty phase about the circumstances under which they and their crews found the victims.  (See pt. I.B.1.a., *ante.*)  Defendant now contends their testimony "was objectionable because it was cumulative," "not necessary to establish any circumstance of the crime that was not established by other evidence," and "was prejudicial because of the way in which [the] prosecutor . . . manipulated and exploited it to inflame the jury and justify seeking death."  But by failing to object to this testimony at trial on these — or any other — grounds, defendant has forfeited these challenges on appeal.  (See *Williams*, *supra*, 43 Cal.4th at p. 620; Evid. Code, § 353.)

In any event, we have repeatedly upheld the admission of evidence about the impact of a first responder's death on that victim's coworkers and community.  (See, e.g., *People v. Brady* (2010) 50 Cal.4th 547, 578 [upholding testimony by fellow law enforcement officers about the impact of their colleague being murdered in the line of duty]; *Ervine*, *supra*, 47 Cal.4th at p. 794 [holding that "the prosecutor's remark during closing argument that '[w]hat you have here is a case where the defendant has literally ripped apart the fabric of society in Lassen County in

particular' " was not only forfeited by a failure to object, but "was a fair comment on the evidence"].)

### c. *Autopsy photos*

At a hearing before the penalty phase, the prosecutor asked the court to "revisit the autopsy photos" it had excluded from the guilt phase. Defense counsel acknowledged the court had suggested during the guilt phase that the photos might be admissible in the penalty phase, but counsel objected that he was "not sure they're relevant, even in a penalty proceeding," because "[t]hey show the condition of the bodies" but "don't necessarily attest to suffering" experienced by the victims. The prosecutor responded that "the condition of the bod[ies] is relevant to how they died." The trial court found that the photos related to factor (a) of section 190.3 because they reflected "the consequence of the crimes of which the defendant was convicted in the guilt phase." The court reasoned that while it was "appropriate" to exclude the photos from the guilt phase under Evidence Code section 352, there is "very little 352 analysis to do in the penalty phase."

During the penalty phase, the prosecution recalled Dr. Cohen, who authenticated the autopsy photos and explained what they showed. Dr. Cohen's testimony spans about 10 pages in the reporter's transcript and lasted about 24 minutes. The defense asked him no questions, the prosecutor did not show the photos during his closing argument, and the jury did not request to see them during deliberations.

Defendant now contends the trial court erred by admitting the autopsy photos because they were unduly prejudicial and cumulative. At trial, however, defendant objected only on relevance grounds. Thus, he failed to preserve his undue

prejudice and cumulativeness challenges for appeal. (See *People v. Alexander* (2010) 49 Cal.4th 846, 905 [relevance objection was insufficient to preserve challenge that evidence was unduly prejudicial under Evid. Code, § 352].) By failing to raise an objection under Evidence Code section 352, defendant did not ask the trial court to engage in the balancing called for by that statute, exercised with the understanding that "the court's discretion under Evidence Code section 352 to exclude evidence showing circumstances of the crime 'is much narrower at the penalty phase than at the guilt phase . . . because the prosecution has the right to establish the circumstances of the crime, including its gruesome consequences ([Pen. Code,] § 190.3, factor (a)), and because the risk of an improper guilt finding based on visceral reactions is no longer present.' " (*Bell, supra,* 7 Cal.5th at pp. 105–106.)

Defendant's preserved relevance objection lacks merit. We have repeatedly held that photos of deceased victims are relevant during the penalty phase as evidence of the circumstances of the crime. (See *People v. Peoples* (2016) 62 Cal.4th 718, 748, citing § 190.3; *People v. Booker* (2011) 51 Cal.4th 141, 187 ["the photographs here graphically depicted the crime scene and the victims' wounds, and as such were relevant to the penalty determination as evidence of the circumstances of the crime"].) Defendant argues that the only relevant circumstances of the crime are those he intended, controlled, or reasonably foresaw, which he maintains are minimal under the prosecution's felony-murder theory. We have previously rejected similar contentions and defendant cites no persuasive reason to revisit our precedent. (See *People v. Romero and Self* (2015) 62 Cal.4th 1, 47–48 [rejecting the contention that "victim impact evidence should be limited to . . .

'consequences that were known or reasonably apparent to the defendant at the time he committed the crime' "]; see *People v. Trinh* (2014) 59 Cal.4th 216, 246 ["We have repeatedly rejected this limit as neither constitutionally nor statutorily warranted"].)

### D. Cumulative Error

Defendant contends that the cumulative effect of the asserted guilt and penalty phase errors requires us to reverse his convictions and death sentence. We have assumed error, but found no prejudice, regarding the trial court's instruction regarding the arson-murder special circumstance and related challenge to the sufficiency of the evidence supporting the finding on that special circumstance, and the admission of evidence in the penalty phase regarding Uncharged Act V. We conclude that the cumulative effect of these assumed errors does not warrant reversal. (See *Scully*, *supra*, 11 Cal.5th at p. 613.)

### E. Challenges to California's Death Penalty Scheme

Defendant raises a series of summary challenges to California's death penalty statute and this court's interpretation thereof. As defendant acknowledges, we have "consistently rejected" these arguments. We decline defendant's request to reconsider our prior precedent regarding the following holdings, and, accordingly, we reject all of defendant's challenges.[47]

"Section 190.2 provides a list of the special circumstances . . . [that] render a defendant eligible for the death penalty. These factors are not so numerous and broadly

---

[47] We assume for purposes of this decision that defendant has not forfeited any of these contentions.

interpreted that they fail to narrow the class of death-eligible first degree murders as required by the Eighth and Fourteenth Amendments." (*Schultz, supra,* 10 Cal.5th at p. 682.)

"Section 190.3, factor (a), which permits aggravation based on the circumstances of the crime, does not result in arbitrary and capricious imposition of the death penalty in violation of the Fifth, Sixth, Eighth or Fourteenth Amendments." (*People v. Ramirez, supra,* 13 Cal.5th at p. 1161.)

"Capital sentencing is 'an inherently moral and normative function, and not a factual one amenable to burden of proof calculations.' [Citation.] For this reason, California's death penalty scheme does not violate the Fifth, Sixth, Eighth and Fourteenth Amendments for failing to require written findings [citation]; unanimous findings as to the existence of aggravating factors or unadjudicated criminal activity [citation]; or findings beyond a reasonable doubt that aggravating factors exist, that aggravating factors outweigh mitigating factors, or that death is the appropriate penalty [citations]. These conclusions are not altered by *Apprendi v. New Jersey* (2000) 530 U.S. 466 . . . , *Ring v. Arizona* (2002) 536 U.S. 584 . . . , or *Hurst v. Florida* (2016) 577 U.S. 92 . . . ." (*People v. Ramirez, supra,* 13 Cal.5th at pp. 1160–1161, fn. omitted.)[48]

---

[48] In the omitted footnote, the *People v. Ramirez* court notes that although "California does require that section 190.3, factors (b) and (c) evidence [regarding other violent acts and prior felony convictions, respectively] be proved beyond a reasonable doubt," this is merely "an evidentiary rule" and "is not constitutionally mandated." (*People v. Ramirez, supra,* 13 Cal.5th at p. 1161, fn. 51.)

The trial court did "not impermissibly fail to inform the jurors regarding the . . . lack of need for unanimity as to mitigating circumstances." (*People v. Loy* (2011) 52 Cal.4th 46, 78.)

"The death penalty scheme does not violate equal protection principles 'by providing significantly fewer procedural protections for persons facing a death sentence than are afforded persons charged with noncapital crimes.' " (*People v. Bracamontes* (2022) 12 Cal.5th 977, 1006–1007 (*Bracamontes*).)

The jury was properly instructed that the ultimate question in the penalty phase of a capital case is whether death is the appropriate penalty. (See CALCRIM No. 766 ["Determine which penalty is appropriate and justified by considering all the evidence and the totality of any aggravating and mitigating circumstances"]; see *People v. McDaniel* (2021) 12 Cal.5th 97, 152 ["CALCRIM No. 766 . . . apprise[s] the jury of its sentencing discretion"]; *People v. Arias* (1996) 13 Cal.4th 92, 171 [reaching a similar conclusion regarding CALJIC No. 8.88].)

"Use of adjectives such as 'extreme' and 'substantial' in section 190.3, factors (d) and (g), respectively, does not create a constitutionally impermissible barrier to the jury's consideration of a defendant's mitigating evidence." (*People v. Johnson* (2016) 62 Cal.4th 600, 656.)

Instructing the jury that a death verdict is appropriate if the aggravating factors are " 'so substantial' " in comparison with the mitigating factors is not impermissibly broad or vague. (*Scully, supra,* 11 Cal.5th at p. 611.)

"There was no requirement that inapplicable sentencing factors be deleted." (*Bracamontes, supra,* 12 Cal.5th at p. 1006.)

The trial court was not required to "define which of the statutory factors could be aggravating and which were only mitigating." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 509; accord, *Bracamontes*, *supra*, 12 Cal.5th at p. 1006.)

"If the trial court instructs the jury that it can impose the death penalty only if it finds that aggravation outweighs mitigation, it need not also instruct the jury on the converse — that it must return a sentence of life without the possibility of parole if it finds that mitigation outweighs aggravation." (*People v. Johnson* (2019) 8 Cal.5th 475, 527–528, citing *People v. Duncan* (1991) 53 Cal.3d 955, 978; see CALCRIM No. 766 ["To return a judgment of death, each of you must be persuaded that the aggravating circumstances . . . outweigh the mitigating circumstances"].)

We have "unwavering[ly]" held that " 'sympathy for a defendant's family is not a matter that a capital jury can consider in mitigation, but that family members may offer testimony of the impact of an execution on them if by so doing they illuminate some positive quality of the defendant's background or character.' " (*Camacho*, *supra*, 14 Cal.5th at pp. 141, 142.)

" ' "[T]here is no requirement jurors be instructed there is a ' " 'presumption of life' " ' or that they should presume life imprisonment without the possibility of parole is the appropriate sentence." ' " (*People v. Tran* (2022) 13 Cal.5th 1169, 1236.)

"The penalty phase jury is not required to make written findings regarding its penalty choice, and the absence of such written findings does not preclude meaningful appellate review." (*Schultz*, *supra*, 10 Cal.5th at p. 684.)

" 'Comparative intercase proportionality review by the trial or appellate courts is not constitutionally required.' " (*Scully*, *supra*, 11 Cal.5th at p. 612, quoting *People v. Snow* (2003) 30 Cal.4th 43, 126.)

"California does not regularly use the death penalty as a form of punishment, and 'its imposition does not violate international norms of decency . . . .' " (*Brooks*, *supra*, 3 Cal.5th at p. 116.)

## III.   DISPOSITION

We affirm the judgment in its entirety.


**GUERRERO, C. J.**


**We Concur:**

**CORRIGAN, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**

PEOPLE v. OYLER

S173784

Concurring and Dissenting Opinion by Justice Evans

A criminal defendant has a constitutional right to be tried by an impartial jury drawn from a venire that has not been tilted in favor of capital punishment. (*Uttecht v. Brown* (2007) 551 U.S. 1, 9 (*Uttecht*); U.S. Const., 6th & 14th Amends.; see also Cal. Const., art. I, § 16.) "Long-standing United States Supreme Court precedent makes clear that prospective jurors may not be disqualified from service in a capital case solely because of their general objections to the death penalty." (*People v. Peterson* (2020) 10 Cal.5th 409, 427 (*Peterson*), citing *Witherspoon v. Illinois* (1968) 391 U.S. 510, 518–523 (*Witherspoon*); *Wainwright v. Witt* (1985) 469 U.S. 412, 424 (*Witt*).) Rather, such jurors are qualified to serve " 'so long as they clearly state that they are willing to temporarily set aside their own beliefs in deference to the rule of law.' " (*People v. Stewart* (2004) 33 Cal.4th 425, 446 (*Stewart*), quoting *Lockhart v. McCree* (1986) 476 U.S. 162, 176 (*Lockhart*).) "[I]f prospective jurors are barred from jury service because of their views about capital punishment on 'any broader basis' than inability to follow the law or abide by their oaths, the death sentence cannot be carried out." (*Adams v. Texas* (1980) 448 U.S. 38, 48 (*Adams*).) Here, prospective juror E.W. was removed from the jury because of her general views about the death penalty. Accordingly, the death judgment cannot stand. (*Gray v. Mississippi* (1987) 481 U.S. 648, 667–668 (*Gray*); *Peterson*, at p. 435.)

## I. QUESTIONING OF EXCUSED JUROR E.W.

The questioning of prospective jurors in this case involved both a written questionnaire and oral voir dire conducted by the trial court. Question 42 of the written questionnaire asked: "What are your GENERAL FEELINGS regarding the death penalty?" Prospective juror E.W. responded, "I feel that it is a necessary penalty to have. I feel that it should be reserved for those who are cruel [and] unusal [*sic*] with their crimes, especially serial killers, rapists [and] criminals [*sic*] against children." Question 43, subpart (a) asked whether the death penalty is used "too often" or "too seldom," and requested that jurors "[p]lease explain." E.W. responded, "No. Most people who get it sit for long periods of time and don't actually get executed. I feel in most cases it is a waste of time." In response to subparts (b) and (c), E.W. indicated she did not belong to any group that advocates for or against the death penalty and her views on the subject were not based on any religious consideration.

Question 44 provided a general explanation regarding the bifurcation of capital proceedings into separate guilt and penalty phases. It then posed a series of interrogatories based on *Witherspoon/Witt* that probed whether jurors' views "concerning capital punishments" would influence their decision-making process. In response to subparts (a) and (b), E.W. responded that she would not refuse to find the defendant guilty of first degree murder, or refuse to find the special circumstances true, to avoid reaching a penalty phase. In response to subpart (c), E.W. responded "no" when asked if she would "<u>automatically refuse</u> to vote in favor of the penalty of death and <u>automatically vote</u> for a penalty of life imprisonment without the possibility of parole, without considering any of the evidence of any of the aggravating and mitigating factors (to

which you will be instructed) regarding the facts of the crime and the background and character of the defendant." Subpart (f) asked, "Could you set aside your own personal feelings regarding what the law ought to be and follow the law as the court explains it to you?" E.W. responded, "Yes."

During voir dire, the trial court raised the issue of the death penalty, explaining it is within the district attorney's discretion to "file death or not if there is, in fact, a first degree murder and a special circumstance." The court explained, "[a]fter that, it is up to a jury" to "determine what the appropriate punishment is if . . . the special circumstance is found true." The court then asked, "Are you, by virtue of your answer . . . on [question] 42, locked into a certain punishment for crimes, and in this case, would you be locked into a certain position?" E.W. responded, "I don't know." She continued: "I've been struggling with, you know, while we were gone, thinking about that in particular. And not knowing what the special circumstances are, I think also . . . ." The court interrupted to remind her that the charged special circumstances were "arson that caused a death" and "multiple murders." The court stated, "We have to know your attitude, and everyone else's that sits on this jury, if we do get to [the penalty phase]. And my question to you is, are both options open to you, and real particularly, open to you if we were to get there?" In response to this question about her "attitude," E.W. replied, "No." The trial court continued, "Okay. You believe that you would favor one position over the other?" E.W. answered, "I honestly do, yes." At that, the trial court excused E.W. without asking whether she could set aside those views and follow the law or otherwise providing an opportunity for further questioning by the prosecution or defense.

3

## II.   LEGAL STANDARD

"[A] sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." (*Witherspoon*, *supra*, 391 U.S. at p. 522, fn. 21.)  "The [high] court explained the reason for this rule:  'A man who opposes the death penalty, no less than one who favors it, can make the discretionary judgment entrusted to him by the State and can thus obey the oath he takes as a juror.  But a jury from which all such men have been excluded cannot perform the task demanded of it,' namely, to 'express the conscience of the community on the ultimate question of life or death.' " (*Peterson*, *supra*, 10 Cal.5th at p. 429, quoting *Witherspoon*, at p. 519.)

"The law also recognizes, however, that states must have a way to ensure capital cases are tried before juries 'able to apply capital punishment within the framework state law prescribes.' " (*Peterson*, *supra*, 10 Cal.5th at p. 429, quoting *Uttecht*, *supra*, 551 U.S. at p. 9.)  Accordingly, a prospective juror's views about capital punishment will support an excusal for cause if those views would " 'prevent or substantially impair the performance of [their] duties as a juror in accordance with [the court's] instructions and [the juror's] oath.' " (*Witt, supra*, 469 U.S. at p. 424; see *People v. Leon* (2015) 61 Cal.4th 569, 591 (*Leon*).)  "Exclusion is proper if the prospective juror ' " 'is unable to conscientiously consider all of the sentencing alternatives, including the death penalty where appropriate.' [Citation.]" ' " (*Leon*, at p. 591, quoting *People v. Jenkins* (2000) 22 Cal.4th 900, 987.)

"Taken together, *Witherspoon* and *Witt* make clear that prospective jurors may not be disqualified from service simply because they object to the death penalty as a general matter." (*Peterson, supra,* 10 Cal.5th at p. 429.) "[T]hose who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law." (*Lockhart, supra,* 476 U.S. at p. 176.) The constitutional standard thus contemplates a "two-part inquiry." (*Leon, supra,* 61 Cal.4th at p. 592.) "It recognizes that a prospective juror may have strong feelings about capital punishment that would generally lead to an automatic vote, one way or the other, on that question. However, it also allows for the possibility that such a juror might be able to set aside those views and fairly consider both sentencing alternatives, as the law requires." (*Ibid.*) Both aspects of this inquiry, that which probes a juror's personal feelings regarding the death penalty and that which probes their willingness to set aside their own views and follow the law, are essential. (*Ibid.*)

Ultimately, " '[t]he critical issue is whether a life-leaning prospective juror — that is, one generally (but not invariably) favoring life in prison instead of the death penalty as an appropriate punishment — can set aside his or her personal views about capital punishment and follow the law as the trial judge instructs.' " (*Peterson, supra,* 10 Cal.5th at p. 430.) "If a juror can obey those instructions and determine whether death is appropriate based on a sincere consideration of aggravating and mitigating circumstances, the juror may not be excused for cause." (*Ibid.*) "This is the meaning of the guarantee of an impartial jury, drawn from the community at large, for the trial of a defendant facing the death penalty." (*Id.* at p. 434.)

### III. DISCUSSION

Because the propriety of an excusal for cause often turns on the specific questions posed to, and responses given by, a dismissed juror, comparison to existing authority may reveal only so much in the usual case. In this case, however, a careful review of *Leon* guides us — or ought to guide us — to the conclusion that the trial court erred in excusing E.W. for cause on the record presented. As discussed below in greater detail, the majority's attempt to avoid the holding of *Leon* (maj. opn., *ante*, at pp. 78–81), as well as our other precedent in this area, is unpersuasive.

In *Leon*, three dismissed jurors expressed general opposition to the death penalty in their written questionnaires, including such statements as, " 'I do not believe the death penalty is a humain [*sic*] punishment' " and, " 'I think we should not have a death penalty at all.' " (*Leon*, *supra*, 61 Cal.4th at p. 590.) In response to standard *Witherspoon*/*Witt* questions, the jurors all indicated that, if the case reached the penalty phase, they would automatically vote for life imprisonment without parole. (*Leon*, at p. 590.) In response to the next questions, which asked whether they would change their answers on automatic voting if instructed to set aside personal feelings and weigh aggravating and mitigating evidence before voting on penalty, the prospective jurors all answered " 'yes.' " (*Id.* at pp. 590–591.) During voir dire, the court "asked each panelist the first four *Witherspoon*/*Witt* questions from the questionnaire, with very little variation or elaboration." (*Id.* at p. 591.) The dismissed jurors repeated their prior answers, again stating they would automatically vote for life imprisonment without parole over death. (*Ibid.*) The court dismissed the jurors for cause.

We found the trial court's inquiry inadequate, explaining: "Before granting a challenge for cause, the 'court must have *sufficient information* regarding the prospective juror's state of mind to permit a *reliable* determination as to whether the juror's views would " 'prevent or substantially impair' " ' performance as a capital juror. [Citation.] Trial courts must therefore make 'a conscientious attempt to determine a prospective juror's views regarding capital punishment to ensure that any juror excused from jury service meets the constitutional standard' . . . . [Citations.] The cursory voir dire of the dismissed jurors here was simply not sufficient to permit an informed determination about their ability to serve. As noted, the court merely repeated the first four *Witherspoon/Witt* questions from the questionnaire. When the prospective jurors repeated their answers about automatically voting for life imprisonment without parole, the court excused them without exploring whether they were capable of setting aside this bias and imposing a verdict of death if the evidence of aggravating and mitigating factors required it. This was error. An adequate *Witherspoon/Witt* voir dire cannot simply reaffirm prospective jurors' biases without also asking whether they are capable of setting them aside and determining penalty in accordance with the law. Regardless of the jurors' personal views or inclinations, they were not disqualified from service unless they were incapable of setting aside these feelings and following the law. [Citations.]" (*Leon, supra*, 61 Cal.4th at pp. 592–593.)

The record supporting disqualification in the instant case is no more robust — and is, in fact, more deficient — than the record in *Leon*. As a threshold matter, prospective juror E.W.'s written questionnaire responses provided no basis to excuse her for cause. E.W. described capital punishment as "a necessary

penalty," while expressing the view that "it should be reserved" for certain types of offenders, "especially serial killers, rapists [and] criminals [*sic*] against children." The general proposition that the death penalty is appropriate for only certain types of offenses comports with the constitutional mandate that capital punishment be narrowly applied. (See *Roper v. Simmons* (2005) 543 U.S. 551, 568 [capital punishment "must be limited to those offenders who commit 'a narrow category of the most serious crimes' and whose extreme culpability makes them 'the most deserving of execution' "].) Because it comports with the law, voicing such a view is not disqualifying.[1] E.W. also expressed that the death penalty is used neither "too often" nor "too seldom." After expressing that the death penalty is used an appropriate amount, E.W. added that she felt it is often a waste of time because persons sentenced to death sit for a long time on death row and are not executed. Because the sentiment expressed has a basis in fact,[2] it likewise is not disqualifying.

---

[1] The types of offenses E.W. identified as justifying imposition of the death penalty did not mirror California's special circumstance statute (Pen. Code, § 190.2). They included certain offenses *not* lawfully punishable by death. (See *Kennedy v. Louisiana* (2008) 554 U.S. 407, 413 [rape of a child is not punishable by death]; *Coker v. Georgia* (1977) 433 U.S. 584, 592 [rape of an adult is not punishable by death].) It is apparent, however, that in identifying certain offenses she considered "especially" cruel and unusual, E.W. did not purport to provide an exhaustive or inflexible list of crimes for which, in her view, the death penalty might be appropriate.

[2] See Cal. Dept. of Corrections and Rehabilitation (CDCR), Condemned Inmate List (Apr. 30, 2025) [identifying 588 condemned inmates] <https://www.cdcr.ca.gov/capital-punishment/condemned-inmate-list-secure-request/> [as of Apr.

(See *People v. Martinez* (2009) 47 Cal.4th 399, 464 (conc. & dis. opn. of Moreno, J.) ["Nor did her view that minority defendants are disproportionately subject to the death penalty disqualify [the dismissed juror]. That view does have a basis in fact and is widely shared."].) In sum, although E.W.'s written questionnaire answers may have expressed mild opposition to the death penalty, such opposition was more moderated than that expressed by the erroneously dismissed jurors in *Leon*. E.W.'s answers did not reflect a concern that the death penalty is used too often or too broadly. Her only written critique of the death penalty concerned the state's failure to fully implement it. E.W. replied "no" to each of the four *Witherspoon/Witt* questions. Of particular note, unlike the jurors in *Leon*, E.W. stated she would *not* automatically vote in favor of life without parole. Finally, E.W. answered "yes" when asked whether she could set aside her own personal feelings and follow the law as given.

---

30, 2025]; all Internet citations in this opinion are archived by year, docket number and case name at <https://courts.ca.gov/opinions/cited-supreme-court-opinions>; CDCR, Inmates Executed 1978 to Present, California Executions Since 1978 [identifying 13 condemned inmates executed in California since 1978, along with date executed and time on death row] <https://www.cdcr.ca.gov/capital-punishment/inmates-executed-1978-to-present/> [as of Apr. 30, 2025]; CDCR, Condemned Inmates Who Have Died Since 1978 [identifying 195 condemned inmates who have died in custody since 1978, along with cause of death] <https://www.cdcr.ca.gov/capital-punishment/condemned-inmates-who-have-died-since-1978/> [as of Apr. 30, 2025]; see also Governor's Exec. Order No. N-09-19 (Mar. 13, 2019) [declaring a moratorium on executions in California] <https://www.gov.ca.gov/wp-content/uploads/2019/03/3.13.19-EO-N-09-19.pdf> [as of Apr. 30, 2025].

Turning to voir dire in the instant case, after explaining that it had to know E.W.'s "attitude" concerning the death penalty should the proceedings reach the penalty phase, the trial court asked E.W. only two questions: (1) "are both options open to you, and real particularly, open to you if we were to get there"; and (2) "[y]ou believe that you would favor one position over the other." These questions are no more probing than those asked and answered in *Leon*. The trial court's questions were, *at best*, merely an alternative articulation of question 44(c) from the written questionnaire, which asked whether she would automatically refuse to vote in favor of the penalty of death. Asking whether E.W. was "open" to both penalties was akin to (though more ambiguous than) asking whether she would automatically vote for one penalty over the other. (See *Leon*, *supra*, 61 Cal.4th at p. 593.) Thus, contrary to the majority's assertion otherwise (maj. opn., *ante*, at p. 79), there is no *meaningful* distinction between the questions posed in *Leon* and the questions posed in this case. Though worded differently, they are *functionally* equivalent. And E.W.'s responses to those questions were no more disqualifying. More critically, while arguing that the trial court here did not " 'simply reaffirm' a subset of questionnaire responses" (maj. opn., *ante*, at p. 79), the majority ignores the crux of the problem with the trial court's questioning in *Leon*: "the court did not inquire about the jurors' willingness to set aside their views and follow the law." (*Leon*, at p. 592.) That is precisely what occurred here. The court excused E.W. "without exploring whether [she was] capable of setting aside [her] bias and imposing a verdict of death if the evidence of aggravating and mitigating factors required it." (*Id.* at p. 593.) There was nothing about the trial court's questions or E.W.'s answers that absolved the court of its obligation to so

inquire during voir dire or that entitles the court's excusal to deference on appeal. (See *ibid.* [trial court's conclusions were "not entitled to deference" where the court's "limited oral voir dire" did not inquire about the jurors' ability to set aside their biases and follow the law].)

In response to yes/no questions, E.W. indicated she was not "open" to both sentencing options and "favored" one over the other. The majority characterizes these responses as "unequivocal." (Maj. opn., *ante*, at p. 81.) I disagree. The sentiment that E.W. was not "open" to both penalties and "favored" one over the other is not "unequivocal" in its rejection of the death penalty. True, E.W. did not elaborate when providing answers. She provided simple "yes" or "no" responses. Yet the *substance* of her answers, given the questions posed, did not foreclose consideration of the death penalty. (See *Stewart*, *supra*, 33 Cal.4th at p. 447 [a juror might answer "yes" to the question posed, which asked whether they would find it very difficult to vote to impose the death penalty, and still be qualified to serve]; cf. *People v. Capistrano* (2014) 59 Cal.4th 830, 856–857 (*Capistrano*) [a juror's decision to answer "yes" to the question posed, which asked whether "*regardless of the evidence*, they would be unwilling or unable to impose the death penalty," was disqualifying because the question was "phrased unequivocally"], overruled on another ground by *People v. Hardy* (2018) 5 Cal.5th 56.) Indeed, the answers given in *Leon* were just as unqualified. The erroneously dismissed jurors in that case stated, without condition, that they would automatically vote in favor of life without the possibility of parole. (*Leon*, *supra*, 61 Cal.4th at p. 591 [jurors responded "yes" to question].) We nonetheless found the trial court's questioning inadequate because, as in the instant case, it did not include sufficient

follow-up to determine whether the jurors' responses foreclosed consideration of the death penalty in accordance with the jury instructions that would be given and their oaths as jurors.

A juror whose personal opposition to the death penalty may "predispose" him to vote for life without parole "may not be excluded, unless that predilection would actually preclude him from engaging in the weighing process and returning a capital verdict." (*People v. Kaurish* (1990) 52 Cal.3d 648, 699.) Even if we construe E.W.'s answers that she was not "open" to both sentencing options and "favored" one penalty over the other as approximating a statement that she would automatically vote for life imprisonment, it was insufficient to disqualify E.W. without inquiry into whether she was capable of "setting [her bias] aside and determining penalty in accordance with the law." (*Leon*, *supra*, 61 Cal.4th at p. 593.) Particularly when her questionnaire answers affirmed she could do just that. (*Ibid.*)

The above holding is not confined to *Leon*. (*Leon*, *supra*, 61 Cal.4th at p. 593.) Time and again, this Court has held that the "critical" *Witherspoon/Witt* inquiry is whether a juror can set aside their views and follow the law. (*Peterson*, *supra*, 10 Cal.5th at p. 430.) "The critical issue is whether a life-leaning prospective juror — that is, one generally (but not invariably) favoring life in prison instead of the death penalty as an appropriate punishment — can set aside his or her personal views about capital punishment and follow the law as the trial judge instructs." (*Ibid.*; *People v. Jones* (2017) 3 Cal.5th 583, 614 (*Jones*) [same]; *People v. Thompson* (2016) 1 Cal.5th 1043, 1065 [same].) "The law is clear that a capital jury may include those who, as an abstract matter, oppose — or even strongly oppose — the death penalty . . . . Eligibility for service does not depend on a juror's abstract views of capital punishment. It depends,

instead, on the prospective juror's willingness and ability to follow a court's instructions and conscientiously consider both penalties in light of the evidence presented by each side. *This* is the meaning of the guarantee of an impartial jury, drawn from the community at large, for the trial of a defendant facing the death penalty." (*Peterson*, at p. 434, italics added.)

Nothing in E.W.'s responses established that she "would have been unable to follow the law and impose the death penalty if circumstances warranted, *which is the only relevant question under high court precedent.*" (*Peterson, supra*, 10 Cal.5th at p. 434, italics added.) The reason for that is simple — because she was not asked. "Although [E.W.'s] answers to [the trial court's] question[s] could well have prompted further inquiry during voir dire, these answers alone offered little insight into the *controlling* issue for purposes of [her] qualification to serve as [a juror] — whether [she], whatever [her] general views on the death penalty might be, could accept and follow the court's instructions and be able to choose either life or death based on a sincere consideration of any aggravating or mitigating circumstances." (*Id.* at p. 430, italics added.) In her written questionnaire, E.W. stated she could set aside her personal views and follow the law as instructed. She was not asked the question again during voir dire. That answer — and her answers as a whole — thus required further inquiry before the court could disqualify her to serve as a capital juror. (*Id.* at p. 430, citing *Leon, supra*, 61 Cal.4th at pp. 592–593.)

To be sure, even if it is "the better practice" to do so, a court that conducts adequate voir dire need not ask in precise terms whether a juror can set aside their biases and follow the law. (*Jones, supra*, 3 Cal.5th at p. 615 [holding substantial evidence supported the trial court's excusal of a juror who was able to vote

for death only if the case "fit [his] criteria," which consisted of a single narrow hypothetical not applicable to the facts of the case being tried].)  But a trial court nonetheless must ask questions and elicit answers probing that ultimate issue.  For example, in *People v. Schultz* (2020) 10 Cal.5th 623 (*Schultz*), on which the majority relies (maj. opn., *ante*, at pp. 81–82), the dismissed juror stated, "I know that I can't put someone to death." (*Schultz*, at p. 653.)  The trial court followed up:  "So you're saying that *regardless of the evidence* and *regardless of the weighing in aggravation and mitigation* in the penalty phase, because of certain principles you hold, you could *never* impose the death penalty.  Is that what you're saying?" (*Ibid.*, italics added.)  The juror responded in the affirmative. (*Ibid.*)  We held *Schultz* was "distinguishable from *Leon* given [the juror's] clear and unambiguous statements during voir dire regarding her inability to impose the death penalty." (*Ibid.*)  "If a prospective juror states unequivocally that he or she would be unable to impose the death penalty *regardless of the evidence*, the prospective juror is, by definition, someone whose views 'would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." ' " (*Capistrano*, *supra*, 59 Cal.4th at p. 859, italics added.)  E.W. made no such statement during voir dire.  And her questionnaire responses indicated an ability and willingness to "set aside [her] personal feelings" and "follow the law as the court explains it" in order to select a penalty.

The majority attempts to distinguish this case on the ground that there was an "evolution" in E.W.'s views from her questionnaire responses to her responses on voir dire. (Maj. opn., *ante*, at p. 82.)  I fail to see how, as compared to the written and verbal responses given in *Leon*, E.W.'s *less* problematic

14

written responses, followed by *equally* (*or less*) problematic voir dire responses, could be sufficient to disqualify her, though the jurors in *Leon* were not disqualified. Non-disqualifying written responses cannot combine with non-disqualifying verbal responses to somehow render E.W. not qualified to serve as a capital juror. In suggesting otherwise, the majority again ignores a critical aspect of our precedent.

We have allowed that a juror's views on the death penalty may evolve or crystalize during voir dire such that a juror may be disqualified from service despite earlier statements indicating, in the abstract, a willingness to set aside their personal views and follow the law. (See *Schultz, supra*, 10 Cal.5th at p. 653; *People v. Winbush* (2017) 2 Cal.5th 402, 428 (*Winbush*).) Critically, however, the responses given during voir dire in those cases were "unequivocal and unambiguous" in precluding consideration of the death penalty, and thus "effectively repudiated" earlier expressions of a willingness to follow the law. (*Schultz*, at p. 653 [the dismissed juror stated she could "never" impose the death penalty "regardless of the evidence" or the "weighing in aggravation and mitigation"].) In *Winbush*, for example, much as in *Schultz*, the dismissed juror was asked if she could "simply wait to hear" the aggravating and mitigating evidence at the penalty phase and, "if the aggravating evidence was appropriate, consider possibly returning a verdict of death." (*Winbush*, at p. 432.) The juror replied that "she could not live with her conscience if she sent anyone to death." (*Ibid.*) The record thus supported the implied finding that the juror "could not vote for death under any circumstances." (*Ibid.*)

In other words, although a juror may initially state that they can set aside their views and follow the law, it may become

15

clear upon further questioning that they cannot.  The issue in
the instant case, however, is that the trial court's questioning
was insufficient to demonstrate that E.W. was incapable of
following the law.  The majority asserts that, "[e]ven without
additional follow-up questions," the trial court could have
formed that impression based on the evolution in E.W.'s views,
"as articulated in unequivocal terms by E.W." during voir dire.
(Maj. opn., *ante*, at pp. 80–81.)  The majority, however, does not
identify those aspects of the trial court's questioning, or E.W.'s
responses, that might support this conclusion.  As stated above,
the trial court did not ask E.W. whether she could set aside her
personal views and follow the law as instructed.  Nor did it ask
whether E.W. would vote in favor of life without parole
*regardless of the evidence* in aggravation and mitigation, or
whether her views regarding the death penalty were so strong
that she would be unwilling to vote for death *in any
circumstance*.  Though there are many forms the inquiry might
have taken, none were employed in this case.[3]

In short, E.W.'s views well may have crystalized during
voir dire.  But what were those views?  The majority reads much

---

[3]    Though we acknowledge as much, the majority observes
that a capital juror's "inability [to serve] may be established in
various ways."  (Maj. opn., *ante*, at p. 83.)  The majority adds
that "there is no required script that must be followed during
voir dire."  (*Ibid.*)  Perhaps there should be, as the majority's
opinion today leaves lower courts and litigants to guess at
whether functionally equivalent questioning will be deemed
sufficient (*id.* at pp. 72–83) or insufficient (*Leon, supra*, 61
Cal.4th at pp. 590–593), with the considerable time, expense,
and anguish of a capital penalty trial hanging in the balance.
(See *Peterson, supra*, 10 Cal.5th at p. 436, citing *People v. Heard*
(2003) 31 Cal.4th 946, 968.)

into E.W.'s reflections — left incomplete because they were interrupted by the trial court — that she had "been struggling with" and "thinking about" whether she would be locked into a certain position when it came to punishment. (See maj. opn., *ante*, at p. 79.) E.W.'s initial response to that inquiry was, "I don't know." This suggests E.W. was not necessarily "locked into" a position. Moreover, even if E.W.'s *personal views* regarding the death penalty had crystalized, that in no way absolved the trial court of inquiring whether her personal views might give way to the law. The majority contends that, in assessing E.W.'s answers, the trial court could have considered the "detailed explanation within the jury questionnaire of jurors' responsibilities at any penalty phase, including the weighing process that jurors would have to undertake." (*Id.* at p. 80, fn. 27.)[4] But E.W. is a lay juror. And, as the majority notes, a week had passed since E.W. completed the written

---

[4] The written questionnaire in *Leon* provided the same explanation regarding the penalty phase process. (*Leon, supra*, 61 Cal.4th at pp. 586, 591 & fn. 10.) This did not alter the import of the jurors' subsequent responses during voir dire, which reaffirmed their predisposition to automatically refuse to vote for the death penalty without comment on their willingness to set aside that view and follow the law. The majority also notes that the trial court in this case identified the charged special circumstances. (Maj. opn., *ante*, at pp. 79–80.) At the risk of sounding like a broken record, the court in *Leon* also identified the special circumstances charged in that case. (*Leon*, at p. 587 ["Having been told the case involved multiple murders committed in the course of robberies, jurors would logically have reflected on their predisposition to vote for life imprisonment without parole, or death, in the context of this case."].) Yet the jurors' knowledge of the special circumstances charged did not tell us whether they were willing to set aside their views on the death penalty in such a case and follow the law as instructed.

questionnaire. (*Id.* at p. 77.) In conducting voir dire, the trial court did not explain the penalty phase process to E.W. Instead, the court began its questioning by telling E.W. that, once the district attorney exercises its charging discretion, "it is up to a jury" to determine the "appropriate punishment." Without further guidance on how that decision would be made, the trial court asked E.W. about her "attitude" regarding the death penalty. A lay juror thus would have understood that the trial court was asking about her personal views. It is a stretch of the imagination to suggest that E.W. understood the court's questioning to ask whether she would be able to set aside her personal views and follow the law as instructed. At bottom, E.W.'s statements that "no" she was not open to both sentencing options and "yes" she favored one penalty over the other did not provide sufficient information to determine whether she was qualified to serve. The statements could have indicated that E.W. was not open to the death penalty at all. Or that she was open to the death penalty in some cases but not this one, or open to the death penalty in theory but did not think herself capable of imposing it. Her answers to the questions posed could have expressed her personal opposition to the death penalty without consideration of what the law requires or her ability to follow the law and obey her oath as a juror in this case if asked to do so. The majority reads the last option out of E.W.'s statements without any basis in the record for doing so. It opines that the trial court could have assigned such a meaning to E.W.'s answers without conducting follow-up questioning designed to illuminate the very issue on which a constitutionally proper excusal turns.

This leads to the last failure in the majority's reasoning. The majority opines that "[t]he trial court — which had the benefit of witnessing E.W.'s demeanor, which we do not — could have reasonably determined . . . that E.W. '[was] unable to conscientiously consider all of the sentencing alternatives, including the death penalty where appropriate.' [Citations.]" (Maj. opn., *ante*, at p. 77.) "Typically, the trial court's determination as to a prospective juror's true state of mind is entitled to deference on appeal." (*Leon, supra*, 61 Cal.4th at p. 593.) "We have recognized that '[t]he trial court is in the unique position of assessing demeanor, tone, and credibility firsthand — factors of "critical importance in assessing the attitude and qualifications of potential jurors." '" (*Ibid.*) This deference is not appropriate, however, when the trial court fails to make an adequate inquiry. (*Ibid.*) Though the court below conducted limited oral voir dire, it was inadequate because the court did not inquire about E.W.'s ability to set aside her biases and follow the law despite her written responses expressing a willingness to do so. (*Ibid.*) Nor does the record disclose any other basis for a finding of incapacity (*ibid.*), e.g., questions designed to illuminate whether E.W. would vote for life without parole *in every case* or would do so *in this case regardless of the evidence in aggravation.* "Under these circumstances, [the trial court's] conclusions are not entitled to deference." (*Id.* at p. 593.)

We may properly defer to a trial court's decision to credit one response over another based on the juror's demeanor, tone, and credibility. (*Winbush, supra*, 2 Cal.5th at p. 429.) But the trial court cannot assess a juror's demeanor, tone, and credibility in giving answers to questions that were not posed. A court's mere assumptions about a juror's views are not entitled to deference. In suggesting that we defer to the trial

court's inadequate findings in this case, the majority risks eroding the constitutional standard for excusal set forth in *Witherspoon* and *Witt* by making it all but unenforceable. (See *Peterson*, *supra*, 10 Cal.5th at p. 433 ["The exclusion of prospective jurors as impaired, in the absence of a record demonstrating they were impaired, is a violation of the Sixth Amendment right to an impartial jury."].) Giving deference to a record devoid of the critical inquiry based on soft variables such as the plainness of the juror's responses or the enthusiasm with which they are given would eliminate any meaningful appellate review. In sum, although further questioning *might* have shown E.W. to be disqualified as a juror in this case, the questioning here was plainly inadequate for that purpose. (*Leon*, *supra*, 61 Cal.4th at p. 593.) As a result, E.W. was improperly excused for cause on a basis broader than her inability to follow the law or abide by her oath. (*Adams*, *supra*, 448 U.S. at p. 48.)

"Under binding United States Supreme Court precedent, error in excusing a prospective juror for cause based on the juror's views about the death penalty requires *automatic* reversal of the penalty verdict." (*Leon*, *supra*, 61 Cal.4th at p. 593, citing *Gray* 481 U.S. at pp. 667–668; see *People v. Riccardi* (2012) 54 Cal.4th 758, 783.)[5] Accordingly, I join the portions of today's opinion affirming Oyler's convictions, but for the reasons above, would vacate the judgment of death and

---

[5] Defense counsel did not object to E.W.'s excusal for cause. Defendant's claim is not forfeited, however, because the trial occurred prior to *People v. McKinnon* (2011) 52 Cal.4th 610, 636, wherein we held that counsel would *prospectively* be required to make a timely objection to preserve *Witherspoon*/*Witt* claims for appeal. (*Schultz*, *supra*, 10 Cal.5th at p. 652, fn. 6.)

permit the People another opportunity to seek the death penalty before a properly selected jury.


**EVANS, J.**


**I Concur:**
**LIU, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Oyler

_____

**Procedural Posture** (see XX below)
**Original Appeal** XX
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**


_____

**Opinion No.** S173784
**Date Filed:**  May 5, 2025

_____

**Court:**  Superior
**County:**  Riverside
**Judge:**  W. Charles Morgan

_____

**Counsel:**

Michael W. Clough, under appointment by the Supreme Court, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Gerald A. Engler and Lance E. Winters, Chief Assistant Attorneys General, Julie L. Garland and James William Bilderback II, Assistant Attorneys General, Holly D. Wilkens, Robin Urbanski and Meredith S. White, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Michael W. Clough
Attorney at Law
6114 Lasalle Avenue #833
Oakland, CA 94611
(650) 274-7764

Meredith S. White
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA 92101
(619) 738-9069